Daniel C. Stewart, SBT #19206500
Paul E. Heath, SBT #09355050
Courtney S. Lauer, SBT #24043771
Michaela C. Crocker, SBT #24031985
**VINSON & ELKINS L.L.P.**
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Tel:  214.220.7960
Fax: 214.999.7960
IES@velaw.com

**ATTORNEYS FOR THE DEBTORS**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE:

|  |  |  |
|---|---|---|
| | § | |
| INTEGRATED ELECTRICAL SERVICES, | § | CASE NO. 06-30602-BJH-11 |
| INC., ET AL., | § | Chapter 11 |
| | § | |
| DEBTORS. | § | (JOINTLY ADMINISTERED) |

**SECOND AMENDED DISCLOSURE STATEMENT
FOR THE SECOND AMENDED JOINT PLAN OF REORGANIZATION
OF INTEGRATED ELECTRICAL SERVICES, INC.
AND CERTAIN OF ITS DIRECT AND INDIRECT SUBSIDIARIES
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE
(Dated:  March 17, 2006)**

**DISCLAIMER**

ALL HOLDERS OF ELIGIBLE CLAIMS AND ELIGIBLE EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ALL SUMMARIES OF THE PLAN AND OTHER STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN, AND THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE INDICATED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN DESCRIBED HEREIN HAS BEEN FILED WITH OR REVIEWED BY, AND THE NEW SECURITIES (AND NEW NOTES AND NEW IES SUBSIDIARY GUARANTEES, IF APPLICABLE) TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER THE SECURITIES ACT OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN REVIEWED, APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS AND SHALL BE INADMISSIBLE FOR ANY PURPOSE ABSENT THE EXPRESS WRITTEN CONSENT OF THE DEBTORS AND THE PARTY AGAINST WHOM SUCH INFORMATION IS SOUGHT TO BE ADMITTED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO

VOTE ON THE PLAN. THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF THE DEBTORS, THE AD HOC COMMITTEE, THE COMMITTEE, OR ANY OTHER PARTY IN INTEREST HAVE BEEN PASSED UPON BY SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION OR WARRANTY REGARDING SUCH DESCRIPTIONS.

THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO CONSTITUTE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS.

### DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This Disclosure Statement includes projected financial information regarding the Reorganized Debtors and certain other "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act, all of which are based upon various estimates and assumptions that the Debtors believe to be reasonable as of the date hereof. These statements involve risks and uncertainties that could cause the Debtors' and Reorganized Debtors' actual future outcomes to differ materially from those set forth in this Disclosure Statement. Such risks and uncertainties include, but are not limited to:

- the Debtors' ability to effect their proposed restructuring, or any other restructuring on terms acceptable to the Debtors;

- the Debtors' ability to continue as a going concern;

- the Debtors' ability to meet debt service obligations and related financial and other covenants, and the possible resulting material default under the Debtors' credit agreements which is not waived or rectified;

- limitations on the availability of sufficient credit to fund working capital;

- limitations on the availability and the increased costs of surety bonds required for certain projects;

- inability to reach agreements with the Debtors' surety companies to provide sufficient bonding capacity;

- risk associated with failure to provide surety bonds on jobs where the Debtors have commenced work or are otherwise contractually obligated to provide surety bonds;

- the inherent uncertainties relating to estimating future operating results and the Debtors' ability to generate sales, operating income, or cash flow;

- potential difficulty in addressing a material weakness in the Debtors' accounting systems that has been identified by the Debtors and their independent auditors;

- fluctuations in operating results because of downturns in levels of construction, seasonality and differing regional economic conditions;

- general economic and capital markets conditions, including fluctuations in interest rates;

- inaccurate estimates used in entering into and executing contracts;

- difficulty in managing the operation of existing entities;

- the high level of competition in the construction industry both from third parties and ex-employees;

- increases in costs or limitations on availability of labor, especially qualified electricians, steel, copper and gasoline;

- accidents resulting from the numerous physical hazards associated with the Debtors' work;

- loss of key personnel;

- business disruption and costs associated with the Securities and Exchange Commission investigation or shareholder derivative action now pending;

- litigation risks and uncertainties;

- unexpected liabilities or losses associated with warranties or other liabilities attributable to the retention of the legal structure or retained liabilities of business units where the Debtors have sold substantially all of the assets;

- the loss of productivity, either at the corporate office or operating level;

- disruptions or inability to effectively manage internal growth or consolidations;

- inability of subsidiaries to incorporate new accounting, control, and operating procedures;

- inaccuracies in estimating revenues and percentage of completion on contracts;

- distraction of management and costs associated with the Debtors' restructuring efforts, including their Chapter 11 filings;

- recent adverse publicity about the Debtors, including their Chapter 11 filing and the receipt by IES of repurchase notices and acceleration notices sent by the Holders of the Senior Convertible Notes; and

- lack of an established trading market for the New IES Common Stock.

You should understand that the foregoing as well as other risk factors discussed in this document, including those listed in Section X under the heading "Certain Factors to be Considered" could cause future outcomes to differ materially from those expressed in such forward-looking statements. Given the uncertainties, you are cautioned not to place undue reliance on any forward-looking statements in determining whether to vote in favor of the Plan or to take any other action. The Debtors undertake no obligation to publicly update or revise information concerning the Debtors' restructuring efforts, borrowing availability, or its cash position or any forward-looking statements to reflect events or circumstances that may arise after the date of this Disclosure Statement. Forward-looking statements are provided in this Disclosure Statement pursuant to the safe harbor established under the private Securities Litigation Reform Act of 1995 and, to the extent applicable, Section 1125(e) of the Bankruptcy Code and should be evaluated in the context of the estimates, assumptions, uncertainties, and risks described herein.

TABLE OF CONTENTS

I. INTRODUCTION AND EXECUTIVE SUMMARY .................................................................. 1
    A.      EXECUTIVE SUMMARY ................................................................................ 1
    B.      CONSIDERATIONS IN PREPARATION OF THE DISCLOSURE
STATEMENT AND PLAN; DISCLAIMERS .................................................................. 1
    C.      GENERAL ......................................................................................................... 3
    D.      SOLICITATION PACKAGE ............................................................................. 4
    E.      VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE .................. 4
    F.      PURPOSE OF THE PLAN ................................................................................ 6
    G.      SUMMARY OF ANTICIPATED DISTRIBUTIONS UNDER THE PLAN ........ 7
    H.      THE CONFIRMATION HEARING AND OBJECTION DEADLINE ................ 9
    I.      SUMMARY OF POST-CONFIRMATION OPERATIONS ............................. 10
    J.      RECOMMENDATION OF BOARDS OF DIRECTORS AND OTHERS TO
APPROVE THE PLAN .................................................................................................... 10
    K.      EQUITY COMMITTEE'S PRELIMINARY STATEMENT WITH RESPECT
TO THE PLAN .............................................................................................................. 11
II. GENERAL INFORMATION REGARDING THE DEBTORS ........................................... 11
    A.      BACKGROUND ............................................................................................ 11
    B.      PLAN SUPPORT AGREEMENT .................................................................... 17
    C.      RESTRUCTURING PROFESSIONALS ......................................................... 17
III. MANAGEMENT AND CORPORATE STRUCTURE OF THE REORGANIZED
DEBTORS ...................................................................................................................... 18
    A.      THE BOARDS OF DIRECTORS AND EXECUTIVE OFFICERS OF THE
REORGANIZED DEBTORS ........................................................................................... 18
    B.      2006 LONG TERM INCENTIVE PLAN ........................................................ 19
    C.      EMPLOYMENT AGREEMENTS FOR EXECUTIVES .................................. 20
IV. SUMMARY OF THE PLAN ............................................................................................ 20
    A.      INTRODUCTION ........................................................................................... 20
    B.      SCHEDULE OF TREATMENT OF CLAIMS AND EQUITY INTERESTS ..... 21
    C.      TREATMENT OF UNCLASSIFIED CLAIMS ............................................... 21
    D.      TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ......... 23
    E.      ALLOWED CLAIMS AND EQUITY INTERESTS ......................................... 27
    F.      POSTPETITION INTEREST .......................................................................... 28
    G.      ALTERNATIVE TREATMENT ..................................................................... 28
    H.      ALLOCATION .............................................................................................. 28
    I.      MEANS FOR IMPLEMENTATION OF THE PLAN ....................................... 28
    J.      PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 34
    K.      PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND
UNLIQUIDATED CLAIMS ............................................................................................ 38
    L.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES 39
    M.      ACCEPTANCE OR REJECTION OF THE PLAN ........................................... 41
    N.      CONDITIONS PRECEDENT; WAIVER ........................................................ 41
    O.      MODIFICATIONS AND AMENDMENTS; WITHDRAWAL .......................... 43
    P.      RETENTION OF JURISDICTION .................................................................. 43
    Q.      COMPROMISES AND SETTLEMENTS ....................................................... 45
    R.      MISCELLANEOUS PROVISIONS ............................................................... 45

V. EVENTS DURING THE CHAPTER 11 CASES ....................................................51
    A.     COMMENCEMENT OF THE CHAPTER 11 CASES........................................51
    B.     APPOINTMENT OF THE OFFICIAL COMMITTEE OF UNSECURED
    CREDITORS ....................................................................................................51
    C.     APPOINTMENT OF THE OFFICIAL EQUITY HOLDERS COMMITTEE.....51
    D.     RETENTION OF PROFESSIONALS ................................................................51
    E.     DEBTOR-IN-POSSESSION FINANCING .......................................................52
    F.     EXIT FACILITIES ...........................................................................................52
VI. CAPITAL STRUCTURE OF THE REORGANIZED DEBTORS........................52
    A.     NEW SECURITIES..........................................................................................52
    B.     SECURITIES LAW MATTERS.......................................................................53
VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .....54
    A.     GENERAL .......................................................................................................54
    B.     CONSEQUENCES TO THE DEBTORS...........................................................55
    C.     CONSEQUENCES TO HOLDERS OF SENIOR SUBORDINATED NOTES ..57
    D.     CONSEQUENCES TO HOLDERS OF IES COMMON STOCK INTERESTS.59
    E.     BACKUP WITHHOLDING ..............................................................................60
    F.     IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE.......60
VIII. FEASIBILITY OF THE PLAN AND THE BEST INTERESTS OF CREDITORS TEST 61
    A.     FEASIBILITY OF THE PLAN..........................................................................61
    B.     BEST INTERESTS TEST .................................................................................62
    C.     LIQUIDATION ANALYSIS .............................................................................63
    D.     VALUATION OF THE REORGANIZED DEBTORS ......................................64
IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ......69
    A.     ALTERNATIVE PLAN(S)...............................................................................69
    B.     LIQUIDATION UNDER CHAPTER 7 ..............................................................69
X. CERTAIN FACTORS TO BE CONSIDERED .....................................................71
    A.     GENERAL .......................................................................................................71
    B.     BUSINESS AND INDUSTRY RISKS .............................................................71
    C.     FAILURE TO RECEIVE REQUISITE ACCEPTANCES .................................78
    D.     FAILURE TO CONFIRM THE PLAN..............................................................78
    E.     FAILURE TO CONSUMMATE THE PLAN ....................................................79
    F.     CLAIMS ESTIMATIONS ................................................................................79
    G.     CERTAIN TAX CONSIDERATIONS .............................................................79
    H.     INHERENT UNCERTAINTY OF FINANCIAL PROJECTIONS ....................79
XI. THE SOLICITATION; VOTING PROCEDURES .............................................80
    A.     VOTING DEADLINE ......................................................................................80
    B.     VOTING PROCEDURES .................................................................................80
    C.     NOTE FOR HOLDERS OF VOTING NOTES AND IES COMMON STOCK..81
    D.     FIDUCIARIES AND OTHER REPRESENTATIVES ......................................83
    E.     PARTIES ENTITLED TO VOTE......................................................................83
    F.     AGREEMENTS UPON FURNISHING BALLOTS ..........................................84
    G.     WAIVERS OF DEFECTS, IRREGULARITIES, ETC.......................................84
    H.     WITHDRAWAL OF BALLOTS; REVOCATION ...........................................85
    I.     DELIVERY OF EXISTING SECURITIES........................................................85
    J.     FURTHER INFORMATION; ADDITIONAL COPIES.....................................86

## TABLE OF ATTACHMENTS

ADDENDUM 1          List of IES Subsidiaries

EXHIBIT A          Second Amended Joint Plan of Reorganization
EXHIBIT B          Disclosure Statement Order (without exhibits)
EXHIBIT C          Financial Projections
EXHIBIT D          IES Annual Report on Form 10-K for the Year Ended September 30, 2005
                   and IES Quarterly Report on Form 10-Q for the Quarter Ended December
                   31, 2005
EXHIBIT E          Plan Support Agreement
EXHIBIT F          Liquidation Analysis and Best Interests Test
EXHIBIT G          Form of New Note and New IES Subsidiary Guarantee
EXHIBIT H          Revolving Exit Facility Commitment Letter
EXHIBIT I          Term Exit Facility Commitment Letter

## I. INTRODUCTION AND EXECUTIVE SUMMARY

A.  EXECUTIVE SUMMARY

Integrated Electrical Services, Inc. and the IES Subsidiaries filed petitions for relief under Chapter 11 of the United States Bankruptcy Code on February 14, 2006 in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors will continue to operate their businesses and to manage their properties as debtors in possession during the pendency of the Chapter 11 Cases.

On February 14, 2006, the Debtors filed the "Joint Plan of Reorganization of Integrated Electrical Services, Inc. and Certain of its Direct and Indirect Subsidiaries under Chapter 11 of the Bankruptcy Code." On March 10, 2006, the Debtors filed the "First Amended Joint Plan of Reorganization of Integrated Electrical Services, Inc." The Plan was formulated after extensive negotiations with the Ad Hoc Committee comprised of certain Holders of the Senior Subordinated Notes. The members of the Ad Hoc Committee were appointed by the United States Trustee to the Committee, which was formed on February 14, 2006. The Senior Subordinated Notes Indenture Trustee was also appointed to the Committee on February 22, 2006. The United States Trustee also appointed an Official Equity Holders Committee (the "Equity Committee") on March 8, 2006, to represent the interests of all holders of Class 8 equity interests in the Debtors. Because of the lateness of the appointment, the Equity Committee has not yet formed a formal recommendation with respect to the proposed treatment of equity interests in Class 8 under the Plan. This Disclosure Statement describes certain aspects of the Plan, the Debtors' current and future business operations, including, but not limited to, the proposed reorganization of the Debtors upon consummation of the Plan, significant events occurring in their Chapter 11 Cases and related matters.

B.  CONSIDERATIONS IN PREPARATION OF THE DISCLOSURE STATEMENT AND PLAN; DISCLAIMERS

BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF ELIGIBLE CLAIMS AND ELIGIBLE EQUITY INTERESTS ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING TREATMENT OF THEIR CLAIMS AND EQUITY INTERESTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. SEE SECTION IV.N -- "SUMMARY OF THE PLAN -- CONDITIONS PRECEDENT; WAIVER." THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

THE DEBTORS PRESENTLY INTEND TO SEEK TO CONSUMMATE THE PLAN AND TO CAUSE THE EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR. PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN,

INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF ALLOWED CLAIMS AND ALLOWED EQUITY INTERESTS IN CERTAIN CLASSES AND THAT COULD AFFECT THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS, ARE DESCRIBED IN SECTION IV.J - "SUMMARY OF THE PLAN - PROVISIONS GOVERNING DISTRIBUTIONS."

THE BOARDS OF DIRECTORS, MANAGING PARTNERS, AND MANAGING MEMBERS (AS THE CASE MAY BE) OF EACH OF THE DEBTORS HAVE APPROVED THE PLAN AND RECOMMEND THAT THE HOLDERS OF ELIGIBLE CLAIMS AND ELIGIBLE EQUITY INTERESTS VOTE TO ACCEPT THE PLAN IN ACCORDANCE WITH THE VOTING INSTRUCTIONS SET FORTH IN SECTION XI -- "THE SOLICITATION; VOTING PROCEDURES" AND IN THE BALLOT. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY THE VOTING DEADLINE. HOLDERS OF ELIGIBLE CLAIMS AND ELIGIBLE EQUITY INTERESTS ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN.

*****

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, ACTUAL AND ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE PLAN OR SUCH DOCUMENTS (AND HOLDERS OF ELIGIBLE CLAIMS AND ELIGIBLE EQUITY INTERESTS SHOULD REFER TO THE PLAN AND SUCH DOCUMENTS IN THEIR ENTIRETY AS ATTACHED HERETO), STATUTORY PROVISIONS, EVENTS, OR INFORMATION. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY IES MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL PROJECTIONS AND OTHER FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS OF ELIGIBLE CLAIMS AND ELIGIBLE EQUITY INTERESTS MUST RELY UPON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY. SEE SECTION X -- "CERTAIN FACTORS TO BE

CONSIDERED" FOR A DISCUSSION OF VARIOUS FACTORS THAT SHOULD BE CONSIDERED IN CONNECTION WITH THE PLAN.

*****

THE DEBTORS ARE RELYING ON SECTION 1145(a)(1) OF THE BANKRUPTCY CODE, TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES LAWS THE OFFER AND ISSUANCE OF NEW SECURITIES (OTHER THAN THE RESTRICTED NEW IES COMMON STOCK WHICH WILL BE ISSUED PURSUANT TO A REGISTRATION STATEMENT ON FORM S-8 TO BE FILED BY IES OR REORGANIZED IES WITH THE SEC) AND SECTION 4(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES LAWS THE OFFER AND ISSUANCE OF THE NEW NOTES AND NEW IES SUBSIDIARY GUARANTEES, IF APPLICABLE, (TO THE EXTENT DEEMED SECURITIES) IN CONNECTION WITH THE SOLICITATION AND THE PLAN. SEE SECTION VI.A -- "CAPITAL STRUCTURE OF THE REORGANIZED DEBTORS -- NEW SECURITIES" FOR A DESCRIPTION OF THE NEW SECURITIES.

EXCEPT AS SET FORTH IN SECTION XI.J -- "THE SOLICITATION; VOTING PROCEDURES -- FURTHER INFORMATION; ADDITIONAL COPIES," NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN THOSE TO WHICH IT RELATES, OR AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION IN WHICH, OR TO ANY PERSON TO WHOM, IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR THE DISTRIBUTION OF ANY NEW SECURITIES (OR NEW NOTES OR NEW IES SUBSIDIARY GUARANTEES, IF APPLICABLE) PURSUANT TO THE PLAN WILL, UNDER ANY CIRCUMSTANCE, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF. ANY ESTIMATES OF CLAIMS OR EQUITY INTERESTS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE AMOUNTS OF CLAIMS OR EQUITY INTERESTS ULTIMATELY ALLOWED BY THE BANKRUPTCY COURT.

C.    GENERAL

This Disclosure Statement has been prepared to comply with section 1125 of the Bankruptcy Code and is hereby transmitted by the Debtors to Holders of Eligible Claims and

Eligible Equity Interests for use in the Solicitation of acceptances of the Plan, a copy of which is attached hereto as **Exhibit A**. Unless otherwise defined in this Disclosure Statement, capitalized terms used herein have the meanings ascribed to them in the Plan.

For purposes of this Disclosure Statement, the following rules of interpretation shall apply: (i) whenever the words "include," "includes" or "including" are used, they shall be deemed to be followed by the words "without limitation," (ii) the words "hereof," "herein," "hereby" and "hereunder" and words of similar import shall refer to this Disclosure Statement as a whole and not to any particular provision, (iii) article, section and exhibit references are to this Disclosure Statement unless otherwise specified, and (iv) with respect to any Distribution under the Plan, "on" a date means on or as soon as reasonably practicable thereafter.

The purpose of this Disclosure Statement is to provide "adequate information" to Entities who hold Eligible Claims and Eligible Equity Interests to enable them to make an informed decision before exercising their right to vote to accept or reject the Plan. By order of the Bankruptcy Court entered on March 13, 2006, (the "Disclosure Statement Order"), this Disclosure Statement was approved and held to contain adequate information. A true and correct copy of the Disclosure Statement Order is attached hereto as **Exhibit B.**

**THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. THE MATERIAL CONTAINED HEREIN IS INTENDED SOLELY FOR THE USE OF HOLDERS OF ELIGIBLE CLAIMS AND ELIGIBLE EQUITY INTERESTS IN EVALUATING THE PLAN AND VOTING TO ACCEPT OR REJECT THE PLAN AND, ACCORDINGLY, MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF HOW TO VOTE ON THE PLAN. THE PLAN IS SUBJECT TO NUMEROUS CONDITIONS AND VARIABLES AND THERE CAN BE NO ABSOLUTE ASSURANCE THAT THE PLAN WILL BE EFFECTUATED.**

D.    SOLICITATION PACKAGE

Accompanying this Disclosure Statement for the purpose of soliciting votes on the Plan are copies of (i) the Plan, (ii) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the hearing to consider Confirmation of the Plan and related matters, and the time for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice"), and, as applicable, (iii) a Ballot or Ballots (and return envelope(s)) that you may use in voting to accept or to reject the Plan, or a notice of non-voting status, as applicable. If you did not receive a Ballot and believe that you should have, please contact the Solicitation Agent at the address or telephone number set forth in the next subsection.

E.    VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE

After carefully reviewing the Plan and this Disclosure Statement, and the exhibits thereto, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. Please

complete and sign your Ballot and return it in the envelope provided so that it is RECEIVED by the Voting Deadline (as defined below). Please note that if you are in Class 5, 6 or 8 and hold Existing Securities evidencing a Claim or Equity Interest through a Nominee, you may be required to return your Ballot to your Nominee sufficiently in advance of the Voting Deadline so as to permit your Nominee to fill out and return a Master Ballot by the Voting Deadline. See Section XI - "Solicitation; Voting Procedures."

Each Ballot has been coded to reflect the Class of Claims or Equity Interests it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

The Equity Committee will issue its recommendation on how to vote on or before March 31, 2006, in the form of a letter that will be mailed to all holders of equity interests in Class 8. A copy of the letter shall also be posted on the following web address on or before March 31, 2006: http://www.velaw.com/mcso/clients/ies.asp. The Equity Committee requests that all holders of equity interests in Class 8 consider the Equity Committee's recommendation prior to casting their ballots.

If you have any questions about the procedure for voting your Eligible Claim or Eligible Equity Interest or with respect to the packet of materials that you have received, please contact the Solicitation Agent:

> IES Ballot Processing
> c/o Financial Balloting Group LLC
> 757 Third Avenue, 3rd Floor
> New York, New York 10017
> (646) 282-1800

**THE BALLOTING AGENT MUST ORIGINAL RECEIVE BALLOTS (AND ORIGINAL MASTER BALLOTS CAST ON BEHALF OF BENEFICIAL HOLDERS) ON OR BEFORE 5:00 P.M., EASTERN TIME, ON APRIL 19, 2006 (THE "VOTING DEADLINE") AT THE ABOVE ADDRESS. EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT, BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE ACCEPTED OR USED IN CONNECTION WITH THE DEBTORS' REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF.**

The Debtors reserve the right to amend the Plan after the Commencement Date with the reasonable consent of the Ad Hoc Committee. Amendments to the Plan that do not materially and adversely affect the treatment of Claims or Equity Interests and are consistent with the terms of the Plan Support Agreement may be approved by the Bankruptcy Court at the Confirmation Hearing without the necessity of resoliciting votes. In the event resolicitation is required, the Debtors will furnish new solicitation packets which shall include new ballots to be used to vote to accept or reject the Plan, as amended.

F.     PURPOSE OF THE PLAN

The primary purpose of the Plan is to effectuate the restructuring of the Debtors' capital structure (the "Restructuring") to improve free cash flow, strengthen the balance sheet, and enhance surety bonding capacity.  Presently, the Debtors have a substantial amount of indebtedness outstanding under the Senior Subordinated Notes and the Senior Convertible Notes. If the Debtors are not able to consummate the Restructuring, the Debtors will likely have to formulate an alternative plan, and the Debtors' financial condition and the value of their securities will likely be further materially adversely affected.

The Restructuring will reduce the amount of the Debtors' outstanding indebtedness by approximately $173 million plus accrued and unpaid interest thereon by converting all of the Senior Subordinated Notes into equity of Reorganized IES through the transfer of Senior Subordinated Note Claims to the Debtors in exchange for a portion of the shares of New IES Common Stock.  By offering the Holders of the Senior Subordinated Notes a majority of the equity of Reorganized IES, the Debtors intend that such Holders will participate in the long-term appreciation of the Debtors' businesses, which the Debtors expect will be enhanced by the reduction of the Debtors' debt obligations.  Following consummation of the Restructuring, IES's long-term debt is expected to be approximately $58 million, comprised of approximately $53 million borrowed and outstanding under the Tem Exit Facility and approximately $4.9 million borrowed and outstanding under the Revolving Exit Facility.  Among other things, pursuant to the Restructuring:

-        Each Holder of Senior Subordinated Notes would receive, in exchange for its total Claim (including principal and interest), its Pro Rata portion of 82% of the New IES Common Stock to be issued pursuant to the Plan, before giving effect to the New Options issued pursuant to the 2006 Long Term Incentive Plan.

-        Each Holder of IES Common Stock Interests would receive its Pro Rata portion of 15% of the New IES Common Stock to be issued pursuant to the Plan, before giving effect to the New Options issued pursuant to the 2006 Long Term Incentive Plan.

-        Certain members of Reorganized Debtors' management would receive restricted shares of New IES Common Stock equal to 3% of the New IES Common Stock to be issued pursuant to the Plan, before giving effect to the New Options issued pursuant to the 2006 Long Term Incentive Plan.

-        On the Effective Date, the sole equity interests in Reorganized IES would consist of New IES Common Stock issued to the Holders of Senior Subordinated Notes, Holders of IES Common Stock Interests and certain members of Reorganized IES's management and New Options to be issued to certain key employees of the Debtors pursuant to the 2006 Long Term Incentive Plan, which will be exercisable for up to 10% of the New IES Common Stock on a fully diluted basis.

- The Debtors' obligations under existing operating leases and trade credit extended to the Debtors by their vendors and suppliers, would be Unimpaired.

- Reimbursement obligations under the Credit Agreement relating to outstanding letters of credit shall be deemed to be obligations under the DIP Facility.

- The $50 million in outstanding Senior Convertible Notes and related IES Subsidiary Guarantees will be refinanced from the proceeds of the Term Exit Facility.

- On the Commencement Date, the Debtors filed motions to approve the CHUBB DIP Bonding Facility and the SureTec DIP Bonding Facility, including the assumption of the underlying bonded contracts. The motions were approved on an interim basis by the Bankruptcy Court on February 15, 2006 [see Docket Nos. 45 and 47] and on a final basis on March 13, 2006 [see Docket Nos. 183 and 184]. On the Effective Date, the Claims of the Debtors' sureties, CHUBB and SureTec, if any, will be Reinstated under the Plan.

This Disclosure Statement sets forth certain detailed information regarding the Debtors' history, their projections for future operations, and significant events that have occurred and that are expected to occur during the Chapter 11 Cases. This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of Confirmation of the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the Confirmation process and the voting procedures that Holders of Eligible Claims and Eligible Equity Interests must follow for their votes to be counted.

G.    SUMMARY OF ANTICIPATED DISTRIBUTIONS UNDER THE PLAN

Under the Plan, Claims against and Equity Interests in the Debtors are divided into Classes. Certain Claims, including Administrative Claims and Priority Tax Claims are not classified and will receive payment in full in Cash on the Distribution Date, as such claims are liquidated, or as agreed with the Holders of such Claims. All other Claims and Equity Interests will receive the Distributions and recoveries (if any) described in the table below.

The table below summarizes the classification and treatment of the Claims and Equity Interests under the Plan. Estimated Claim amounts are based upon balances as of December 31, 2005. Estimated recovery percentages are based upon the mid-point total Enterprise Value of the Debtors as determined by Gordian Group, LLC, the Debtors' financial advisor ("Gordian") (see Section VIII.D -- "FEASIBILITY OF THE PLAN AND THE BEST INTERESTS OF CREDITORS TEST -- VALUATION OF THE REORGANIZED DEBTORS"). The actual Allowed amount and recovery percentage may vary materially depending upon the nature and extent of Claims actually asserted. This summary is qualified in its entirety by reference to the provisions of the Plan.

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of Allowed Claims or Equity Interests | Estimated Percentage Recovery of Allowed Claims or Equity Interests |
|---|---|---|---|---|
| Class 1 | Priority Claims | Unimpaired | n/a[1] | 100% |
| Class 2 | Credit Agreement Claims | Unimpaired | n/a | 100% |
| Class 3 | Secured Claims | Unimpaired | n/a[2] | 100% |
| Class 4 | Unsecured Claims | Unimpaired | Approximately $48mm[3] | 100% |
| Class 5 | Senior Convertible Note Claims | Impaired | $50mm plus interest accrued through the Commencement Date | 100% |
| Class 6 | Senior Subordinated Note Claims | Impaired | $172.9mm plus accrued interest through the Commencement Date | 70.1% |
| Class 7 | Subordinated Claims | Unimpaired | -0- | n/a |
| Class 8 | IES Common Stock Interests | Impaired | n/a | 15% of New IES Common Stock |
| Class 9 | IES Other Equity Interests | Impaired | n/a | 0% |
| Class 10 | IES Subsidiary Debtor Interests | Unimpaired | n/a | 100% (Reinstated) |

[1] Priority employee Claims have been paid in full by the Debtors in the ordinary course of business pursuant to the interim order entered by the Bankruptcy Court on February 15, 2006, authorizing the payment of pre-petition employee wages and continuation of employee benefits [Docket No. 44].

[2] This Class includes Secured Claims to the extent not otherwise paid in full. The Claims in this class, which potentially include any mechanics' and materialmens' liens and/or Secured Claims of the Debtors' surety bond providers, are anticipated to be *de minimis*, given the fact that the Debtors have paid or will pay trade Claims in the ordinary course of business pursuant to the authority given to them by the Bankruptcy Court in its order authorizing the payment of undisputed general unsecured claims in the ordinary course of business, entered on February 15, 2006 [Docket No. 56].

[3] This amount is an estimated amount of the trade Claims as of the December 31, 2005 and does not include contingent and unliquidated Claims such as litigation claims. To the extent that a trade claim is entitled to administrative or secured status (by virtue of a materialman's lien or otherwise) or is otherwise paid in the ordinary course of business prior to Confirmation, this number would be reduced.

H.    THE CONFIRMATION HEARING AND OBJECTION DEADLINE

**THE BANKRUPTCY COURT HAS SET APRIL 25, 2006 AT 9:00 A.M., CENTRAL TIME, AS THE DATE AND TIME FOR THE HEARING ON CONFIRMATION OF THE PLAN AND TO CONSIDER ANY OBJECTIONS TO THE PLAN. THE CONFIRMATION HEARING WILL BE HELD AT THE UNITED STATES BANKRUPTCY COURT, 1100 COMMERCE STREET, 14TH FLOOR, DALLAS, TEXAS, 75242. THE DEBTORS WILL REQUEST CONFIRMATION OF THE PLAN AT THE CONFIRMATION HEARING.**

**THE BANKRUPTCY COURT HAS FURTHER FIXED APRIL 19, 2006, AT 4:00 P.M., PREVAILING CENTRAL TIME, AS THE DEADLINE (THE "OBJECTION DEADLINE") FOR FILING OBJECTIONS TO CONFIRMATION OF THE PLAN WITH THE BANKRUPTCY COURT. OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE SERVED BY HAND DELIVERY OR FACSIMILE SO AS TO BE RECEIVED ON OR BEFORE THE OBJECTION DEADLINE BY THE FOLLOWING PARTIES:**

*Counsel to the Debtors:*

Daniel C. Stewart
Paul E. Heath
Vinson & Elkins L.L.P.
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
(214) 220-7716 (fax)

*Counsel to the Ad Hoc Committee and Official Committee of Unsecured Creditors*:

Marcia L. Goldstein
Ted S. Waksman
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
(212) 735-4919 (fax)

*United States Trustee*:

Office of the United States Trustee
Attn: George McElreath
Room 9C60, 1100 Commerce Street
Dallas, Texas 75242
(214) 767-6530 (fax)

ANY OBJECTION TO CONFIRMATION OF THE PLAN MUST BE IN WRITING AND (A) MUST STATE THE NAME AND ADDRESS OF THE OBJECTING PARTY AND THE

AMOUNT OF ITS CLAIM OR THE NATURE OF ITS EQUITY INTEREST AND (B) MUST STATE WITH PARTICULARITY THE NATURE OF ITS OBJECTION. ANY CONFIRMATION OBJECTION NOT TIMELY FILED AND SERVED AS SET FORTH HEREIN SHALL BE DEEMED WAIVED AND SHALL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

I.  SUMMARY OF POST-CONFIRMATION OPERATIONS

Attached hereto as **Exhibit C** are the Financial Projections that project the financial performance of the Reorganized Debtors through 2010. The Financial Projections are based upon the current business plan for the Reorganized Debtors, information available as of March 7, 2006, and numerous assumptions that are an integral part of the Financial Projections, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize. See Section X.H -- "CERTAIN FACTORS TO BE CONSIDERED -- INHERENT UNCERTAINTY OF FINANCIAL PROJECTIONS."

J.  RECOMMENDATION OF BOARDS OF DIRECTORS AND OTHERS TO APPROVE THE PLAN

The respective boards of directors, managing partners or managers, as applicable, of the Debtors approved the solicitation of acceptances of the Plan and all of the transactions contemplated thereby. In light of the benefits to be attained by the Holders of Eligible Claims and Eligible Equity Interests pursuant to consummation of the transactions contemplated by the Plan, the Debtors' respective boards of directors, managing partners or managers, as applicable, recommend that such Holders of Eligible Claims and Eligible Equity Interests vote to accept the Plan. The Debtors' respective boards of directors, managing partners or managers, as applicable, have reached this decision after considering the alternatives to the Plan that are available to the Debtors and the possible affect on the Debtors' business operations, creditors, and shareholders of such alternatives. These alternatives include liquidation under Chapter 7 of the Bankruptcy Code or a reorganization under Chapter 11 of the Bankruptcy Code with an alternative plan of reorganization. The Debtors' respective boards of directors, managing partners or managers, as applicable, determined, after consulting with financial and legal advisors, that the Restructuring Transactions contemplated in the Plan would likely result in a distribution of greater values to creditors and shareholders than would a liquidation under Chapter 7. For a comparison of estimated distributions under Chapter 7 of the Bankruptcy Code and under the Plan, see Section VIII.C -- "FEASIBILITY OF THE PLAN AND THE BEST INTERESTS OF CREDITORS TEST - LIQUIDATION ANALYSIS."

AS FURTHER DESCRIBED IN SECTION II.B. – "PLAN SUPPORT AGREEMENT," THE AD HOC COMMITTEE SUPPORTS THE PLAN. WHILE MEMBERS OF THE AD HOC COMMITTEE HAVE AGREED TO SUPPORT AND VOTE IN FAVOR OF THE PLAN, THEY HAVE NOT PROPOSED THE PLAN NOR HAVE THEY PROMULGATED THIS DISCLOSURE STATEMENT. THE COMMITTEE ALSO SUPPORTS THE PLAN.

THE DEBTORS' RESPECTIVE BOARDS OF DIRECTORS, MANAGING PARTNERS OR MANAGERS, AS APPLICABLE, EACH SUPPORT THE PLAN AND URGE ALL HOLDERS OF ELIGIBLE CLAIMS AND ELIGIBLE EQUITY INTERESTS

WHOSE VOTES ARE BEING SOLICITED TO TIMELY SUBMIT BALLOTS TO ACCEPT AND SUPPORT THE PLAN.

K.     EQUITY COMMITTEE'S PRELIMINARY STATEMENT WITH RESPECT TO THE PLAN

The Equity Committee's professionals are in the process of analyzing the Plan and the Debtors' valuation set forth in Section VIII.D of this Disclosure Statement. The Equity Committee expects to formulate a view with respect to the Plan and express that view to holders of equity interests in Class 8 on or before March 31, 2006. The Equity Committee was appointed by the United States Trustee on March 8, 2006, only two days prior to the hearing on the adequacy of this Disclosure Statement. The Equity Committee was formed to represent the interests of all holders of Class 8 equity interests in the Debtors and to evaluate whether the Plan proposes to treat the Class 8 equity holders fairly and equitably. Because of the lateness of its appointment, the Equity Committee has not yet formed a final view on the proposed treatment of equity interests in Class 8 under the Plan. The Equity Committee's professionals are in the process of performing an intensive and detailed evaluation of the Plan and the valuation of the new equity interests in the Reorganized Debtors set forth in Section VIII.D of this Disclosure Statement, the result of which could impact the distribution to holders of equity interests in Class 8. The Equity Committee will issue a formal recommendation as to how equity holders should vote on the Plan on or before March 31, 2006.

## II. GENERAL INFORMATION REGARDING THE DEBTORS

A.     BACKGROUND

IES and the IES Subsidiaries comprise one of the leading national providers of electrical services in the United States providing a large range of services, focusing primarily on competitive bid design and building, and maintaining and servicing electrical data communications and utilities systems for commercial, industrial, and residential customers. For the fiscal year ended September 30, 2005, gross revenues were approximately $1.1 billion.

IES provides services to a diverse customer base, including general contractors, property managers and developers, corporations, government agencies and municipalities, and homeowners. IES currently serves the 48 continental states. IES maintains its corporate headquarters in Houston, Texas, and had approximately 8,900 employees as of September 30, 2005.

*Formation and Operations*

IES is what is commonly referred to as a business "roll-up." IES was incorporated in 1997 and, since its initial formation, has continued to expand its operations through the acquisition of other electrical contracting companies. Since 2003, IES has continued to focus internally on integrating its information systems and establishing a regionally based management structure to enhance operating controls at all levels of the organization, as well as integrating a consolidated procurement program and structure to manage customers and vendors on a national basis.

Integrated Electrical Services, Inc. is the parent company of all the IES operating entities. It is responsible for all overhead and centralized administrative functions, including providing corporate staff, acting as the cash contractor entity, managing IES's insurance programs, performing all SEC reporting, managing network services, and performing many other administrative functions.

Additional information concerning the Debtors and their financial condition and results of operations, on a consolidated basis, can be found in the Debtors' Annual Report on the Form 10-K for the year ended September 30, 2005 and in the Debtors' Quarterly Report on the Form 10-Q for the quarter ended December 31, 2005, copies of which are attached hereto as **Exhibit D**, as well as in IES's other recent Securities and Exchange Commission filings, which can be accessed at www.sec.gov and at IES's website, www.ies-co.com.

1.      EXISTING CAPITAL STRUCTURE OF THE DEBTORS

a.      IES Common Stock

As of March 8, 2006, IES had approximately 39,393,545 shares of common stock outstanding, with a par value of $0.01 per share, which included 2,605,709 shares of restricted voting common stock held by C. Byron Snyder.[4]  In addition, as of March 8, 2006, IES had 160,994 shares of unvested restricted common stock issued and held in treasury, and outstanding options to purchase approximately 3,063,786 shares of IES common stock.  As of March 8, 2006, there were approximately 1,300 Holders of record of IES Common Stock.  The trading range of IES Common Stock was between $0.23 per share and $0.98 per share in December 2005 and between $0.47 per share and $0.67 per share in January 2006.  Prior to December 15, 2005, IES Common Stock was publicly traded on the New York Stock Exchange (the "NYSE") under the ticker symbol "IES."  The NYSE suspended trading of IES Common Stock on December 15, 2005, and intends to de-list the IES Common Stock pending completion of applicable procedures, including the pending appeal by IES of the NYSE's Staff's decision.  IES Common Stock is currently trading over-the-counter on the pink sheets under the symbol "IESRQ.PK."

IES owns, directly or indirectly, 100% of the capital stock, membership interests, or partnership interests, as applicable, of each of the IES Subsidiaries.

b.      Credit Agreement

On August 1, 2005, IES entered into a three-year $80 million asset-based revolving credit facility (the "Credit Agreement") with Bank of America, N.A. ("BofA"), as administrative agent. This Credit Agreement replaced IES's existing revolving credit facility with JPMorgan Chase Bank, N.A., which was scheduled to mature on August 31, 2005.  IES and each of its operating

---

[4] The current holdings of IES common stock by the current directors and members of senior management are:  C. Byron Snyder – 13,192 shares of common stock and 2,605,709 shares of restricted voting common stock; Donald L. Luke – 3,315 shares of common stock; George O. McDaniel – 2,201 shares of common stock; Charles H. Beynon – 2,201 shares of common stock; Ronald P. Badie – 30,508 shares of common stock; David A. Miller – 12, 083 shares of common stock; Curt L. Warnock – 5,629 shares of common stock; Richard Humphrey – 73,694 shares of common stock; and Robert Callahan – 2,820 shares of common stock.

subsidiaries, each of which are debtors herein, were co-borrowers and were jointly and severally liable for all obligations under the Credit Agreement. Certain other IES Subsidiaries guaranteed all of the obligations under the Credit Agreement. The obligations of the borrowers and the guarantors were secured by a pledge of substantially all of the Debtors' assets, excluding certain assets pledged to secure surety bonds procured by the Debtors in connection with their operations.

   c.  Senior Convertible Notes

   On November 24, 2004, IES entered into a purchase agreement for a private placement of $36.0 million in aggregate principal amount of its 6.5% Senior Convertible Notes due 2014. The Senior Convertible Notes require payment of interest semi-annually in arrears at an annual rate of 6.5%, have a stated maturity of November 1, 2014, constitute senior unsecured obligations, are guaranteed on a senior unsecured basis by significant domestic IES Subsidiaries, and are convertible at the option of the Holder under certain circumstances into shares of IES's Common Stock at an initial conversion price of $3.25 per share, subject to adjustment.

   On February 24, 2005 and following shareholder approval, IES sold $14 million in principal amount of its 6.5% Senior Convertible Notes due 2014, pursuant to a separate option exercised by the Holders of the aforementioned $36 million aggregate principal amount of Senior Convertible Notes issued by IES in an initial private placement on November 24, 2004.

   d.  Senior Subordinated Notes

   IES has outstanding two different issues of Senior Subordinated Notes with similar terms in the aggregate principal amount of $172.9 million. The Senior Subordinated Notes bear interest at 9.375% and will mature on February 1, 2009. Interest is paid on the Senior Subordinated Notes on February 1 and August 1 of each year. The Senior Subordinated Notes are unsecured senior subordinated obligations of IES and are subordinated to all other existing and future senior indebtedness of IES. The Senior Subordinated Notes are guaranteed on a senior subordinated basis by the IES Subsidiaries.

   e.  Other Prepetition Obligations of the Debtors

   Many of the Debtors' customers require the posting of performance and/or payment bonds issued by a surety. The Debtors' primary surety bond provider is CHUBB, pursuant to that certain Underwriting, Continuing Indemnity and Security Agreement dated as of January 14, 2005 between CHUBB, IES, and certain IES Subsidiaries and related agreements, including the recent amendment thereto dated January 17, 2006. Under these agreements, CHUBB provides bonds on behalf of certain of the Debtors, and the Debtors are obligated to indemnify CHUBB for any expenses incurred by CHUBB on the Debtors' behalf. As of December 31, 2006, the Debtors' cost to complete projects covered by CHUBB bonds was approximately $59.6 million. CHUBB holds approximately $33 million in cash and letters of credit as collateral.

   The Debtors also have an arrangement with SureTec for the provision of up to $5 million in surety bonds and pursuant to which the Debtors are obligated to indemnify SureTec for any expenses incurred by SureTec on the Debtors' behalf. As of February 13, 2006, SureTec had issued approximately $2.7 million in bonds, which are secured by a $1.5 million letter of credit.

2. SECURITIES LITIGATION AND SEC INVESTIGATION

a. *In re Integrated Electrical Services, Inc. Securities Litigation, No. 4:04-CV-3342, in the United States District Court for the Southern District of Texas, Houston Division.* Between August 20, 2004 and October 4, 2004, five putative securities fraud class actions were filed against IES and certain of its existing and former officers and directors. The five lawsuits were consolidated under the caption *In re Integrated Electrical Services, Inc. Securities Litigation*. The plaintiffs allege that the defendants violated Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 by making materially false and misleading statements during the proposed class period of November 10, 2003 to August 13, 2004. On January 10, 2006, the district court dismissed the lawsuit, with prejudice. Although the Debtors believe that the claims asserted in this litigation would be treated as Securities Litigation Claims under the Plan, because the Debtors believe there is no merit to the Claims, which belief is supported by the recent dismissal with prejudice, the Debtors believe any Securities Litigation Claim held by these plaintiffs ultimately would not be recoverable against IES. On February 2, 2006, the plaintiffs filed an appeal of the district court's dismissal of their claims.

b. *Radek v. Allen, et al., No. 2004-48577, in the 113th Judicial District Court, Harris County, Texas.* On September 3, 2004, Chris Radek ("Radek") filed a shareholder derivative action naming certain of IES's present and former officers as individual defendants and IES as a nominal defendant. On July 15, 2005, Radek filed an amended shareholder derivative petition alleging substantially similar factual claims to those made in the putative class action. The Debtors believe that the claims asserted by Radek have no merit, and this belief is supported by the recent dismissal with prejudice of Radek's claims on February 8, 2006. The time for filing an appeal of the state court order had not elapsed as of the Commencement Date. In any event, the claims asserted in this litigation are derivative in nature, would belong to the estate, and any recovery would inure to the benefit of the estate and not the plaintiffs.

c. *SEC Investigation.* On August 31, 2004, the Fort Worth Regional Office of the SEC sent a request for information concerning IES's inability to file its 10-Q in a timely fashion, the internal investigation conducted by counsel to the Audit Committee of IES's Board of Directors, and the material weaknesses identified by IES's auditors in August 2004. In December 2004, the Commission issued a formal order authorizing the staff to conduct a private investigation into these and related matters, including, among other things, IES's 2004 restatement; whether two receivables which were written down in the aggregate amount of approximately $2.4 million in 2004 should have been disclosed earlier and/or accounted for differently; and whether certain resolved loss contingencies should have been disclosed in IES's quarterly and annual reports on Forms 10-Q and 10-K prior to their resolution. The investigation is still ongoing, and IES is cooperating with the SEC. The outcome of this investigation is not currently known. An adverse outcome in this matter could have a material adverse effect on IES's business, consolidated financial condition, results of operations or cash flows.

3.    EVENTS LEADING TO THE DEBTORS' RESTRUCTURING

a.    Background

A confluence of several factors has led to the Debtors' need to seek voluntary protection under Chapter 11.  Like many business roll-ups, the Debtors suffer from certain operational difficulties.  The underlying problem, however, is its financial structure that simply places too much debt on the Debtors' operating structure.  Accordingly, while the Debtors require certain operational changes, this is primarily a financial restructuring.

Historically, a significant percentage of the Debtors' contracts have been contracts that have required surety bonds.  In mid-2004, given the change in the surety market and the Debtors' operating performance, CHUBB, the Debtors' primary surety provider, began restricting the Debtors' bonding capacity.  This restriction in bonding capacity limited the Debtors' ability to bid on and retain higher margin jobs and has significantly affected revenues.  The Debtors' specific financial and operational difficulties have been further complicated by the downturn in commercial construction, which has been depressed since 2001.

Over the past year, the Debtors have worked diligently to solve their financial and operational difficulties.  IES has worked to divest itself of certain commercial operations, including some not as profitable as retained operations and some heavily dependent upon bonding, either through asset sales or by shutting down operations.  During fiscal year 2005, IES sold 13 units and closed two others.

As part of its continuing initiative to strengthen its balance sheet, IES engaged Gordian in October 2005 to develop alternatives to refinance and de-lever all or a portion of its long-term debt, including the Senior Subordinated Notes, with the goal of improving cash flow, enhancing credit ratings, and enhancing surety bonding capacity for the Debtors.

In the Debtors' annual report on Form 10-K for the fiscal year ended September 30, 2005, as filed with the Securities and Exchange Commission on December 21, 2005 and attached hereto as Exhibit D, their independent registered public accounting firm, Ernst & Young LLP, included a going concern modification in its audit opinion on their consolidated financial statements for the fiscal year ended September 30, 2005, as a result of the Debtors' operating losses during fiscal 2005 and the Debtors' potential non-compliance with certain debt covenants subsequent to September 30, 2005.

b.    Defaults and Other Recent Events

On December 15, 2005, IES was orally notified by the New York Stock Exchange ("NYSE") that trading of its common stock had been suspended immediately due to IES's announcement, on December 14, 2005, that it was contemplating filing a prepackaged plan of reorganization under Chapter 11 of the Bankruptcy Code.  On December 16, 2005, IES received written confirmation from the NYSE of the suspension of trading of its common stock on December 15, 2005 and the NYSE's intent to de-list the IES common stock pending completion of applicable procedures, including the pending appeal by IES of the NYSE's staff's decision.  Pursuant to the Senior Convertible Notes Indenture, the delisting of IES's common stock from the NYSE, without a subsequent listing on the American Stock Exchange or qualification for

trading on The NASDAQ National Market or The NASDAQ Small Cap Market, will result in a "Fundamental Change." Thirty five Business Days after the occurrence of a Fundamental Change, the Holders of the Senior Convertible Notes have the right under the Senior Convertible Notes Indenture to require IES to repurchase the Senior Convertible Notes.

On January 19, 2006, the Holders of the Senior Convertible Notes sent repurchase notices to IES, claiming that a "Termination of Trading" (and, therefore, a "Fundamental Change") had occurred on December 15, 2005, which entitled them to exercise their repurchase rights under the Senior Convertible Notes Indenture. IES responded on January 20, 2006, taking the position that the suspension of trading by the NYSE was not a "Termination of Trading" under the terms of the Senior Convertible Notes Indenture and demanding that the Holders immediately withdraw their repurchase notices as having been wrongfully submitted. The Holders of the Senior Convertible Notes did not withdraw the repurchase notices as requested. On February 10, 2006, the Holders of the Senior Convertible Notes delivered acceleration notices to IES. The acceleration notices state that, due to the failure of IES to repurchase the Senior Convertible Notes by February 7, 2006 pursuant to the repurchase notices, the Holders of the Senior Convertible Notes are accelerating the Senior Convertible Notes pursuant to the Senior Convertible Notes Indenture. IES takes the position that the Holders of the Senior Convertible Notes are not entitled to accelerate the Senior Convertible Notes pursuant to the Senior Convertible Notes Indenture under the circumstances asserted by the Holders. In any case, as a result of filing the Chapter 11 Cases, the obligations of the Debtors, if any, to repurchase the Senior Convertible Notes has been stayed.

On January 20, 2006, IES and certain of the IES Subsidiaries entered into an amendment (the "Fifth Amendment") to the Credit Agreement. The Fifth Amendment extended the deadline for the Company's submission of financial statements covering the period ending December 31, 2005 from January 20, 2006 to January 26, 2006 in connection with the Fixed Charge Coverage Ratio test for the period ending December 31, 2005. As of January 26, 2006, the Company failed to meet the Fixed Charge Coverage Ratio for the period ending December 31, 2005, constituting an event of default under the Credit Agreement. Additionally, the Company was in default with respect to the pledge of its ownership interest in EnerTech Capital Partners II L.P. to BofA as Collateral under the Credit Agreement. By reason of the existence of these defaults, BofA did not have any obligation to make additional extensions of credit under the Credit Agreement and had full legal right to exercise its rights and remedies under the Credit Agreement and related agreements.

On January 27, 2006, IES entered into a forbearance agreement ("Forbearance Agreement") with BofA in connection with the Credit Agreement. The Forbearance Agreement provided for BofA's forbearance from exercising its rights and remedies under the Credit Agreement and related agreements from January 27, 2006 through the earliest to occur of (i) 5:00 p.m. (Dallas, Texas time) on February 28, 2006 or (ii) the date that any Forbearance Default (as defined in the Forbearance Agreement) occurs. Notwithstanding the forbearance, on January 26, 2006 BofA sent a "blockage notice" to the Senior Subordinated Notes Indenture Trustee preventing any payments from being made on such notes. Lastly, under the Forbearance Agreement, BofA had no obligation to make any loans or otherwise extend any credit to IES under the Credit Agreement. Any agreement by BofA to make any loans or otherwise extend any further credit was in the sole discretion of BofA.

Since the Commencement Date, the Bankruptcy Court approved on an interim basis [Docket No. 48], and the Debtors have entered into, the DIP Facility. The DIP Facility was approved by the Bankruptcy Court on a final basis on March 10, 2006. Under the terms of the DIP Facility, all letters of credit outstanding under the Credit Agreement are deemed to have been issued under the DIP Facility.

B.      PLAN SUPPORT AGREEMENT

As stated above, in November 2005, the Debtors commenced negotiations with the Ad Hoc Committee of certain Holders of the Senior Subordinated Notes (who were represented by Conway, Del Genio, Gries & Co., LLC, as financial advisors, and Weil, Gotshal & Manges LLP, as legal counsel) in an effort to formulate a structure and transaction for a consensual restructuring of the Debtors. Following extensive negotiations, the parties entered into a non-binding agreement in principle regarding certain economic terms of a financial restructuring of the Debtors and began formulating the Plan embodying that agreement.

On February 13, 2006, certain Holders of Senior Subordinated Notes holding approximately 61% of the outstanding Senior Subordinated Notes entered into the Plan Support Agreement, a copy of which is attached hereto as **Exhibit E**. The Plan Support Agreement sets forth the terms of the contemplated Restructuring as embodied in the Plan.

The Plan Support Agreement provides for the Restructuring to be effectuated through prearranged Chapter 11 cases. Under the terms of the Plan Support Agreement, among other things, the failure of the Debtors to obtain the entry of the Confirmation Order by May 30, 2006 may terminate the obligations of the Supporting Noteholders under the Plan Support Agreement.

The Plan Support Agreement is subject to the finalization of definitive agreements and related documentation and the satisfaction of certain specified conditions. Based upon the extensive negotiation and coordination with, and input from, advisors to the Ad Hoc Committee, the Debtors are of the opinion that all definitive agreements and related documentation (except for the definitive documentation of the Revolving Exit Facility and the Term Exit Facility which have not been fully negotiated or drafted as of the date hereof) fully comply with the terms and conditions set forth in the Plan Support Agreement.

C.      RESTRUCTURING PROFESSIONALS

The Debtors have retained Sanford R. Edlein of Glass & Associates, Inc. as their Chief Restructuring Officer. Mr. Edlein and any associates of Glass providing services to the Debtors will be paid on an hourly basis in accordance with Glass' standard billing rates terms.

The Debtors have retained Gordian to act as the Debtors' financial advisor in connection with the Restructuring. Under the terms of the engagement, Gordian receives a monthly fee of $125,000 and will also be entitled to a transaction fee ("Transaction Fee") comprising:

1.      a.      0.5% of the face amount of all Senior Subordinated Notes and Senior Convertible Notes compromised in a financial transaction for the first $56.0 million of outstanding notes compromised; plus

17

b.  0.75% of the face amount of all notes compromised in a financial transaction for up to the next $56.0 million of outstanding notes compromised; plus

c.  1.0% of the face amount of all notes compromised in a financial transaction for up to the next $56.0 million of outstanding notes compromised, and

d.  2.0% of the face amount of all additional notes compromised, and

2.  1.5% of the aggregate consideration that is paid or payable in connection with all other financial transactions, excluding replacement senior bank financing.

The monthly fees, together with the transaction fees, will not exceed $2,500,000.

The Debtors have retained Vinson & Elkins L.L.P. as their bankruptcy and restructuring counsel. The Debtors will pay Vinson & Elkins L.L.P. in accordance with its standard billing terms.

The Debtors have retained Financial Balloting Group LLC to serve as the Solicitation Agent in connection with the Solicitation. The Debtors will pay the Solicitation Agent reasonable and customary compensation for its services in connection with the Solicitation, plus reimbursement for reasonable out-of-pocket expenses. Brokers, dealers, commercial banks, trust companies and other Nominees will be reimbursed by the Debtors for customary mailing and handling expenses incurred by them in forwarding materials to their customers, but will not otherwise be compensated for their services. The Debtors also will pay any other customary fees and expenses attributable to the Solicitation. The Solicitation Agent will perform administrative tasks only and will not make any recommendation to any Holder of an Eligible Claim with respect to its acceptance or rejection of the Plan.

The Debtors have also agreed to pay the reasonable fees and expenses of the legal and financial advisors to the Ad Hoc Committee. These professionals include Conway, Del Genio, Gries & Co., LLC, as financial advisors, which has been employed by the Ad Hoc Committee for a fixed fee of $105,000 per month, and Weil, Gotshal & Manges LLP, as legal counsel, which will be compensated in accordance with its standard billing terms. The Committee has filed applications to retain (i) Weil, Gotshal & Manges LLP as counsel to the Committee and (ii) Conway, Del Genio, Gries & Co., LLC as financial advisors to the Committee. Upon approval of these applications, payment of the fees and expenses of such Committee Professionals will be subject to approval of the Bankruptcy Court.

## III. MANAGEMENT AND CORPORATE STRUCTURE OF THE REORGANIZED DEBTORS

### A. THE BOARDS OF DIRECTORS AND EXECUTIVE OFFICERS OF THE REORGANIZED DEBTORS

On the Effective Date, the term of each member of IES's current board of directors will automatically expire. Subject to the requirements of section 1129(a)(5) of the Bankruptcy Code,

the initial board of directors of Reorganized IES on and after the Effective Date will consist of nine (9) members, the names of whom will be set forth in the Plan Supplement. The members of the board of directors of Reorganized IES will consist of IES's new chief executive officer and eight (8) other members to be designated by the Ad Hoc Committee. The board of directors, managing partner or manager, as applicable, of each of the Debtors will have the responsibility for the oversight of each the Reorganized Debtors, as applicable, on and after the Effective Date.

Existing IES senior management (the "Senior Management Supporting Group") will maintain their current positions as executive officers of Reorganized IES on and after the Effective Date at their current compensation levels. The Senior Management Supporting Group is as follows:

| Name | Position |
|------|----------|
| C. Byron Snyder | President and Chief Executive Officer[5] |
| Richard C. Humphrey | Chief Operating Officer |
| Curt L. Warnock | Senior Vice President, General Counsel and Corporate Secretary |
| David A. Miller | Senior Vice President and Chief Financial Officer |
| Bob Callahan | Senior Vice President of Human Resources |

The current officers, directors, managers and managing partners of each of the IES Subsidiaries, as applicable, shall also serve as the officers, directors, managers and managing partners of each of the Reorganized Subsidiaries. The identities of such Persons will be set forth in the Plan Supplement.

B. 2006 LONG TERM INCENTIVE PLAN

On the Effective Date, Reorganized IES will adopt a stock incentive plan (the "2006 Long Term Incentive Plan"). The 2006 Long Term Incentive Plan will provide for awards in the form of stock options and restricted stock. Pursuant to the terms of the 2006 Long Term Incentive Plan, up to a maximum of 10% of the number of fully diluted shares of New IES Common Stock outstanding as of the Effective Date will be available for issuance. Individual awards will not exceed 50% of the maximum number of shares available for issuance under the 2006 Long Term Incentive Plan. Certain members of Reorganized IES's Management will be issued shares of Restricted New IES Common Stock equal to 3% of the New IES Common Stock to be issued pursuant to the Plan, before giving effect to the options issued pursuant to the 2006 Long Term Incentive Plan, with 2.5% to be allocated to existing IES management on the

---

[5] Pursuant to the employment agreement dated February 13, 2006 between IES and C. Byron Snyder (a copy of which was filed with the Debtors' initial Plan Supplement on the Commencement Date), unless the agreement is earlier terminated in accordance with its terms, Mr. Snyder will remain the President and Chief Executive Officer of IES, or Reorganized IES, as the case may be, until the earlier of such time (i) as a new president and chief executive officer is hired by the board of directors of IES or Reorganized IES, as the case may be, or (ii) as is otherwise determined by the board of directors of IES or Reorganized IES, as the case may be (in either case, a "Replacement Event"). If Mr. Snyder ceases to be the President and Chief Executive Officer as a result of a Replacement Event before the end of the two-year term of his employment agreement, Mr. Snyder will continue to be engaged by IES or Reorganized IES, as the case may be, as a consultant until the end of such term unless the agreement is earlier terminated in accordance with its terms.

Effective Date and 0.5% to be reserved for the new Chief Executive Officer and/or other new key employees, as determined by the board of directors of Reorganized IES. The Restricted New IES Common Stock to be issued on the Effective Date will vest one-third (1/3) on January 1, 2007 (the "Initial Vesting Date"), one-third (1/3) on the first anniversary of the Initial Vesting Date, and one-third (1/3) on the second anniversary of the Initial Vesting Date; provided, however, that if a person receiving Restricted New IES Common Stock is involuntarily terminated by Reorganized IES, without cause, prior to the Initial Vesting Date, the portion of the Restricted New IES Common Stock allocated to such person that would have vested on the Initial Vesting Date absent the termination will automatically vest upon such termination.

After the Effective Date, Reorganized IES will grant options issued pursuant to the 2006 Long Term Incentive Plan to C. Byron Snyder and to certain other officers and key employees identified by Reorganized IES's board of directors. The New Options will be issued with an exercise price equal to the fair market value of the Reorganized IES shares as of the date of issuance and with vesting provisions to be determined by the board of directors of Reorganized IES, or, in the case of Mr. Snyder, such exercise price and vesting provisions will be as set forth in his option agreement with Reorganized IES (the form of which is attached to his Employment Agreement with IES).

C.      EMPLOYMENT AGREEMENTS FOR EXECUTIVES

On the Effective Date, Reorganized IES will assume all existing Employment Agreements to which the Debtors are a party.

IV. SUMMARY OF THE PLAN

A.      INTRODUCTION

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and shareholders. In addition to permitting rehabilitation of the debtor, Chapter 11 promotes equality of treatment of creditors and equity security holders who hold substantially similar claims against or equity interests in the debtor and its assets. In furtherance of these two goals, upon the filing of a petition for relief under Chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the Chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any entity acquiring property under the plan, and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and

substitutes therefor the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS ATTACHED THERETO AND DEFINITIONS THEREIN), WHICH IS ATTACHED HERETO AS **EXHIBIT A**.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, THEIR ESTATES, THE REORGANIZED DEBTORS, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

B.    SCHEDULE OF TREATMENT OF CLAIMS AND EQUITY INTERESTS

| CLASS | DESIGNATION | IMPAIRMENT | ENTITLED TO VOTE |
|---|---|---|---|
| Class 1 | Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Credit Agreement Claims | Unimpaired | No (deemed to accept) |
| Class 3 | Secured Claims | Unimpaired | No (deemed to accept) |
| Class 4 | Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 5 | Senior Convertible Note Claims | Impaired | Yes |
| Class 6 | Senior Subordinated Note Claims | Impaired | Yes |
| Class 7 | Subordinated Claims | Unimpaired | No (deemed to accept) |
| Class 8 | IES Common Stock Interests | Impaired | Yes |
| Class 9 | IES Other Equity Interests | Impaired | No (deemed to reject) |
| Class 10 | IES Subsidiary Debtor Interests | Unimpaired | No (deemed to accept) |

C.    TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

1.    ADMINISTRATIVE CLAIMS

Except to the extent that any Entity entitled to payment of any Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim

shall receive Cash equal to the unpaid portion of its Allowed Administrative Claim, on the latest of (a) the Distribution Date, (b) the date on which its Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which its Administrative Claim becomes payable under any agreement relating thereto, or as soon thereafter as is reasonably practicable. Notwithstanding the foregoing, any Allowed Administrative Claim based upon a liability incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases, including but not limited to the reasonable fees and expenses incurred after the Commencement Date by the Indenture Trustees, shall be paid by the Debtors or the Reorganized Debtors as Administrative Claims in the ordinary course of the Debtors' businesses, in accordance with the terms and conditions of any agreement relating thereto or upon such other terms as may be agreed upon between the Holder of such Claim and the Debtors, without application by or on behalf of any such parties to the Bankruptcy Court, and without notice and a hearing, unless specifically required by the Bankruptcy Court.

### 2. PRIORITY TAX CLAIMS

On the later of (a) the Distribution Date or (b) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (x) Cash equal to the unpaid portion of such Allowed Priority Tax Claim or (y) such other treatment as to which the Debtors and such Holder shall have agreed upon in writing.

### 3. PROFESSIONAL FEE CLAIMS

The Holders of Professional Fee Claims shall file their respective final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date by no later than the date that is sixty (60) days after the Effective Date, or such other date that may be fixed by the Bankruptcy Court. If granted by the Bankruptcy Court, such award shall be paid in full in such amount as is Allowed by the Bankruptcy Court either (a) on the date such Professional Fee Claim becomes an Allowed Professional Fee Claim, or as soon as reasonably practicable thereafter, or (b) upon such other terms as may be mutually agreed upon between such Holder of an Allowed Professional Fee Claim and the Debtors. Requests for compensation under section 503(b)(3) and (4) of the Bankruptcy Code must be filed with the Bankruptcy Court and served on the Debtors, any Committee appointed in the Chapter 11 Cases, the Equity Committee, and other parties in interest by the Administrative Claims Bar Date. Notwithstanding the foregoing, and in the event that the applications to retain (i) Weil, Gotshal & Manges LLP, as counsel to the Committee and/or (ii) Conway, Del Genio, Gries & Co., LLC, as financial advisors to the Committee are not approved by the Bankruptcy Court, the reasonable fees and expenses incurred after the Commencement Date by (x) Weil, Gotshal & Manges LLP as counsel to the Ad Hoc Committee, and (y) Conway, Del Genio, Gries & Co., LLC, as financial advisors to the Ad Hoc Committee, in accordance with their respective agreements with IES, shall both be paid by the Debtors or the Reorganized Debtors as Administrative Claims in the ordinary course of the Debtors' businesses, without application by or on behalf of any such parties to the Bankruptcy Court, and without notice and a hearing, unless specifically required by the Bankruptcy Court. If the Debtors or the Reorganized Debtors and any such professional cannot agree on the amount of fees and expenses to be paid to such party, the amount of fees and expenses shall be determined by the Bankruptcy

Court.  If any fees and expense have not been paid to Weil, Gotshal & Manges LLP and/or Conway, Del Genio, Gries & Co., LLC in the ordinary course and the parties do not disagree as to the appropriate amounts payable, such fees and expenses shall be paid by the Reorganized Debtors on the Effective Date (unless the Bankruptcy Court has otherwise specifically required a hearing on the payment of such amounts).  The payment of the Weil, Gotshal & Manges LLP and Conway, Del Genio, Gries & Co., LLC fees and expenses under Article 2.03 of the Plan is part of the overall settlement embodied by the Plan among the Supporting Noteholders and the Debtors.

D.   TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

1.   CLASS 1- PRIORITY CLAIMS

a.   <u>Claims in Class</u>:  Priority Claims are Claims that are accorded priority in right of payment under section 507(a) of the Bankruptcy Code (other than Allowed Administrative Claims and Allowed Priority Tax Claims).

b.   <u>Treatment</u>:  On the later of (i) the Distribution Date or (ii) the date on which its Priority Claim becomes an Allowed Priority Claim, or, in each case, as soon as reasonably practicable thereafter, each Holder of an unpaid Allowed Priority Claim against the Debtors shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Claim, Cash equal to the full amount of its Allowed Priority Claim.

c.   <u>Voting</u>:  Class 1 is Unimpaired by the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, each Holder of an Allowed Priority Claim in Class 1 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

2.   CLASS 2 - CREDIT AGREEMENT CLAIMS

a.   <u>Claims in Class</u>:  Class 2 consists of all Allowed Credit Agreement Claims, to the extent outstanding and not refinanced in full from the proceeds of the DIP Facility.

b.   <u>Treatment</u>:  Unless otherwise agreed to by the Holders of any Allowed Credit Agreement Claim, on the Effective Date, or as soon as reasonably practicable thereafter, (i) the Holder of any noncontingent Allowed Credit Agreement Claim that has not been refinanced in full pursuant to the DIP Facility shall receive Cash in an amount equal to one hundred percent (100%) of such Holder's remaining Allowed Credit Agreement Claim, and (ii) all letters of credit issued and outstanding under the Credit Agreement that have not been refinanced in full pursuant to the DIP Facility shall be replaced by the Reorganized Debtors.  All IES Subsidiary Guarantees of obligations under the Credit Agreement shall be terminated provided that all Allowed Credit Agreement Claims are refinanced in full and/or eliminated by the replacement of the outstanding letters of credit.

c.   <u>Voting</u>:  Class 2 is Unimpaired by the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, each Holder of an Allowed Credit Agreement Claim in Class 2 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

3.      CLASS 3 - SECURED CLAIMS

a.      <u>Claims in Class</u>:  Class 3 consists of all Allowed Secured Claims, other than Claims in Class 2, including, but not limited to, the Allowed Secured Claims of CHUBB and SureTec, if any.

b.      <u>Treatment</u>: On the later of (x) the Effective Date, (y) the date on which a Secured Claim becomes an Allowed Secured Claim, or (z) such other date as may be ordered by the Bankruptcy Court, or, in each case, as soon as reasonably practicable thereafter, each Allowed Secured Claim shall be, at the election of the Debtors, (i) Reinstated, (ii) paid in Cash, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Secured Claim together with accrued post-Commencement Date interest, (iii) satisfied by the Debtors' surrender of the collateral securing such Allowed Secured Claim, or (iv) offset against, and to the extent of, the Debtors' claims against the Holder of such Allowed Secured Claim.  To the extent that any Allowed Secured Claim is Reinstated under the Plan, the IES Subsidiary Guarantees (if any) of such Allowed Secured Claim shall be Reinstated as well.

c.      <u>Voting</u>:  Class 3 is Unimpaired by the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, each Holder of an Allowed Secured Claim in Class 3 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

4.      CLASS 4 - UNSECURED CLAIMS

a.      <u>Claims in Class</u>:   Class 4 consists of all Allowed Unsecured Claims, other than Claims in Classes 5, 6 or 7.

b.      <u>Treatment</u>: Except to the extent that any Entity entitled to payment of any Allowed Unsecured Claim agrees to a less favorable treatment, each Holder of an Allowed Unsecured Claim shall, at the election of the Debtors, on the Effective Date, or as soon as reasonably practicable thereafter:  (x) receive Cash equal to the unpaid amount of such Claim or (y) have such Claim Reinstated.  The Debtors will have paid a substantial portion, if not all, of the undisputed and liquidated Allowed Class 4 Claims in the ordinary course of business prior to Confirmation.

c.      <u>Voting</u>:   Class 4 is Unimpaired by the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, each Holder of an Allowed Unsecured Claim in Class 4 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.      CLASS 5 – SENIOR CONVERTIBLE NOTE CLAIMS

a.      <u>Claims in Class</u>:   Class 5 consists of all Allowed Senior Convertible Note Claims.

b.      <u>Treatment</u>:  On the later of (x) the Effective Date, (y) the date on which a Senior Convertible Note Claim becomes an Allowed Senior Convertible Note Claim, or (z) such other date as may be ordered by the Bankruptcy Court, and, solely with respect to

clauses (y) and (z) above, within five (5) business days thereafter, each Allowed Senior Convertible Note Claim shall be paid in Cash from the proceeds of the Term Exit Facility, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Senior Convertible Note Claim; *provided, however*, that if the Term Exit Facility does not close on or before the Effective Date, the Debtors shall have the right to request a hearing (the "Contingency Hearing") before the Bankruptcy Court to be convened upon not less than thirty-five (35) days advance written notice to the Senior Convertible Notes Indenture Trustee and the Holders of Allowed Senior Convertible Note Claims, to either (x) Reinstate the Allowed Senior Convertible Notes (the "Reinstatement Treatment") or (y) exchange each Allowed Senior Convertible Note Claim for a Pro Rata share of the New Notes in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Senior Convertible Note Claim (the "New Note Exchange Treatment"). In the event the Senior Convertible Notes are Reinstated, the IES Subsidiary Guarantees of the Senior Convertible Note Claims will be Reinstated as well. In the event New Notes are issued in exchange for Class 5 Claims, New IES Subsidiary Guarantees will be given by the same IES Subsidiaries that guaranteed IES's obligations under the Senior Convertible Notes Indenture.

        c.      <u>Voting</u>: Class 5 may be Impaired by the Plan in the event that the Debtors elect to give the Holders of Claims in Class 5 the New Notes in exchange for such Claims. Therefore, the Holders of Claims in Class 5 are being solicited for votes in favor of the Plan. To the extent the treatment of Class 5 Claims elected by the Debtors is determined by the Bankruptcy Court to render the Holders of such Claims Unimpaired, the Holders of Claims in Class 5 will be conclusively presumed to have accepted the Plan notwithstanding that any Holder of a Claim in Class 5 may have voted to reject the Plan.

        d.      <u>Reservation of Rights</u>. Until the Bankruptcy Court has scheduled a Contingency Hearing and set an objection deadline with respect to such hearing, (i) neither the Senior Convertible Notes Indenture Trustee nor any Holder of a Senior Convertible Note Claim shall be required to assert any objections concerning the confirmability of the Plan, and (ii) the Debtors will not adduce any evidence or advance any legal arguments concerning the propriety, under Bankruptcy Code section 1129 or otherwise, of the Reinstatement Treatment or the New Note Exchange Treatment, nor shall the Senior Convertible Notes Indenture Trustee nor any Holder of a Senior Convertible Note Claim object to the Plan on the basis of the Reinstatement Treatment or New Note Exchange Treatment prior to receiving written notice of the Reinstatement Treatment or the New Note Exchange Treatment as set forth in Article 3.03(e)(ii) of the Plan. If the Bankruptcy Court convenes a Contingency Hearing, none of the Bankruptcy Court, the Senior Convertible Notes Indenture Trustee or the Holders of Senior Convertible Note Claims shall be bound in any manner by legal or factual determinations made by the Bankruptcy Court at the Confirmation Hearing. Without limiting the foregoing in any respect, if a Contingency Hearing is convened, the Senior Convertible Notes Indenture Trustee and each Holder of a Senior Convertible Note Claim shall have the right to challenge the confirmability of the Plan on any ground which they have standing to raise, and the Bankruptcy Court shall (a) consider their objections de novo and determine the merits of any such objections (and the legal consequences of the vote of any Holder of a Senior Convertible Note Claim) as if they were raised at the Confirmation Hearing, and (b) determine, inter alia, the issue of whether the Plan treatment of the Senior Convertible Note Claims constitutes "unfair discrimination" pursuant to section 1129(b) of the Bankruptcy Code as if all Claims paid pursuant to the Order Authorizing

Payment of Undisputed General Unsecured Claims in the Ordinary Course of Business [Docket No. 56] were to be paid in Cash pursuant to the Plan. The Holders of the Senior Convertible Note Claims withdraw all objections to the Disclosure Statement. The Senior Convertible Notes Indenture Trustee and any Holder of a Senior Convertible Note Claim shall reserve their rights to assert that Holders of Senior Convertible Note Claims are entitled to be paid any and all amounts, including without limitation, principal, interest, fees, liquidated damages and other charges, to which the Holders of Senior Convertible Note Claims or the Senior Convertible Notes Indenture Trustee are determined to be entitled under the terms of any operative lending document, including, without limitation, the Senior Convertible Notes Indenture, the Senior Convertible Notes, the Bankruptcy Code, other applicable law, or otherwise.

6. CLASS 6 - SENIOR SUBORDINATED NOTE CLAIMS

a. <u>Claims in Class</u>: Class 6 consists of all Allowed Senior Subordinated Note Claims. On the Effective Date, the Senior Subordinated Note Claims shall be deemed Allowed in the aggregate principal amount of approximately $173 million plus accrued and unpaid interest thereon through the Commencement Date.

b. <u>Treatment</u>: On the Effective Date, or as soon as reasonably practicable thereafter, Holders of Allowed Senior Subordinated Note Claims shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Senior Subordinated Note Claims, their Pro Rata share of eighty-two percent (82%) of the New IES Common Stock, subject to dilution by the issuance of shares of New IES Common Stock upon the exercise of the New Options. The IES Subsidiary Guarantees of the Senior Subordinated Note Claims shall be terminated and forever discharged as of the Effective Date.

c. <u>Voting</u>: Class 6 is Impaired by the Plan. Each Holder of an Allowed Senior Subordinated Note Claim in Class 6 is entitled to vote to accept or reject the Plan.

7. CLASS 7 - SUBORDINATED CLAIMS

a. <u>Claims in Class</u>: Class 7 consists of all Allowed Subordinated Claims.

b. <u>Treatment</u>: On the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Subordinated Claim shall have its Claim Reinstated.

c. <u>Voting</u>: Class 7 is Unimpaired by the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, each Holder of an Allowed Subordinated Claim in Class 7 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

8. CLASS 8 - IES COMMON STOCK INTERESTS

a. <u>Equity Interests in Class</u>: Class 8 consists of all Allowed IES Common Stock Interests.

b.    Treatment:  On the Effective Date, or as soon as reasonably practicable thereafter, all existing Allowed IES Common Stock Interests will be cancelled, and Holders of Allowed IES Common Stock Interests will receive, in exchange for such Allowed IES Common Stock Interests, their Pro Rata share of fifteen percent (15%) of the New IES Common Stock, subject to dilution by the issuance of shares of New IES Common Stock upon the exercise of the New Options.

c.    Voting:  Class 8 is Impaired by the Plan.  Each Holder of an Allowed IES Common Stock Interest in Class 8 is entitled to vote to accept or reject the Plan.

9.    CLASS 9 - IES OTHER EQUITY INTERESTS

a.    Equity Interests in Class:  Class 9 consists of all IES Other Equity Interests.  For avoidance of doubt, the IES Other Equity Interests will include all options to purchase IES Common Stock that, immediately prior to the Effective Date, are issued and outstanding but have not been exercised in accordance with the terms and conditions of the applicable IES long-term incentive plans and related agreements pursuant to which such options were granted or that have not been deemed exercised pursuant to Article 4.05 of the Plan or that have been deemed under the provisions of Article 4.05 of the Plan to be IES Other Equity Interests.

b.    Treatment:  On the Effective Date, all IES Other Equity Interests shall be cancelled, and the Holders of IES Other Equity Interests shall not receive or retain any property or interest in property on account of their IES Other Equity Interests.

c.    Voting:  Holders of IES Other Equity Interests shall receive no Distribution under the Plan.  Pursuant to section 1126(g) of the Bankruptcy Code, each Holder of an IES Other Equity Interest in Class 9 is conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

10.    CLASS 10 - IES SUBSIDIARY DEBTOR INTERESTS

a.    Equity Interests in Class:  Class 10 consists of all IES Subsidiary Debtor Interests.

b.    Treatment: On the Effective Date, all IES Subsidiary Debtor Interests shall be Reinstated and shall vest in Reorganized IES, or the respective Reorganized Debtors, as the case may be.

c.    Voting:  Holders of IES Subsidiary Debtor Interests are Unimpaired.  Pursuant to section 1126(f) of the Bankruptcy Code, each Holder of an IES Subsidiary Debtor Interest in Class 10 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

E.    ALLOWED CLAIMS AND EQUITY INTERESTS

Notwithstanding any provision in the Plan to the contrary, the Debtors or Reorganized Debtors shall only make Distributions on account of Allowed Claims and Allowed Equity

27

Interests.   A Claim that is Disputed by the Debtors as to its amount only shall be deemed Allowed in the amount the Debtors admit owing and Disputed as to the remainder.

F.    POSTPETITION INTEREST

In accordance with section 502(b)(2) of the Bankruptcy Code, the amount of all prepetition Unsecured Claims against the Debtors shall be calculated as of the Commencement Date.  Except as otherwise explicitly provided in the Plan, in section 506(b) of the Bankruptcy Code or by Final Order, no Holder of a prepetition Claim shall be entitled to or receive interest on such Claim after the Commencement Date.

G.    ALTERNATIVE TREATMENT

Notwithstanding any provision in the Plan to the contrary, any Holder of an Allowed Claim may receive, instead of the Distribution or treatment to which it is entitled under the Plan, any other Distribution or treatment to which it, the Debtors and the Ad Hoc Committee may agree to in writing; provided, however, that such other Distribution or treatment shall not provide a return having a present value in excess of the present value of the Distribution or treatment that otherwise would be given such Holder pursuant to the Plan.

H.    ALLOCATION

The value of any New IES Common Stock received by Holders of Claims in satisfaction of interest-bearing obligations shall be allocated first to the full satisfaction of principal of such interest-bearing obligations and second in satisfaction of any accrued and unpaid interest.

I.    MEANS FOR IMPLEMENTATION OF THE PLAN

1.    CONTINUED CORPORATE EXISTENCE

The Reorganized Debtors shall continue to exist after the Effective Date as separate Entities in accordance with the applicable law in the applicable jurisdiction in which they were formed under their respective certificates of incorporation, limited partnership, or formation, as applicable, and bylaws or similar organizational documents, as applicable, in effect before the Effective Date except as their certificates of incorporation, limited partnership, or formation and bylaws or similar organizational documents may be amended pursuant to the Plan.  On the Effective Date, without any further corporate or similar action, the certificate of incorporation and bylaws of Reorganized IES shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities.  The certificate of incorporation and by-laws of Reorganized IES shall be substantially in the form included in the Plan Supplement.  The appointment of the Board of Directors of Reorganized IES pursuant to the Plan as of the Effective Date being deemed to constitute the election of directors of Reorganized IES by written consent in lieu of an annual meeting pursuant to Section 303 of the Delaware General Corporation Law and Section 211 of the Delaware General Corporation Law, Reorganized IES shall not be required to hold an annual meeting of stockholders prior to the end of its 2006 fiscal year.  The certificate of incorporation, limited partnership or formation and bylaws or other organizational documents of each Reorganized Subsidiary shall be the

certificate of incorporation, limited partnership, or formation and bylaws of each Reorganized Subsidiary on the Effective Date without any modification or amendment thereto.

## 2. RESTRUCTURING TRANSACTIONS

On the Effective Date, and pursuant to the Plan or the applicable Plan Supplement documents, the applicable Debtors or Reorganized Debtors shall enter into the Restructuring Transactions contemplated in the Plan, and shall take any actions as may be reasonably necessary or appropriate to effect a restructuring of their respective businesses or the overall organizational structure of the Reorganized Debtors. The Restructuring Transactions may include one or more mergers, consolidations, restructurings, conversions, dissolutions, transfers or liquidations as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate. The actions to effect the Restructuring Transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation or reincorporation, limited partnership, or formation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (d) all other actions that the applicable Entities determine to be reasonably necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions. The chairman of the board of directors, president, chief executive officer, chief financial officer, any executive vice-president or senior vice-president, or any other appropriate officer, manager or managing partner of each Debtor or Reorganized Debtor, as appropriate, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such other actions, as may be reasonably necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan. The secretary or assistant secretary of the appropriate Debtor or Reorganized Debtor, as appropriate, shall be authorized to certify or attest to any of the foregoing actions.

## 3. CORPORATE ACTION; CANCELLATION OF SECURITIES

As of the Effective Date, the Certificates evidencing the Existing Securities shall evidence solely the right to receive from the Debtors the Distribution of the consideration, if any, set forth in Article 3.03 of the Plan. On the Effective Date, except as otherwise provided for in the Plan, and except to the extent that the Term Exit Facility does not close and the Debtors elect to Reinstate the Senior Convertible Notes and related IES Subsidiary Guarantees, (a) the Existing Securities, to the extent not already cancelled, shall be deemed cancelled and of no further force or effect without any further action on the part of the Bankruptcy Court or any other Person, and (b) the obligations of the Debtors under the Existing Securities and under the Debtors' certificates of incorporation, limited partnership, or formation, any agreements, indentures, or certificates of designations governing the Existing Securities shall be terminated and discharged; provided, however, that each indenture or other agreement that governs the rights of the Holder

29

of a Claim based upon the Existing Securities and that is administered by an indenture trustee, agent, or servicer shall continue in effect solely for the purposes of (x) allowing such indenture trustee, agent, or servicer to make the Distributions to be made on account of such Claims under the Plan and (y) permitting such indenture trustee, agent, or servicer to maintain any rights it may have for fees, costs, expenses, and indemnification under such indenture or other agreement. Additionally, the cancellation of any indenture shall not impair the rights and duties under such indenture as between the indenture trustee thereunder and the beneficiaries of the trust created thereby. Additionally, as of the Effective Date, all IES Other Equity Interests, to the extent not already cancelled, shall be cancelled. For avoidance of doubt, the IES Other Equity Interests will include all options to purchase IES Common Stock that, immediately prior to the Effective Date, are issued and outstanding but have not been exercised in accordance with the terms and conditions of the applicable IES long-term incentive plans and related agreements pursuant to which such options were granted or that have not been deemed exercised pursuant to Article 4.05 of the Plan or that have been deemed under the provisions of Article 4.05 of the Plan to be IES Other Equity Interests. The IES Subsidiary Debtor Interests shall not be cancelled, but shall be Reinstated and shall vest in Reorganized IES or the respective Reorganized Debtors, as the case may be, as of the Effective Date.

## 4. DIRECTORS AND EXECUTIVE OFFICERS

On the Effective Date, the term of each member of IES's current board of directors will automatically expire. Subject to the requirements of section 1129(a)(5) of the Bankruptcy Code, the initial board of directors of Reorganized IES on and after the Effective Date will consist of nine (9) members, consisting of IES's new chief executive officer and eight (8) other members to be designated by the Ad Hoc Committee.

The Debtors shall identify the individuals proposed to serve as directors of Reorganized IES in the Plan Supplement, which shall be filed with the Bankruptcy Court on or before the date that is ten (10) days prior to the Confirmation Hearing. The board of directors of Reorganized IES shall have the responsibility for the oversight of Reorganized IES on and after the Effective Date. The members of existing IES management shall maintain their current positions as executive officers of the Reorganized Debtors on and after the Effective Date, unless otherwise provided herein or in the Plan Supplement. The current officers and directors of the IES Subsidiaries shall also serve as the officers and directors of each of the Reorganized Subsidiaries, respectively, on and after the Effective Date unless otherwise provided in the Plan Supplement.

On the Effective Date, Reorganized IES will assume all existing Employment Agreements.

## 5. DIP FACILITY AND DIP BONDING FACILITIES

Effective February 14, 2006, IES and certain IES Subsidiaries, as borrowers, and each of the non-borrower IES Subsidiaries, as guarantors, entered into the DIP Facility. The DIP Facility was used to refinance all obligations under the Credit Agreement and will be used to permit borrowings for ongoing working capital needs and to continue the letters of credit outstanding under the Credit Agreement. The DIP Facility is evidenced by the DIP Credit Documents. The DIP Facility was approved on a final basis on March 10, 2006.

Effective February 14, 2006, the Debtors entered into the CHUBB DIP Bonding Facility, pursuant to which CHUBB will consider providing additional bonding of up to $12 million per month for a period of four (4) months in exchange for $1.5 million per month in cash or letters of credit as additional collateral.  The CHUBB DIP Bonding Facility was approved on a final basis on March 13, 2006 [see Docket No. 183].

The SureTec DIP Bonding Facility, pursuant to which SureTec will consider providing up to $10 million of bonding capacity, inclusive of pre-petition bonds outstanding, and provided that aggregate bonding in excess of $5 million is subject to the delivery by the Debtors to SureTec of an additional $1.5 million letter of credit, was approved by the Bankruptcy Court on a final basis on March 13, 2006 [see Docket No. 184].

The Scarborough DIP Bonding Facility, pursuant to which Scarborough will provide up to $100 million in bonding capacity, subject to the provision by the Debtors of a $2 million letter of credit and the payment by the Debtors of a bonding premium of approximately 3.5% of the face amount of each bond to be issued, was approved by the Bankruptcy Court on a final basis on March 13, 2006 [see Docket No. 185].

6.   VESTING OF OPTIONS AND IES EXISTING RESTRICTED COMMON STOCK; DEEMED EXERCISE OF CERTAIN OPTIONS FOR IES COMMON STOCK.

In connection with and immediately prior to the consummation of the Plan on the Effective Date, all IES Existing Restricted Common Stock and all non-vested options to purchase IES common stock issued pursuant to IES's existing long-term incentive plans and related agreements and outstanding (or, in the case of certain shares of IES Existing Restricted Common Stock, issued and held in treasury) immediately prior to the Effective Date will become fully vested, all restrictions, if any, with respect thereto will lapse and all performance criteria, if any, applicable thereto, will be deemed to have been satisfied.  In connection with and immediately prior to the consummation of the Plan on the Effective Date, each option that becomes vested pursuant to the terms of Article 4.05 of the Plan with an exercise price that is less than or equal to the Fair Market Value (as defined in the applicable existing IES long-term incentive plan and related agreement pursuant to which such option was granted) of a share of IES common stock on the day prior to the Effective Date will be deemed to have been exercised by the holder thereof in a cashless exercise and such holder shall be deemed to have received upon such exercise a number of shares of IES common stock (rounded down to the nearest whole number after taking into account all such options held by such holder) having a Fair Market Value as of the day prior to the Effective Date that is equal to the difference between such Fair Market Value and such exercise price.  The shares of IES common stock deemed to be so issued will be treated as Class 8 IES Common Stock Interests under the Plan.  Each other option to purchase IES common stock that is issued and outstanding immediately prior to the Effective Date will be treated as a Class 9 IES Other Equity Interest and cancelled on the Effective Date unless prior to the Effective Date the holder thereof exercises such option in accordance with the terms and conditions of the applicable existing IES long-term incentive plan and related agreement pursuant to which such option was issued, in which case the share(s) of IES common stock issued upon exercise thereof shall be treated as Class 8 IES Common Stock Interests under the Plan.

7.    NEW SECURITIES

As of the Effective Date, 12,631,421 shares of New IES Common Stock shall be issued, on a Pro Rata basis, to Holders of Allowed Senior Subordinated Note Claims in full satisfaction of and in exchange for their Allowed Senior Subordinated Note Claims.  As a result, the Holders of the Allowed Senior Subordinated Note Claims will own 82% of the shares of New IES Common Stock issued and outstanding as of the Effective Date, subject to dilution by the issuance of shares of New IES Common Stock upon exercise of the New Options granted pursuant to the 2006 Long Term Incentive Plan.

As of the Effective Date, 2,310,626 shares of New IES Common Stock shall be issued, on a Pro Rata basis, to the Holders of IES Common Stock Interests in full satisfaction of and in exchange for such IES Common Stock Interests.  As a result, the Holders of IES Common Stock Interests will own 15% of the shares of New IES Common Stock issued and outstanding as of the Effective Date, subject to dilution by the issuance of shares of New IES Common Stock upon exercise of the New Options granted pursuant to the 2006 Long Term Incentive Plan.

As of the Effective Date, 462,125 shares of Restricted New IES Common Stock, representing 3% of the shares of New IES Common Stock issued and outstanding as of the Effective Date, shall be issued to certain members of Reorganized IES's management as part of the 2006 Long Term Incentive Plan.  Existing IES management will receive 2.5% of the shares of New IES Common Stock issued and outstanding as of the Effective Date and 0.5% will be reserved for the new Chief Executive Officer and/or other new key employees, to be allocated by the board of directors of Reorganized IES.  The Restricted New IES Common Stock to be issued on the Effective Date will vest one-third (1/3) on January 1, 2007 (the "Initial Vesting Date"), one-third (1/3) on the first anniversary of the Initial Vesting Date, and one-third (1/3) on the second anniversary of the Initial Vesting Date; provided, however, that if a person receiving Restricted New IES Common Stock is involuntarily terminated by Reorganized IES, without cause, prior to the Initial Vesting Date, the portion of the Restricted New IES Common Stock allocated to such person that would have vested on the Initial Vesting Date absent the termination will automatically vest upon such termination.

As of the Effective Date, and without the requirement of any further action by any Entity, each former Holder of an Allowed Senior Subordinated Note Claim that becomes an owner of at least 10% of the shares of New IES Common Stock issued and outstanding as of such date or shall otherwise be an affiliate of Reorganized IES shall become a party to a Registration Rights Agreement with Reorganized IES.    The Registration Rights Agreement shall require Reorganized IES to file a "shelf" registration statement covering resales of New IES Common Stock after the Effective Date and shall provide the stockholders that are parties thereto with demand and piggyback registration rights following the expiration of such "shelf" registration statement on the terms set forth in the Registration Rights Agreement.  The Registration Rights Agreement shall be substantially in the form set forth in the Plan Supplement.

As of the Effective Date, the board of directors of the Reorganized IES shall be authorized to issue the New Options to purchase an aggregate of up to ten percent (10%) of the number of fully diluted outstanding shares of New IES Common Stock as of the Effective Date in accordance with the 2006 Long Term Incentive Plan.

The issuance, grant, and reservation of New Securities authorized in Article 4.06 of the Plan shall not require any further act or action by any shareholder or creditor of the Debtors, under applicable law, regulation, order or rule.

On or before the Distribution Date, Reorganized IES shall issue the New IES Common Stock for Distribution pursuant to the provisions of the Plan. All securities to be issued shall be deemed issued as of the Effective Date regardless of the date on which they are actually distributed.

8.    ISSUANCE OF NEW SECURITIES AND NEW NOTES

The issuance of the New Securities (and, if applicable, the issuance of the New Notes and New IES Subsidiary Guarantees) by Reorganized IES is hereby authorized without further act by the board of directors, shareholders, or officers of Reorganized IES or action under applicable law, regulation, order, or rule. All New Securities, except the Restricted New IES Common Stock (which will be issued pursuant to a registration statement on Form S-8 to be filed by IES or Reorganized IES with the SEC), issued under the Plan shall be exempt from registration under the Securities Act or any applicable state or local law pursuant to section 1145 of the Bankruptcy Code. To the extent the New Notes and New IES Subsidiary Guarantees are deemed to be "securities" under the Securities Act, they will be issued (if they are issued) under section 4(2) of the Securities Act and Regulation D thereunder.

9.    EXIT FACILITIES

On the Effective Date, Reorganized IES and certain of the IES Subsidiaries, as borrowers, and each of its non-borrower Reorganized Subsidiaries, as guarantors, will enter into two Exit Facilities, which will consist of the Revolving Exit Facility and the Term Exit Facility. The Revolving Exit Facility will provide liquidity for working capital and other general corporate purposes to Reorganized IES and its debtor and non-debtor subsidiaries following the conclusion of the Chapter 11 Cases, and the Term Exit Facility will be available to refinance the Senior Convertible Notes. A portion of the proceeds of the Revolving Exit Facility shall be used to refinance the principal balance of loans outstanding under the DIP Credit Documents, and any outstanding letters of credit under the DIP Facility, if not continued under the Revolving Exit Facility, will be either cash collateralized or back-stopped with new letters of credit from the Revolving Exit Facility.

10.    2006 LONG TERM INCENTIVE PLAN

On the Effective Date, the Reorganized Debtors will adopt the 2006 Long Term Incentive Plan, the terms of which are described in Article III(B) of this Disclosure Statement and the form of which has been included in the Debtors' initial Plan Supplement, which is intended to provide incentives to certain officers and key employees to continue their efforts to foster and promote the long-term growth and performance of the Reorganized Debtors.

11.    REVESTING OF ASSETS

The property of each Debtor's Estate shall revest in the applicable Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtors may operate their businesses and

may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all property of the Reorganized Debtors shall be free and clear of all Claims, encumbrances, Equity Interests, charges and Liens except as specifically provided or contemplated in the Plan, in connection with the Revolving Exit Facility, the Term Exit Facility, or in the Confirmation Order. Without limiting the generality of the foregoing, the Reorganized Debtors may, without application to or approval by the Bankruptcy Court, pay professional fees and expenses incurred after the Effective Date.

### 12. PRESERVATION OF RIGHTS OF ACTION; SETTLEMENT OF LITIGATION CLAIMS

Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, following the Confirmation Date, the Reorganized Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Causes of Action that any of the Debtors or their Estates may hold against any Person or Entity without further approval of the Bankruptcy Court. The Reorganized Debtors or their successor(s) may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

### 13. EXEMPTION FROM CERTAIN TRANSFER TAXES

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or any other Person or Entity pursuant to the Plan, including the Revolving Exit Facility and the Term Exit Facility, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### J. PROVISIONS GOVERNING DISTRIBUTIONS

### 1. DISTRIBUTIONS FOR CLAIMS AND EQUITY INTERESTS ALLOWED AS OF THE EFFECTIVE DATE

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, Distributions and issuances of New IES Common Stock, Restricted New IES Common Stock, and New Notes (to the extent applicable) to be made (1) in exchange for or on account of Claims or Equity Interests that are Allowed Claims or Allowed Equity Interests as of the Effective Date or (2) to members of Reorganized IES's management pursuant to the 2006 Long Term Incentive Plan, shall be made on the Distribution Date, or as soon thereafter as reasonably practicable. All Cash Distributions shall be made by the Disbursing Agent from available Cash of the Reorganized Debtors. Any Distribution under the Plan of property other than Cash (including

any issuance of New IES Common Stock, Restricted New IES Common Stock, and New Notes, to the extent applicable, and the Distribution of such New IES Common Stock, Restricted New IES Common Stock, or New Notes (to the extent applicable) in exchange for Allowed Claims and Allowed Equity Interests as of the Effective Date) shall be made by the Disbursing Agent, the Senior Subordinated Notes Indenture Trustee, the Senior Convertible Notes Indenture Trustee, or the transfer agent in accordance with the terms of the Plan.

2.      DISBURSING AGENT

The Disbursing Agent shall make all Distributions required under the Plan, except with respect to a Holder of a Claim whose Distribution is governed by an indenture or other agreement and is administered by an indenture trustee, agent, or servicer, which Distributions shall be deposited with the appropriate indenture trustee, agent, or servicer, who shall deliver such Distributions to the Holders of Allowed Claims in accordance with the provisions of the Plan and the terms of the relevant indenture or other governing agreement.

If the Disbursing Agent is an independent third party designated by the Reorganized Debtors to serve in such capacity (or, in the case of the Senior Subordinated Notes Indenture or the Senior Convertible Notes Indenture, the Indenture Trustees), such Disbursing Agent or Indenture Trustee shall receive, without further Bankruptcy Court approval, reasonable compensation for Distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from the Reorganized Debtors on terms acceptable to the Reorganized Debtors, or, in the case of the Indenture Trustees, in accordance with the terms and conditions of the Senior Subordinated Notes Indenture or Senior Convertible Notes Indenture (as applicable) or upon such other terms as may be agreed upon between such Indenture Trustee and the Reorganized Debtors. No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. If otherwise so ordered, all costs and expenses of procuring any such bond shall be paid by the Reorganized Debtors.

3.      SURRENDER OF SECURITIES OR INSTRUMENTS

On or before the Distribution Date, or as soon as reasonably practicable thereafter, each Holder of a Certificate shall surrender such Certificate (i) in the case of Equity Interests, to the Disbursing Agent, (ii) in the case of the Senior Subordinated Notes, to the Senior Subordinated Notes Indenture Trustee, and (iii) in the case of the Senior Convertible Notes, to the Senior Convertible Notes Trustee, and each Certificate shall be cancelled. No Distribution of property under the Plan shall be made to or on behalf of any such Holder unless and until such Certificate is received by the Disbursing Agent or the applicable Indenture Trustee, as the case may be, or the unavailability of such Certificate is reasonably established to the satisfaction of the Disbursing Agent or the applicable Indenture Trustee, as the case may be. Any such Holder who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Disbursing Agent or the applicable Indenture Trustee, as the case may be, prior to the second anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims or Equity Interests in respect of such Certificate and shall not participate in any Distribution under the Plan, and any securities in

respect of such forfeited Distribution shall be cancelled notwithstanding any federal or escheat laws to the contrary.

### 4.      INSTRUCTIONS TO DISBURSING AGENT

Prior to any Distribution on account of an Allowed Senior Subordinated Note Claim, the Senior Subordinated Notes Indenture Trustee shall (i) inform the Disbursing Agent as to the amount of properly surrendered Senior Subordinated Notes and (ii) inform the Disbursing Agent in a properly completed letter of transmittal, accompanied by properly remitted securities, of the names of registered Holders of Allowed Senior Subordinated Note Claims, and the number of shares of New IES Common Stock to be issued and distributed to or on behalf of such Holders of Allowed Senior Subordinated Note Claims in exchange for properly surrendered Senior Subordinated Notes.

In the event that the Debtors elect to make a Distribution on account of the Allowed Senior Convertible Note Claims, the Senior Convertible Notes Indenture Trustee shall, prior to such Distribution, (x) inform the Disbursing Agent as to the amount of properly surrendered Senior Convertible Notes and (y) inform the Disbursing Agent in a properly completed letter of transmittal, accompanied by properly remitted securities, of the names of registered Holders of Allowed Senior Convertible Note Claims, and the Pro Rata share of the principal amount of the Senior Convertible Notes held by each such Holder.

### 5.      SERVICES OF THE INDENTURE TRUSTEES

The Indenture Trustees' services with respect to consummation of the Plan shall be as set forth in the Plan and as authorized by the Senior Subordinated Notes Indenture and the Senior Convertible Notes Indenture, as applicable.

### 6.      RECORD DATE FOR PLAN DISTRIBUTIONS

Except with respect to securities Claims and Equity Interests, at the close of business on the Record Date for Plan Distributions, the transfer ledgers for the Senior Secured Debt (maintained by BofA, as administrative agent under the Credit Agreement) shall be closed, and there shall be no further changes recognized in the record Holders of such debt. The Reorganized Debtors and the Disbursing Agent, if any, shall have no obligation to recognize any transfer of any such debt occurring after the Record Date for Plan Distributions and shall be entitled instead to recognize and deal for all purposes the Plan with only those record Holders listed on the transfer ledgers as of the close of business on the Record Date for Plan Distributions. Distributions on account of any securities Claims or Equity Interests shall be made in accordance with Article 5.03 of the Plan.

### 7.      MEANS OF CASH PAYMENT

Cash payments under the Plan shall be in U.S. funds by check, wire transfer, or such other commercially reasonable manner as the payor shall determine in its sole discretion.

8.    CALCULATION OF DISTRIBUTION AMOUNTS OF NEW IES COMMON STOCK

No fractional shares of New IES Common Stock shall be issued or distributed under the Plan or by Reorganized IES or any Disbursing Agent, indenture trustee, agent, or servicer. Each Person entitled to receive New IES Common Stock shall receive the total number of whole shares of New IES Common Stock to which such Person is entitled. Whenever any Distribution to a particular Person would otherwise call for Distribution of a fraction of a share of New IES Common Stock, such number of shares to be distributed shall be rounded up or down to the nearest whole number and such Person shall receive no separate consideration for such fractional shares.

9.    DELIVERY OF DISTRIBUTIONS; UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS

Distributions to Holders of Allowed Claims shall be made by the Disbursing Agent or the Indenture Trustees, as the case may be, (a) at the Holder's last known address, (b) at the address in any written notice of address change delivered to the Disbursing Agent, (c) in the case of the Holder of an Allowed Senior Convertible Note Claim or an Allowed Senior Subordinated Note Claim, at the address in the respective Indenture Trustee's official records, or (d) at the address set forth in a properly completed letter of transmittal accompanying a Certificate properly remitted in accordance with the terms of the Plan. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made, unless and until the Disbursing Agent or respective Indenture Trustee is notified of such Holder's then current address, at which time all missed Distributions shall be made to such Holder without interest. Amounts in respect of undeliverable Distributions made through the Disbursing Agent or an Indenture Trustee shall be returned to the appropriate Reorganized Debtor or Indenture Trustee, as the case may be, until such Distributions are claimed. All claims for undeliverable Distributions must be made on or before the second anniversary of the Effective Date, after which date (x) all Cash in respect of such forfeited Distribution including interest accrued thereon shall revert to Reorganized IES and (y) all New IES Common Stock or New Notes (to the extent applicable) in respect of such forfeited Distribution shall be cancelled, in each case, notwithstanding any federal or escheat laws to the contrary. The Debtors will file a list of unclaimed Distributions immediately prior to the closing of these Chapter 11 Cases.

10.    WITHHOLDING AND REPORTING REQUIREMENTS

In connection with the Plan and all Distributions, the Disbursing Agent shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions shall be subject to any such withholding and reporting requirements. The Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements.

11.    SETOFFS

Other than in respect of any Allowed Credit Agreement Claim or any Allowed Senior Subordinated Note Claim, a Reorganized Debtor may, but shall not be required to, set off against

any Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or Reorganized Debtors may have against the Claim's Holder; provided, however, that neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Reorganized Debtors of any claim that the Debtors or Reorganized Debtors may have against such Holder. Nothing in the Plan shall be deemed to expand rights to setoff under applicable non-bankruptcy law.

K.  PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS

1.  OBJECTIONS TO CLAIMS; DISPUTED CLAIMS

The Debtors intend to make Distributions, as required by the Plan, in accordance with the Schedules, if any, and the books and records of the Debtors (or in the case of the Senior Secured Debt or obligations under the DIP Facility, in accordance with the books and records of BofA as administrative agent). Unless disputed by a Holder of a Claim or Equity Interest, the amount set forth in the Schedules, if any, and the books and records of the Debtors shall constitute the amount of the Allowed Claim or Allowed Equity Interest of such Holder. If any Holder of a Claim or Equity Interest disagrees with the Debtors, such Holders must so advise the Debtors in writing, in which event, the Claim or Equity Interest shall be a Disputed Claim or a Disputed Equity Interest. The Debtors intend to attempt to resolve any such disputes consensually, or, at the Debtors option, through other judicial means outside of the Bankruptcy Court. Nevertheless, the Debtors may, in their discretion, file with the Bankruptcy Court (or any other court of competent jurisdiction) an objection to the allowance of any Claim or Equity Interest, or any other appropriate motion or adversary proceeding with respect thereto. All such objections shall be litigated to Final Order; provided, however, that the Debtors may compromise and settle, withdraw or resolve by any other method, without requirement of Bankruptcy Court approval, any objections to Claims or Equity Interests. In addition, any Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code or other applicable law regardless of whether such Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of the any appeal relating to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

2.  NO DISTRIBUTION PENDING ALLOWANCE

Notwithstanding any other provision in the Plan, if any portion of a Claim is a Disputed Claim or any portion of an Equity Interest is a Disputed Equity Interest, no payment or Distribution provided under the Plan shall be made on account of or in exchange for such portion

of such Claim or Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or an Allowed Equity Interest.

### 3.    DISTRIBUTIONS AFTER ALLOWANCE

To the extent that a Disputed Claim or Disputed Equity Interest ultimately becomes an Allowed Claim or Allowed Equity Interest, a Distribution shall be made to the Holder of such Allowed Claim or Allowed Equity Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court or other applicable court of competent jurisdiction allowing any Disputed Claim or Disputed Equity Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Equity Interest the Distribution to which such Holder is entitled under the Plan on account of or in exchange for such Allowed Claim.

### L.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    ASSUMED CONTRACTS AND LEASES

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date each Reorganized Debtor shall be deemed to have assumed each executory contract and unexpired lease to which it is a party, unless such contract or lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, (iii) is the subject of a motion to reject filed on or before the Confirmation Date or (iv) is set forth in a schedule, as an executory contract or unexpired lease to be rejected, filed as part of the Plan Supplement. The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Effective Date to the extent not specifically assumed or rejected as of an earlier date.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

### 2.    PAYMENTS RELATED TO ASSUMPTION OF CONTRACTS AND LEASES

Any monetary amounts by which any executory contract and unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the applicable Debtor on or before the Effective Date; *provided, however,* if there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of a Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of

section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

3.     REJECTED CONTRACTS AND LEASES

Except for those executory contracts and unexpired leases set forth on a schedule to be filed with the Plan Supplement or specifically rejected pursuant to a separate order of the Bankruptcy Court, none of the executory contracts and unexpired leases to which the Debtors are a party shall be rejected under the Plan; provided, however, that the Debtors reserve the right, at any time prior to the Confirmation Date, to seek to reject any executory contract or unexpired lease to which any Debtor is a party.

4.     CLAIMS BASED UPON REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES

All Claims arising out of the rejection of executory contracts and unexpired leases must be served upon the appropriate Debtor and its counsel within sixty (60) days after the earlier of (i) the date of entry of an order of the Bankruptcy Court approving such rejection or (ii) the Confirmation Date.  Any such Claims not filed within such times shall be forever barred from assertion against the respective Debtor, its Estate, and its property.

5.     COMPENSATION AND BENEFIT PLANS AND TREATMENT OF RETIREMENT PLAN

Except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, all employee compensation and benefit plans of the Debtors, including benefit plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Commencement Date and not since terminated, shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Plan.  The Debtors' obligations under such plans and programs shall survive Confirmation of the Plan, except for (i) executory contracts or employee benefit plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code) and (ii) such executory contracts or employee benefit plans as have previously been rejected, are the subject of a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract; provided, however, that the Debtors' obligations, if any, to pay all "retiree benefits," as defined in section 1114(a) of the Bankruptcy Code, shall continue unimpaired and in full force and effect.  Options issued under the Debtors' long term incentive plans existing as of the Commencement Date shall be cancelled unless exercised prior to the Effective Date in accordance with the terms and conditions of the applicable existing IES long-term incentive plans and agreements pursuant to which such options were issued or deemed exercised pursuant to the provisions of Article 4.05 of the Plan.

M.    ACCEPTANCE OR REJECTION OF THE PLAN

1.    CLASSES ENTITLED TO VOTE

Each Holder, as of the Voting Record Date, of an Allowed Claim in Impaired Classes 5 and 6 or an Allowed Equity Interest in Impaired Class 8 is entitled to vote to accept or reject the Plan.  Holders of Claims or IES Subsidiary Interests in Unimpaired Classes 1, 2, 3, 4, 7, and 10 shall not be entitled to vote because they are conclusively deemed, by operation of section 1126(f) of the Bankruptcy Code, to have accepted the Plan.  Holders of Equity Interests in Impaired Class 9 will not receive or retain any property under the Plan on account of their Equity Interests, and therefore are deemed not to have accepted the Plan by operation of section 1126(g) of the Bankruptcy Code.

2.    ACCEPTANCE BY IMPAIRED CLASSES

An Impaired Class of Claims shall have accepted the Plan if the Holders of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in the Class actually voting have voted to accept the Plan, in each case not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code.

3.    ELIMINATION OF CLASSES

Any Class that does not contain any Allowed Claims or Equity Interests or any Claims or Equity Interests temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed not included in the Plan for purposes of (i) voting to accept or reject the Plan and (ii) determining whether such Class has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

4.    NONCONSENSUAL CONFIRMATION

The Bankruptcy Court may confirm the Plan over the dissent of or rejection by any Impaired Class if all of the requirements for consensual confirmation under subsection 1129(a), other than subsection 1129(a)(8), of the Bankruptcy Code and for nonconsensual confirmation under subsection 1129(b) of the Bankruptcy Code have been satisfied.  To the extent necessary, the Debtors shall request Confirmation of the Plan, as the Plan may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

N.    CONDITIONS PRECEDENT; WAIVER

1.    CONDITIONS TO CONFIRMATION

a.    The proposed Confirmation Order shall be in form and substance reasonably acceptable to the Debtors, the Ad Hoc Committee, and any Committee appointed in these Chapter 11 Cases.  This condition is subject to the satisfaction or waiver in accordance with Article 9.04 of the Plan.

b.    The proposed Confirmation Order shall be in form and substance reasonably acceptable to the Revolving Exit Facility Agent and the Term Exit Facility Agent in

all respects that relate to, or could otherwise reasonably be expected to impact in an adverse manner, the Revolving Exit Facility Lenders or the Term Exit Facility Lenders.

## 2. CONDITIONS TO EFFECTIVE DATE

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Article 9.04 of the Plan:

a. The Confirmation Order shall have been entered by the Bankruptcy Court.

b. The Confirmation Order shall have become a Final Order.

c. All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained.

d. The Debtors shall have executed and delivered all documents necessary to effectuate the issuance of the New Securities and the New Notes and New IES Subsidiary Guarantees (if applicable).

e. All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

f. All documents referenced in subsections (d) and (e) of this paragraph, including all documents in the Plan Supplement, shall be reasonably acceptable to the Ad Hoc Committee.

g. No stay of the consummation of the Plan shall be in effect.

Furthermore, it shall be a condition to the effectiveness of the Plan that (i) the Term Exit Facility shall have closed and Cash from the proceeds of such facility shall be available to pay the Holders of the Allowed Senior Convertible Note Claims as required by Article 3.03(e)(ii) of the Plan, (ii) the Bankruptcy Court shall have entered an order, following a Contingency Hearing approving either (a) the Reinstatement Treatment, or (b) the New Note Exchange Treatment, or (iii) if a requirement for a Contingency Hearing is waived by the Holders of the Senior Convertible Notes, the Debtors and the Holders of the Senior Convertible Notes shall have reached an agreement on the applicable treatment. If a Contingency Hearing is convened and the Bankruptcy Court sustains objections asserted by the Senior Convertible Notes Indenture Trustee or Holders of Senior Convertible Note Claims to confirmation of the Plan (whether such objections relate to the proposed treatment of the Senior Convertible Note Claims or other confirmation issues), the Bankruptcy Court shall forthwith vacate the Confirmation Order.

## 3. EFFECT OF FAILURE OF CONDITIONS

In the event that one or more of the conditions specified in Article 9.02 of the Plan shall not have occurred or been waived pursuant to Article 9.04 of the Plan on or before July 14, 2006, or such later date as may be agreed to by the Debtors and the Ad Hoc Committee, (a) the Confirmation Order shall be vacated, (b) no Distributions under the Plan shall be made, (c) the

Debtors and Holders of Claims and Equity Interests shall be restored to the *status quo* as of the day immediately preceding the Confirmation Date as though the Confirmation Order had never been entered, and (d) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any Person or governmental Entity or to prejudice in any manner the rights of the Debtors or any Person or governmental Entity in any further proceedings involving the Debtors.

4.      WAIVER OF CONDITIONS

Each of the conditions set forth in Article 9.01 and Article 9.02 of the Plan, other than as set forth in Article 9.02(a) and Article 9.02(g) the Plan, may be waived in whole or in part by the Debtors with the consent of the Ad Hoc Committee (which consent shall not be unreasonably withheld).

O.      MODIFICATIONS AND AMENDMENTS; WITHDRAWAL

Subject to the provisions of the Plan Support Agreement, the Debtors may amend or modify the Plan at any time prior to the Confirmation Date. The Debtors reserve the right to include any amended exhibits in the Plan Supplement with the consent of the Ad Hoc Committee, whereupon each such amended exhibit shall be deemed substituted for the original of such exhibit; provided, however, that the DIP Commitment Letter, the DIP Credit Documents, the Revolving Exit Facility Commitment Letter, the Revolving Exit Facility Credit Documents, and the Term Exit Facility Commitment Letter and the Term Exit Facility Credit Documents may not be amended without the consent of the parties thereto. After the Confirmation Date the Debtors or Reorganized Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, and the Confirmation Order, and to accomplish such matters as may be reasonably necessary to carry out the purposes and intent of the Plan so long as such proceedings do not materially and adversely affect the treatment of Holders of Claims or Equity Interests under the Plan.

P.      RETENTION OF JURISDICTION

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the Plan's Confirmation and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Cases and the Plan, to the fullest extent permitted by law, including jurisdiction to:

      1.      hear and determine any and all objections to the allowance of Claims or Equity Interests;

      2.      hear and determine any and all motions to estimate Claims at any time, regardless of whether the Claim to be estimated is the subject of a pending objection, a pending appeal, or otherwise;

      3.      hear and determine any and all motions to subordinate Claims or Equity Interests at any time and on any basis permitted by applicable law;

4.      hear and determine all Professional Fee Claims and other Administrative Claims;

5.      hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any Rejection Claim or required Cure or the liquidation of any Claims arising therefrom;

6.      hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases;

7.      enter such orders as may be necessary or appropriate in aid of the consummation of the Plan and to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

8.      hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan and all contracts, instruments, and other agreements executed in connection with the Plan;

9.      hear and determine any request to modify the Plan or to cure any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court;

10.      issue and enforce injunctions or other orders, or take any action that may be necessary or appropriate to restrain any interference with or compel action for the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

11.      enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

12.      hear and determine any matters arising in connection with or relating to the Plan, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

13.      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

14.      recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

15.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16.      hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

17.    hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

18.    enter a final decree closing the Chapter 11 Cases.

### Q.    COMPROMISES AND SETTLEMENTS

Pursuant to Federal Rule of Bankruptcy Procedure 9019(a), the Debtors may compromise and settle various Claims against them and/or claims they may have against other Persons.  Each of the Debtors expressly reserves the right (and except as otherwise provided in the Plan, with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against it and claims that it may have against other Persons up to and including the Effective Date.  After the Effective Date, such right shall transfer to the Reorganized Debtors pursuant to the Plan and no Bankruptcy Court approval of any such action, compromise or settlement shall be required.

### R.    MISCELLANEOUS PROVISIONS

### 1.    BAR DATES FOR CERTAIN CLAIMS

### a.    ADMINISTRATIVE CLAIMS

At the election of the Debtors, the Confirmation Order may establish an Administrative Claims Bar Date for the filing of all Administrative Claims (other than Administrative Claims paid in the ordinary course of business pursuant to Article 2.01 of the Plan, Claims for United States Trustee fees, Professional Fee Claims, Claims outstanding under the DIP Facility, or Claims for the expenses of the members of the Ad Hoc Committee, the Committee, or the Equity Committee.  If such an Administrative Claims Bar Date is established, Holders of asserted Administrative Claims (other than Administrative Claims paid in the ordinary course of business pursuant to Article 2.01 of the Plan, Professional Fee Claims, Claims for United States Trustee fees, Claims outstanding under the DIP Facility, or Claims for the expenses of the members of the Ad Hoc Committee or of any other Committee (if appointed)), must submit proofs of Administrative Claim on or before such Administrative Claims Bar Date or forever be barred from doing so.  If an Administrative Claims Bar Date is set, (i) the notice of Confirmation to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) shall set forth such date and constitute notice of the Administrative Claims Bar Date, and (ii) the Debtors or the Reorganized Debtors, as the case may be, shall have ninety (90) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Claims Bar Date to review and object to such Administrative Claims.  All such objections shall be litigated to Final Order; *provided, however,* that the Debtors or the Reorganized Debtors may compromise and settle, withdraw or resolve by any other method, without requirement of Bankruptcy Court approval, any objections to Administrative Claims.

### b.    PROFESSIONAL FEE CLAIMS

All final requests for compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code for services

rendered to the Debtors, the Committee, or to such other entities as to which the foregoing sections apply prior to the Confirmation Date must be filed and served on the Reorganized Debtors and their counsel no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to applications of such Professionals or other Entities for compensation or reimbursement of expenses must be filed and served on the Reorganized Debtors and their counsel and the requesting Professional or other Entity, no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

### 2.    PAYMENT OF STATUTORY FEES

All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  All such fees that arise after the Effective Date but before the closing of the Chapter 11 Cases shall be paid by the Reorganized Debtors.

### 3.    SEVERABILITY OF PLAN PROVISIONS

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 4.    SUCCESSORS AND ASSIGNS

The rights, benefits and obligations of all Persons named or referred to in the Plan shall be binding on, and shall inure to the benefit of, their respective heirs, executors, administrators, personal representatives, successors or assigns.

### 5.    INJUNCTION

ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES PURSUANT TO SECTIONS 105 AND 362 OF THE BANKRUPTCY CODE OR OTHERWISE AND IN EFFECT ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE IN EFFECT UNTIL THE EFFECTIVE DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL PERSONS OR ENTITIES THAT HAVE HELD, HOLD OR MAY HOLD CLAIMS OR CAUSES OF ACTION AGAINST OR EQUITY INTERESTS IN ANY OF THE DEBTORS ARE, AS OF THE EFFECTIVE DATE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST ANY OF THE DEBTORS AND THEIR ESTATES, THE

46

REORGANIZED DEBTORS, OR THEIR PROPERTY OR ASSETS, ON ACCOUNT OF SUCH CLAIMS, CAUSES OF ACTION OR EQUITY INTERESTS: (A) COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION OR OTHER PROCEEDING RELATING TO SUCH CLAIM, CAUSE OF ACTION OR EQUITY INTEREST; (B) ENFORCING, LEVYING, ATTACHING, COLLECTING OR OTHERWISE RECOVERING IN ANY MANNER OR BY ANY MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE OR ORDER RELATING TO SUCH CLAIM, CAUSE OF ACTION OR EQUITY INTEREST; (C) CREATING, PERFECTING OR ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY LIEN RELATING TO SUCH CLAIM, CAUSE OF ACTION OR EQUITY INTEREST; (D) ASSERTING ANY SETOFF, RIGHT OF SUBROGATION OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY DEBT, LIABILITY OR OBLIGATION DUE TO THE DEBTORS RELATING TO SUCH CLAIM, CAUSE OF ACTION OR EQUITY INTEREST; AND (E) PROCEEDING IN ANY MANNER IN ANY PLACE WHATSOEVER THAT DOES NOT CONFORM TO OR COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN OR THE CONFIRMATION ORDER.   NOTWITHSTANDING THIS SECTION, THE SET OFF RIGHTS OF ANY HOLDERS OF ALLOWED CLAIMS ARE PRESERVED TO THE EXTENT OF APPLICABLE LAW.

6.    DEBTORS' RELEASES

AS OF THE EFFECTIVE DATE, THE DEBTORS AS DEBTORS IN POSSESSION AND THE REORGANIZED DEBTORS WILL BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES (OTHER THAN THE RIGHTS OF THE DEBTORS AND THE REORGANIZED DEBTORS TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER THE PLAN) WHETHER DIRECT OR DERIVATIVE, LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, DISPUTED OR UNDISPUTED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE, OR IN ANY WAY RELATING TO THE RESTRUCTURING OF THE DEBTORS, THE CHAPTER 11 CASES, THE PLAN, OR THE DISCLOSURE STATEMENT, AND THAT COULD HAVE BEEN ASSERTED BY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES AGAINST (A) THE DIRECTORS, OFFICERS AND EMPLOYEES OF ANY OF THE DEBTORS AND THE DEBTORS' AGENTS, ADVISORS AND PROFESSIONALS SERVING AS OF THE COMMENCEMENT DATE, IN EACH CASE IN THEIR CAPACITY AS SUCH, (B) THE HOLDERS OF SENIOR SUBORDINATED NOTE CLAIMS, INCLUDING THE SUPPORTING NOTEHOLDERS, AND THE SENIOR SUBORDINATED NOTES INDENTURE TRUSTEE, AND THE AGENTS, ADVISORS AND PROFESSIONALS OF SAME, IN EACH CASE IN THEIR CAPACITY AS SUCH, (C) THE HOLDERS OF CREDIT AGREEMENT CLAIMS AND CLAIMS UNDER THE DIP FACILITY, AND THE AGENTS, ADVISORS AND PROFESSIONALS OF SAME, IN EACH CASE IN THEIR CAPACITY AS

SUCH, AND (D) THE MEMBERS OF ANY COMMITTEE, INCLUDING THE AD HOC COMMITTEE, AND ITS AGENTS, ADVISORS AND PROFESSIONALS, IN EACH CASE IN THEIR CAPACITY AS SUCH; PROVIDED, HOWEVER, NOTHING IN ARTICLE 13.06 OF THE PLAN SHALL BE CONSTRUED TO RELEASE OR EXCULPATE ANY PERSON OR ENTITY FROM FRAUD, WILLFUL MISCONDUCT, CRIMINAL CONDUCT, OR UNAUTHORIZED USE OF CONFIDENTIAL INFORMATION THAT CAUSES DAMAGES OR FOR PERSONAL GAIN.

## 7.    EXCULPATION AND LIMITATION OF LIABILITY

The Debtors, the Reorganized Debtors, the Holders of Senior Subordinated Note Claims, the Supporting Noteholders, the Senior Secured Lenders, the DIP Lenders, the Senior Subordinated Notes Indenture Trustee, the Committee, the Ad Hoc Committee and any and all of their respective present and former members, officers, directors, employees, equity interest holders, partners, affiliates, advisors, attorneys, and agents, and any of their successors or assigns, shall not have or incur any liability to any Holder of a Claim or an Equity Interest, or any other party-in-interest, or any of their respective agents, employees, equity interest holders, partners, members, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the negotiation, solicitation, and/or distribution of the Plan and Disclosure Statement, the administration of the Chapter 11 Cases, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence, and in all respects they shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities.

## 8.    BINDING EFFECT

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims against and Equity Interests in the Debtors, their respective successors and assigns, including the Reorganized Debtors, and all other parties-in-interest in the Chapter 11 Cases.

## 9.    REVOCATION, WITHDRAWAL, OR NON-CONSUMMATION

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file other plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation of the Plan does not occur, then (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (a) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity, (b) prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, or (c) constitute an admission of any sort by the Debtors or any other Entity.

10. COMMITTEES

On the Effective Date, the duties of the Committee and the Equity Committee shall terminate.

11. PLAN SUPPLEMENT

Any and all agreements, exhibits, lists, or schedules referred to herein but not filed with the Plan shall be contained in the Plan Supplement. The Debtors' initial Plan Supplement was filed with the Bankruptcy Court on the Commencement Date. All remaining documents required to be filed with the Plan Supplement but not filed as part of the initial Plan Supplement shall be filed with the Bankruptcy Court at least ten (10) days prior to the date of the commencement of the Confirmation Hearing. Thereafter, any Person may examine the Plan Supplement in the office of the Clerk of the Bankruptcy Court during normal court hours or may obtain a copy by contacting Pam Lewis, paralegal at Vinson & Elkins L.L.P., at (214) 220-7960. Holders of Claims against or Equity Interests in the Debtors may also obtain a copy of the Plan Supplement upon written request to the Debtors in accordance with Article 13.12 of the Plan.

12. NOTICES TO DEBTORS

Any notice, request, or demand required or permitted to be made or provided to or upon a Debtor or a Reorganized Debtor under the Plan shall be (i) in writing, (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) first class mail, or (e) facsimile transmission, and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

INTEGRATED ELECTRICAL SERVICES, INC.
1800 West Loop South
Suite 500
Houston, Texas  77027
Attn:  Curt L. Warnock
Telephone:  (713) 860-1500
Facsimile:  (713) 860-1588

with a required copy to:

Vinson & Elkins L.L.P.
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas  75201-2975
Attn:  Daniel C. Stewart
Telephone:  (214) 220-7700
Facsimile:  (214) 220-7716

13.     INDEMNIFICATION OBLIGATIONS

Except as otherwise specifically set forth in the Plan, any obligations or rights of the Debtors or Reorganized Debtors to defend, indemnify, reimburse, or limit the liability of the Debtors' present and former directors, managing partners, managers, officers or employees (the "Covered Persons") pursuant to the Debtors' or Reorganized Debtors' certificates of incorporation, limited partnership or formation, bylaws or similar organizational documents, policy of providing employee indemnification, applicable state law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Covered Persons based upon any act or omission related to such Covered Persons' service with, for, or on behalf of the Debtors prior to the Effective Date shall be deemed executory contracts assumed under the Plan and shall, in any event, survive Confirmation and remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement, or limitation of liability accrued or is owed in connection with an occurrence before or after the Commencement Date.

14.     GOVERNING LAW

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of New York shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation or organization of each Debtor shall govern corporate or other governance matters with respect to such Debtor, in either case without giving effect to the principles of conflicts of law thereof.

15.     PREPAYMENT

Except as otherwise provided in the Plan or the Confirmation Order, the Debtors shall have the right to prepay, without penalty or premium, all or any portion of an Allowed Claim at any time; provided, however, that any such prepayment shall not be in violation of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

16.     SECTION 1125(e) OF THE BANKRUPTCY CODE

As of the Confirmation Date, the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the Bankruptcy Code. As of the Confirmation Date, the Debtors, the Supporting Noteholders, and each of their respective affiliates, agents, directors, managing partners, managers, officers, employees, investment bankers, financial advisors, attorneys, and other professionals shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the New Securities and the New Notes and New IES Subsidiary Guarantees (if applicable) under the Plan, and therefore are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for the violation of any law, rule or regulation governing the solicitation of acceptances or rejections of the Plan, the offer and issuance of New Securities and the New Notes and New IES Subsidiary Guarantees (if applicable) under the Plan, or the distribution or dissemination of any information contained in the Plan, the Disclosure Statement, the Plan Supplement, and any and all related documents.

## V. EVENTS DURING THE CHAPTER 11 CASES

### A.        COMMENCEMENT OF THE CHAPTER 11 CASES

On the Commencement Date, the Debtors filed their petitions for reorganization relief under Chapter 11 of the Bankruptcy Code. The Chapter 11 Cases are being jointly administered under the above-referenced case name and number. The Debtors do not expect the Chapter 11 Cases to be protracted. To expedite their emergence from Chapter 11, the Debtors sought and obtained authority to, among other things, (i) pay their pre-petition employee Claims and to continue employee benefits [Docket No. 44],[6] (ii) pay their undisputed general unsecured Claims in the ordinary course of business [Docket No. 56], (iii) pay pre-petition sales, use, and other taxes, (iii) maintain pre-petition bank accounts and cash management systems [Docket No. 43], (iv) enter into the DIP Facility and to use cash collateral [Docket No. 50], enter into the CHUBB DIP Bonding Facility and use CHUBB's cash collateral [Docket No. 47], and enter into the SureTec DIP Bonding Facility [Docket No. 45]. The Debtors intend to seek all necessary and appropriate relief from the Bankruptcy Court in order to facilitate their reorganization goals in a timely manner.

### B.        APPOINTMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

On February 27, 2006, the United States Trustee appointed an Official Committee of Unsecured Creditors, initially comprised of members of the Ad Hoc Committee and later amended to add the appointment of the Senior Subordinated Notes Indenture Trustee.

### C.        APPOINTMENT OF THE OFFICIAL EQUITY HOLDERS COMMITTEE

On March 8, 2006, the United States Trustees appointed an Official Equity Holders Committee to represent the interests of all holders of Class 8 equity interests in the Debtors.

### D.        RETENTION OF PROFESSIONALS

The Debtors, with Bankruptcy Court approval, have retained and employed certain Professionals to represent and assist them in connection with the Chapter 11 Cases. Some of these Professionals have been intimately involved with the negotiation and development of the Plan and include: (i) Sanford R. Edlein of Glass & Associates, Inc., as Chief Restructuring Officer for the Debtors, (ii) Vinson & Elkins L.L.P., as restructuring counsel for the Debtors, (iii) Gordian Group, LLC, as financial advisor to the Debtors; and (iv) Financial Balloting Group LLC, as Solicitation Agent for the Debtors. The Debtors also filed an application to employ certain professionals to assist with the operations of their businesses in the ordinary course [Docket No. 95], which was approved by the Bankruptcy Court on March 10, 2006. These so-called "ordinary course professionals" will not be involved in the administration of the Chapter 11 Cases.

---

[6] Notwithstanding that the Debtors have been authorized to continue employee benefits, all options that may have been issued under the Debtors' long term incentive plans in place as of the Effective Date will be cancelled as of the Effective Date, except for those options that have become IES Existing Option Shares prior to the Effective Date.

E.  DEBTOR-IN-POSSESSION FINANCING

IES and certain IES Subsidiaries, as borrowers, and each of the non-borrower IES Subsidiaries, as guarantors, entered into the DIP Facility, with an effective date of February 14, 2006. The DIP Facility was used to refinance all obligations under the Credit Agreement and is being used to permit borrowings for ongoing working capital needs and the issuance of new letters of credit. The DIP Facility is evidenced by the DIP Credit Documents.

F.  EXIT FACILITIES

On the Effective Date, the DIP Facility described above will convert to the Revolving Exit Facility, the terms and conditions of which are set forth in the Revolving Exit Facility Commitment Letter and applicable documentation. The Revolving Exit Facility will provide liquidity for working capital and other general corporate purposes to Reorganized IES and its debtor and non-debtor subsidiaries following the conclusion of the Chapter 11 Cases and will be used to refinance the principal balance of loans outstanding under the DIP Credit Facility. There will also be a Term Exit Facility, the terms and conditions of which are set forth in the Term Exit Facility Commitment Letter, which will be available to refinance the Senior Convertible Notes.

## VI. CAPITAL STRUCTURE OF THE REORGANIZED DEBTORS

A.  NEW SECURITIES

The following discussion summarizes the material provisions of the New Securities including references, where applicable, to Reorganized IES's Certificate of Incorporation and Bylaws. This summary does not purport to be complete and is qualified in its entirety by reference to the full text of the Plan and Reorganized IES's Certificate of Incorporation and Bylaws.

1.  NEW IES COMMON STOCK

Reorganized IES's Certificate of Incorporation will authorize the issuance of 100,000,000 shares of New IES Common Stock having a par value of $0.01 per share, 12,631,421 of which shall be issued on the Effective Date to the Holders of the Senior Subordinated Note Claims, 2,310,626 of which shall be issued on the Effective Date to the Holders of IES Common Stock, and 462,125 of which shall be issued as restricted stock to management of Reorganized IES. Holders of New IES Common Stock will be entitled to vote upon all matters submitted to a vote of the stockholders of Reorganized IES and will be entitled to one vote for each share of New IES Common Stock held. Holders of New IES Common Stock will not have preemptive rights. Holders of New IES Common Stock will be entitled to receive dividends as may be declared by the board of directors of the Reorganized Debtors from time to time.

2.  REGISTRATION RIGHTS AGREEMENT

As of the Effective Date, and without the requirement of any further action by any Person, each former Holder of an Allowed Senior Subordinated Note Claim that becomes on the Effective Date an owner of at least 10% of the shares of New IES Common Stock issued and outstanding as of such date or who is otherwise an affiliate of Reorganized IES (collectively, the

52

"Original Holders") will become a party to the Registration Rights Agreement with Reorganized IES. The Registration Rights Agreement will require Reorganized IES to file a "shelf" registration statement covering resales of New IES Common Stock by the Original Holders after the Effective Date and will provide the Original Holders with demand and piggyback registration rights following the expiration of such "shelf" registration statement on the terms set forth in the Registration Rights Agreement. The form of Registration Rights Agreement that outlines the Original Holders' registration rights was filed with the Debtors' initial Plan Supplement on the Commencement Date.

### B. SECURITIES LAW MATTERS

Neither the offer nor the issuance of New IES Common Stock (other than the issuance of the Restricted New IES Common Stock) in exchange for certain Claims against, or Equity Interests in, the Debtors has been registered under the Securities Act or similar state statutes or "Blue Sky" laws. The Debtors will rely on section 1145(a)(1) of the Bankruptcy Code to exempt the offer and issuance of the New IES Common Stock (other than the issuance of the Restricted New IES Common Stock) pursuant to the Plan from the registration requirements of the Securities Act and applicable state securities and "Blue Sky" laws. The Restricted New IES Common Stock will be issued pursuant to a registration statement on Form S-8 to be filed with the SEC by IES or Reorganized IES. The New Notes and New IES Subsidiary Guarantees, to the extent deemed "securities" shall be issued (if they are issued) pursuant to Section 4(2) of the Securities Act and Regulation D thereunder.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities pursuant to a plan of reorganization from the registration requirements of the Securities Act and from registration under state securities laws if the following conditions are satisfied: (i) the securities are issued by a company (a "debtor" under the Bankruptcy Code) (or its affiliates or successors) under a plan of reorganization; (ii) the recipients of the securities hold a claim against, an interest in, or a claim for an administrative expense against, the debtor; and (iii) the securities are issued in exchange for the recipients' claims against or interests in the debtor, or principally in such exchange and partly for cash or property. In general, offers and sales of securities made in reliance on the exemption afforded under section 1145(a) of the Bankruptcy Code are deemed to be made in a public offering, so that the recipients thereof, other than underwriters, are free to resell such securities without registration under the Securities Act. In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

The exemption from the registration requirements of the Securities Act for resales provided by section 1145(a) is not available to a recipient of New IES Common Stock if such individual or entity is deemed to be an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. Section 1145(b) of the Bankruptcy Code defines the term "underwriter" as one who (a) purchases a claim with a view toward distribution of any security to be received in exchange for the claim, or (b) offers to sell securities issued under a plan for the Holders of such securities, or (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view toward distribution, or (d) is a control person of the issuer of the securities. Notwithstanding the foregoing, statutory underwriters may be able to sell securities without registration pursuant to

Rule 144 under the Securities Act (subject, however, to any resale limitations contained therein), which, in effect, permits the resale of securities (including those securities received by statutory underwriters pursuant to a chapter 11 plan) subject to applicable volume limitations, notice and manner of sale requirements and certain other conditions.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT HEREBY PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES AND BANKRUPTCY MATTERS DESCRIBED HEREIN. THE DEBTORS INCORPORATE BY REFERENCE ALL DISCLOSURES SET FORTH IN THEIR PUBLIC FILINGS WITH THE SECURITIES AND EXCHANGE COMMISSION. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTORS ENCOURAGE EACH CREDITOR, EQUITY INTEREST HOLDER, AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN.

## VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. GENERAL

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Claims or Equity Interests. The following summary does not address the federal income tax consequences to Holders not entitled to vote on the Plan, including Holders whose Claims or Equity Interests are entitled to reinstatement or payment in full in cash under the Plan or Holders whose Claims or Equity Interests are to be extinguished without any Distribution. Although the Debtors do not believe that any of the treatment options under the Plan with respect to the Holders of Senior Convertible Note Claims will result in material adverse federal income tax consequences to such Holders, such Holders should consult their own tax advisors as to the tax consequences (if any) of the treatments proposed in the Plan.

The following summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to

the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities and Holders of Claims or Equity Interests who are themselves in bankruptcy). Furthermore, this discussion assumes that Holders of Claims or Equity Interests hold only Claims or Equity Interests in a single Class. Holders of multiple Classes of Claims or Equity Interests should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

This discussion assumes that the various debt and other arrangements to which the Debtors are a party will be respected for federal income tax purposes in accordance with their form.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR EQUITY INTERESTS. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

B.    CONSEQUENCES TO THE DEBTORS

The Debtors expect to report consolidated net operating loss ("NOL") carryforwards for federal income tax purposes of approximately $146 million as of September 30, 2005. In 2002, the Debtors adopted a tax accounting method change that allowed a deduction of goodwill for income tax purposes that had previously been classified as non-deductible. The accounting method change resulted in additional amortizable tax basis in goodwill and additional NOL carryforwards (included in the $146 million NOL) of approximately $82 million for federal income tax purposes and $53 million for state income tax purposes. The Debtors believe that the realization of these additional NOL carryforwards is less than probable if challenged by the IRS.

As discussed below, the amount of the Debtors' NOL carryforwards may be significantly reduced upon implementation of the Plan. In addition, the Reorganized Debtors' subsequent utilization of any built-in losses with respect to their assets and NOL carryforwards remaining and possibly certain other tax attributes may be restricted as a result of and upon the implementation of the Plan.

1.    REDUCTION OF NOLS

The Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes -- such as NOL carryforwards, current year NOLs, tax credits and tax basis in assets -- by the amount of any cancellation of indebtedness ("COD"). COD is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given

in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction). As a result of consummation of the Plan, and in particular the exchange of Senior Subordinated Notes for New IES Common Stock, and based on the mid-point of the valuation range set forth herein, the Debtors expect to realize $48.4 million of COD. See Section VIII.D – "VALUATION OF THE REORGANIZED DEBTORS."

2. LIMITATION ON NOL CARRYFORWARDS AND OTHER TAX ATTRIBUTES

Following the implementation of the Plan, the Debtors anticipate that any remaining NOLs, built-in losses with respect to their assets and tax credit carryforwards, and, possibly, certain other tax attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") will be subject to limitation under section 382 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions pursuant to the Plan.

Under section 382, if a corporation undergoes an "ownership change" the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed more fully below, the Debtors anticipate that the issuance of the New IES Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes.

a. General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject is equal to the product of (i) the fair market value of the stock of the loss corporation immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

The annual limitation is first utilized against recognized built-in losses in post-"ownership change" years. A built-in loss exists if the Debtors' aggregate tax basis in their assets exceeds their fair market value at the time of the "ownership change." It is not certain whether the Debtors will have a built-in loss with respect to their assets at the time of the implementation of the Plan.

There is a risk that trading in IES Common Stock prior to the implementation of the Plan could cause the Debtors to experience an "ownership change," in which case the Debtors' ability to offset future taxable income with Pre-Change Losses would be severely limited (and the special bankruptcy exceptions described below would not apply to such Pre-Change Losses). At this time, the Debtors do not believe that there has been a sufficient acquisition of IES Common Stock by "5-percent shareholders," as defined in section 382 of the Tax Code to cause an "ownership change," but there can be no assurance that an "ownership change" will not occur prior to the implementation of the Plan.

b.    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when qualified (so-called "old and cold") creditors of a company in bankruptcy receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed Chapter 11 plan (the "382(l)(5) Exception").    Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the reorganization, and during the part of the taxable year prior to and including the reorganization, in respect of all debt converted into stock in the reorganization.    If the 382(l)(5) Exception applies and the Debtors undergo another ownership change within two years after consummation of the bankruptcy, then the Debtors' Pre-Change Losses are eliminated in their entirety.    The Debtors do not anticipate that they will qualify for the 382(l)(5) Exception.

Where the 382(l)(5) Exception is not applicable (either because the debtor company does not qualify for it or the debtor company otherwise elects not to utilize the Exception), a second special rule will generally apply (the "382(l)(6) Exception").    When the 382(l)(6) Exception applies, a corporation in bankruptcy that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.    This differs from the ordinary rule that requires the fair market value of a corporation that undergoes an ownership change to be determined before the events giving rise to the change.

Assuming a fair market value of New IES Common Stock of $155 million based upon the midpoint of the Enterprise Value range at the time of implementation of the Plan, and no prior "ownership change" with respect to the Debtors, the annual limitation on the Debtors' Pre-Change Losses under the 382(l)(6) Exception will be $6.8 million.    See Section VIII.D. – "VALUATION OF THE REORGANIZED DEBTORS."

C.    CONSEQUENCES TO HOLDERS OF SENIOR SUBORDINATED NOTES

Pursuant to the Plan, each Holder of Senior Subordinated Notes will receive in exchange for, and in full satisfaction and discharge of, its Allowed Senior Subordinated Note Claim, New IES Common Stock.    The federal income tax consequences of the Plan to the Holders of Senior Subordinated Notes will depend, in part, on whether the Senior Subordinated Notes constitute a "security" for federal income tax purposes.

Whether an instrument constitutes a "security" is determined based upon all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for federal income tax purposes.    These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the

obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. The Debtors will take the position that the Senior Subordinated Notes are in fact "securities," and treat the exchange of such Notes for stock as a "reorganization" under section 368(a)(1) of the Tax Code.

If Senior Subordinated Notes are treated as securities, the exchange of a Holder's Senior Subordinated Notes for New IES Common Stock should be treated as a recapitalization and therefore a tax-free reorganization under the Tax Code. In general, this means that a Holder will not recognize gain or loss with respect to the exchange (except with respect to accrued but unpaid interest on the Senior Subordinated Notes). A Holder should obtain a tax basis in the New IES Common Stock equal to the tax basis of the Senior Subordinated Notes exchanged therefor and should have a holding period for the New IES Common Stock that includes the holding period for the Senior Subordinated Notes; provided that the tax basis of any share of New IES Common Stock treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for such share of New IES Common Stock should not include the holding period of the Senior Subordinated Notes.

If the Senior Subordinated Notes are not treated as "securities" for federal income tax purposes, a Holder of Senior Subordinated Notes should be treated as exchanging its Senior Subordinated Notes for New IES Common Stock in a fully taxable exchange. In that case, the Holder should recognize gain or loss equal to the difference between (i) the fair market value of the New IES Common Stock as of the Effective Date received that is not allocable to accrued interest, and (ii) the Holder's basis in the debt instrument constituting the surrendered Senior Subordinated Notes. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Senior Subordinated Notes were held for more than one year by the Holder. To the extent that a portion of the New IES Common Stock received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income. A Holder's tax basis in the New IES Common Stock received should equal the fair market value of the New IES Common Stock as of the Effective Date. A Holder's holding period for the New IES Common Stock should begin on the day following the Effective Date.

To the extent that any amount received by a Holder of a Senior Subordinated Note is attributable to accrued interest, such amount should be taxable to the Holder as interest income. Conversely, a Holder of a Senior Subordinated Note may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Senior Subordinated Notes was previously included in the Holder's gross income but was not paid in full by Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a Senior Subordinated Note will be attributable to accrued interest is unclear. Under the Plan, all distributions in respect of any Senior Subordinated Note will be allocated first to the principal amount of such Senior Subordinated Note, and thereafter to the amount of any unpaid but accrued interest with respect to such Senior Subordinated Note. However, there is no assurance that such allocation would be respected by the IRS.

58

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder of a Senior Subordinated Note who exchanges the Senior Subordinated Note for New IES Common Stock on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the Senior Subordinated Notes. In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the Senior Subordinated Note, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of Senior Subordinated Notes that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Notes were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the surrendered Senior Subordinated Notes that had been acquired with market discount are deemed to be exchanged for New IES Common Stock in a tax-free reorganization, any market discount that accrued on such debts but was not recognized by the Holder may cause any gain recognized on the subsequent sale, exchange, redemption or other disposition of the New IES Common Stock to be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged Senior Subordinated Note.

In addition, under Section 108(e)(7) of the Tax Code, any gain recognized on the subsequent sale, exchange, redemption, or other disposition of New IES Common Stock will be treated as ordinary income to the extent the Holder of the surrendered Senior Subordinated Notes previously claimed ordinary loss deductions with respect to the surrendered Senior Subordinated Notes.

## D.    CONSEQUENCES TO HOLDERS OF IES COMMON STOCK INTERESTS

Pursuant to the Plan, on or as soon as practicable after the Effective Date, each Holder of an Allowed IES Common Stock Interest in the Debtors shall receive, in full and complete satisfaction of such equity interest, New IES Common Stock of the Reorganized Debtors.

The exchange of stock for New IES Common Stock should be treated as a "reorganization" under section 368 of the Tax Code (and therefore as a tax-free exchange). Holders of Allowed IES Common Stock Interests in the Debtors will be required to reallocate the basis of the stock constituting such Equity Interests, as directed by the Tax Code. The holding period of the New IES Common Stock of the Reorganized Debtors will include the holding period of the stock constituting Allowed IES Common Stock Interests in the Debtors.

Certain Holders may have previously claimed a worthless deduction with respect to their Allowed IES Common Stock Interests, which worthlessness deduction most likely would have been claimed as a capital loss by the Holder. SUCH HOLDERS SHOULD DISCUSS THE TAX TREATMENT OF THE PLAN WITH THEIR PERSONAL TAX ADVISERS, BUT IT IS LIKELY THE CASE THAT SUCH HOLDERS WILL BE REQUIRED TO RECOGNIZE AS

CAPITAL GAIN THE VALUE OF THE NEW IES COMMON STOCK RECEIVED UPON CONSUMMATION OF THE PLAN.

Pursuant to the Plan, all unvested IES Existing Restricted Common Stock will become vested immediately prior to the Effective Date. For federal income tax purposes, the vesting of such IES Existing Restricted Common Stock will be treated as compensation, taxable as ordinary income, to the owner of such IES Existing Restricted Common Stock for their taxable year which includes the date of vesting, unless the owner of such IES Existing Restricted Common Stock has previously made an election under section 83(b) of the Tax Code to include the grant value of such IES Existing Restricted Common Stock in income.

Pursuant to the Plan, all unvested options to purchase IES common stock will become vested immediately prior to the Effective Date, and certain options to purchase IES common stock will be deemed exercised immediately prior to the Effective Date pursuant to Article 4.05 of the Plan. For federal income tax purposes, the deemed exercise of any options pursuant to Article 4.05 of the Plan will be treated as compensation, taxable as ordinary income, to the Holders of the resulting shares of IES common stock in an amount equal to the spread between the fair market value of the IES common stock and the exercise price of the option for their taxable year which includes the date of exercise.

Holders of IES Existing Restricted Common Stock and Holders of options to purchase IES common stock should discuss with their personal tax advisors the tax treatment of the vesting of the IES Existing Restricted Common Stock or the deemed exercise of options (as applicable) that will occur immediately prior to the Effective Date under the Plan.

E.    BACKUP WITHHOLDING

Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends, if any, and will comply with all applicable reporting requirements of the Tax Code.

F.    IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN. TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS OR EQUITY INTERESTS UNDER THE INTERNAL REVENUE CODE; (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (3) HOLDERS OF

CLAIMS OR EQUITY INTERESTS SHOULD SEEK ADVICE BASED UPON THEIR
PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

VIII. FEASIBILITY OF THE PLAN AND THE BEST INTERESTS OF CREDITORS TEST

A.      FEASIBILITY OF THE PLAN

In connection with Confirmation of the Plan, section 1129(a)(11) of the Bankruptcy Code
requires that the Bankruptcy Court find that Confirmation of the Plan is not likely to be followed
by the liquidation or the need for further financial reorganization of the Debtors. This is the so-
called "feasibility" test. To support its belief in the feasibility of the Plan, the Debtors, with the
assistance of their financial advisors, have prepared the Financial Projections attached hereto as
**Exhibit C**.

The Financial Projections indicate that the Reorganized Debtors should have sufficient
cash flow to make the payments required under the Plan on the Effective Date, repay and service
debt obligations, and maintain operations on a going-forward basis. Accordingly, the Debtors
believe that the Plan complies with section 1129(a)(11) of the Bankruptcy Code. As noted in the
Financial Projections, however, the Debtors caution that no representations can be made as to the
accuracy of the Financial Projections or as to the Reorganized Debtors' ability to achieve the
projected results. Many of the assumptions upon which the Financial Projections are based are
subject to uncertainties outside the control of the Debtors. Some assumptions inevitably will not
materialize, and events and circumstances occurring after the date on which the Financial
Projections were prepared may be different from those assumed or may be unanticipated, and
may adversely affect the Debtors' financial results. See Section X -- "CERTAIN FACTORS TO
BE CONSIDERED" for a discussion of certain risk factors that could affect financial feasibility
of the Plan.

THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW
TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN
INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND
REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING
FINANCIAL PROJECTIONS. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE
NOT BEEN AUDITED BY THE DEBTORS' INDEPENDENT CERTIFIED
ACCOUNTANTS. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE
FINANCIAL PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME
OF WHICH HAVE NOT BEEN ACHIEVED TO DATE AND MAY NOT BE REALIZED IN
THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, LITIGATION,
ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY, IF
NOT ALL, OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS.
CONSEQUENTLY, THE FINANCIAL PROJECTIONS SHOULD NOT BE REGARDED AS
A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON,
THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY
VARY MATERIALLY FROM THOSE PRESENTED IN THE FINANCIAL PROJECTIONS.

B.    BEST INTERESTS TEST

Even if the Plan is accepted by all Holders of Eligible Claims and Eligible Equity Interests, the Bankruptcy Code requires that the Bankruptcy Court find that the Plan is in the best interests of all Holders of Claims and Equity Interests that are Impaired by the Plan and that have not accepted the Plan as a requirement to confirm the Plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires the Bankruptcy Court to find either that all members of an impaired class of claims or equity interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each impaired class of claims and equity interests if a debtor were liquidated under Chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the disposition of the Debtors' assets if liquidated in Chapter 7 cases under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtors' assets by a Chapter 7 trustee.

The amount of liquidation value available to Holders of unsecured Claims against the Debtors would be reduced by, first, the claims of secured creditors (to the extent of the value of their collateral), and by the costs and expenses of liquidation, as well as by other administrative expenses and costs of the Chapter 7 cases.  Costs of a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, and litigation costs.  The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business.  Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay unsecured Claims or to make any distribution in respect of Equity Interests.  The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured Claims.

In a Chapter 7 liquidation, no junior class of Claims or Equity Interests may be paid unless all classes of Claims or Equity Interests senior to such junior class are paid in full.  Section 510(a) of the Bankruptcy Code provides that subordination agreements are enforceable in a bankruptcy case to the same extent that such subordination is enforceable under applicable non-bankruptcy law.  Therefore, no class of Claims or Equity Interests that is contractually subordinated to another class would receive any payment on account of its Claims or Equity Interests, unless and until such senior class were paid in full.

Once the Bankruptcy Court ascertains the recoveries in liquidation of the Debtors' secured and priority creditors, it would then determine the probable distribution to unsecured creditors from the remaining available proceeds of the liquidation.  If this probable distribution has a value greater than the value of distributions to be received by the unsecured creditors under the Plan, then the Plan is not in the best interests of creditors and cannot be confirmed by the Bankruptcy Court.  As shown in the Liquidation Analysis attached hereto as **Exhibit F**, the Debtors believe that each member of each Class of Impaired Claims and Equity Interests will

receive at least as much, if not more, under the Plan as it would receive if the Debtors were liquidated.

C.   LIQUIDATION ANALYSIS

As noted above, the Debtors believe that under the Plan all Holders of Impaired Claims and Equity Interests will receive property with a value not less than the value each such Holder would receive in a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on:

(i)   consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to Holders of Impaired Claims and Equity Interests, including:

-   the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to one or more Chapter 7 trustees and professional advisors to such trustee(s), who are likely not familiar with the Debtors' industry and business operations,

-   the erosion in value of assets in a Chapter 7 case in the context of  the rapid liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail,

-   the adverse effects on the Debtors' businesses as a result of the likely departure of key employees and the probable loss of customers,

-   the substantial increases in Claims, including those covered by the necessity of sureties to obtain third parties to complete bonded jobs, as well as substantially increased estimated contingent Claims, lease and contract rejection Claims, and possible WARN Act Claims, which would be satisfied on a priority basis or on parity with the Holders of Claims and Equity Interests of the Debtors, and

-   the substantial delay in distributions to the Holders of Claims and Equity Interests that would likely ensue in a Chapter 7 liquidation, and

(ii)   the liquidation analysis prepared by the Debtors, which is attached hereto as **Exhibit F**.

The Debtors believe that any liquidation analysis is speculative, as such an analysis necessarily is premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. Thus, there can be no assurance as to values that would actually be realized in a Chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

For example, the Liquidation Analysis necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims.  No order or finding has been entered by the Bankruptcy Court or any other court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis.  In preparing the Liquidation Analysis, the Debtors have projected an amount of Allowed Claims within a reasonable range such that, for purposes of the Liquidation Analysis, the largest possible liquidation dividend to Holders of Allowed Claims can be assessed.  The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

To the extent that Confirmation of the Plan requires the establishment of amounts for the Chapter 7 liquidation value of the Debtors, funds available to pay Claims, and the reorganization value of the Debtors, the Bankruptcy Court will determine those amounts at the Confirmation Hearing.  Accordingly, the annexed Liquidation Analysis is provided solely to disclose to Holders the effects of a hypothetical Chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.

D.   VALUATION OF THE REORGANIZED DEBTORS

1.   OVERVIEW

The Debtors have been advised by Gordian, its financial advisor, with respect to the consolidated Enterprise Value (as hereinafter defined) of the Reorganized Debtors on a going-concern basis.  Gordian has undertaken this valuation analysis for the purpose of determining value available for distribution to Holders of Allowed Claims and Allowed Equity Interests pursuant to the compromise embodied in the Plan and to analyze the relative recoveries to such Holders thereunder.  The estimated total value available for distribution (the "Distributable Value") to Holders of Allowed Claims and Allowed Equity Interests is based on an estimated value of the Reorganized Debtors' operations on a going-concern basis (also, the "Enterprise Value").  Any NOL Value, as defined herein, would be incremental to Enterprise Value.

Based in part on information provided by the Debtors, Gordian has concluded solely for purposes of the Plan that the Enterprise Value of the Reorganized Debtors ranges from $188 million to $238 million, with a midpoint of $213 million as of an assumed Effective Date of May 1, 2006.  After giving effect to approximately $53 million of Term Exit Facility borrowings and $4.9 million of Revolving Exit Facility borrowings estimated to be outstanding at May 1, 2006 (pursuant to the Projections attached as Exhibit C), Gordian's mid-point estimated Distributable Value implies a value for the New IES Common Stock of $155.1 million.  Assuming approximately 15.4 million shares of New IES Common Stock are distributed to the Holders of Allowed Subordinated Note Claims and Allowed IES Common Stock Interests and certain members of Reorganized IES's management pursuant to the Plan, the value of New IES Common Stock is equal to approximately $10.07 per share.  These values do not give effect to, among other things, the potentially dilutive impact of any shares issued upon exercise of the New Options granted under the 2006 Long Term Incentive Plan, nor any incremental NOL Value.  Gordian's estimate of Enterprise Value does not constitute an opinion as to fairness from a

financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ASSUMED ENTERPRISE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE OF MAY 1, 2006, REFLECTS WORK PERFORMED BY GORDIAN ON THE BASIS OF INFORMATION AVAILABLE TO GORDIAN CURRENT AS OF THE DATE OF THIS DISCLOSURE STATEMENT. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT GORDIAN'S CONCLUSIONS, NEITHER GORDIAN NOR THE DEBTORS HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM GORDIAN'S ESTIMATE OR THE UNDERLYING INFORMATION PROVIDED TO GORDIAN BY THE DEBTORS.

With respect to the Financial Projections prepared by the management of the Debtors and included in this Disclosure Statement, Gordian assumed that such Financial Projections were reasonable and prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. Gordian's Enterprise Value range assumes the Reorganized Debtors will achieve their Financial Projections in all material respects, including gross profit growth and improvements in operating margins, earnings and cash flow. If the businesses perform at levels below those set forth in the Financial Projections, such performance may have a materially negative impact on Enterprise Value.

In estimating the Enterprise Value and equity value of the Reorganized Debtors, Gordian (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, including the Financial Projections as described in this Disclosure Statement, which data were prepared and provided to Gordian by the management of the Debtors and which relate to the Reorganized Debtors' business and their prospects; (c) met with certain members of senior management to discuss the Debtors' operations and future prospects; (d) reviewed publicly available financial data and considered the market value of public companies that Gordian deemed generally comparable to the operating business of the Debtors; (e) considered certain economic and industry information relevant to the operating business; and (f) conducted such other studies, analyses, inquiries, and investigations as it deemed appropriate. Although Gordian conducted a review and analysis of the Debtors' business, operating assets, and liabilities and the Reorganized Debtors' business plan, it assumed and relied upon the accuracy and completeness of all financial and other information furnished to it by the Debtors, as well as publicly available information.

In addition, Gordian did not independently verify management's Financial Projections in connection with preparing estimates of Enterprise Value, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith. Such estimates were developed solely for purposes of the formulation and negotiation of the Plan, the compromise contained therein, and the analysis of implied relative recoveries to Holders of Allowed Claims and Allowed Equity Interests thereunder.

Gordian's analysis addresses the estimated going concern Enterprise Value of the Debtors. It does not address other aspects of the proposed reorganization, the Plan, or any other

transactions and does not address the Debtors' underlying business decision to effect the reorganization set forth in the Plan. Gordian's estimated Enterprise Value of the Debtors does not constitute a recommendation to any Holder of Claims or Equity Interests as to how such Holder should vote or otherwise act with respect to the Plan. Gordian has not been asked to, nor did Gordian express, any view as to what the value of the Debtors' securities will be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated Enterprise Value of the Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any Entity of the consideration to be received by such Entity under the Plan or of the terms and provisions of the Plan.

The estimates contained herein reflect the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Debtors, Gordian, nor any other Entity assumes responsibility for their accuracy. In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by prepetition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.

## 2. VALUATION METHODOLOGY

The following is a brief summary of certain financial analyses performed by Gordian to arrive at its range of estimated Enterprise Values for the Reorganized Debtors. Gordian performed certain procedures, including each of the financial analyses described below, and reviewed the assumptions with the management of the Debtors on which such analyses were based. Gordian's valuation analysis must be considered as a whole and selecting just one methodology or portions of the analysis could create a misleading or incomplete conclusion as to Enterprise Value.

Under the valuation methodologies summarized below, Gordian derived a range of Enterprise Values assuming the Reorganized Debtors are a full taxpayer.

### a. COMPARABLE COMPANY ANALYSIS

Comparable company analysis estimates the value of a company based upon the implied valuations of other similar companies that are publicly traded. Under this methodology, Enterprise Values for selected public companies are typically expressed as multiples of various income statement items. The primary valuation metric applied in this analysis includes Enterprise Value to EBITDA. The analysis also includes a multi-year financial comparison of

each company's income statement, balance sheet, and cash flow statement. In addition, each company's performance, profitability, operating margins, leverage, and business trends are examined. Based upon these analyses, financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Debtors. Criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, location, market presence and size and scale of operations. The selection of truly comparable companies is typically difficult and subject to limitations due to sample size and the availability of meaningful market-based information. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value.

Gordian selected the following publicly traded companies (the "Peer Group") on the basis of general comparability to the Debtors by way of one or more of the factors described above: Comfort Systems USA, Inc.; Dycom Industries Inc.; EMCOR Group Inc.; Infrasource Services, Inc.; MasTec Inc.; and Quanta Services Inc.

Gordian calculated Enterprise Value to EBITDA multiples by dividing the Enterprise Values of each comparable company as of March 2, 2006, by their latest twelve months ("LTM") EBITDA, as determined through public filings and other publicly available information. This analysis produced multiples of Enterprise Value to EBITDA ranging from a low of approximately 9.2x to a high of approximately 20.0x, with a mean of approximately 13.6x and a mid-point or median of approximately 12.9x.

Gordian then applied a range of multiples to the Debtors' historical and projected EBITDA to determine a range of Enterprise Values. In conducting this analysis, Gordian employed a multiples range centered around the lower quartile (bottom 25%) Enterprise Value to EBITDA multiples derived in the publicly comparable company analysis described above and in line with historical Enterprise Value to EBITDA multiples for the Peer Group. Gordian made this judgment based upon what it believes is the recent depressed operating performance of the Debtors and relative conservatism of the Reorganized Debtors' Financial Projections, specifically, lower near-term forecasted profit margins in comparison to those realized historically by its Peer Group.

b.    DISCOUNTED CASH FLOW ANALYSIS

The Discounted Cash Flow ("DCF") analysis values a business by determining the current value of estimated future cash flows to be generated by that business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return debt and equity investors would require to invest in the business based upon its capital structure. The value of the firm is determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows provided in its business plan (the "Projections") plus an estimate for the value of the firm beyond the period of 2006 to 2010 (the "Projection

Period") known as the terminal value. The terminal value is derived by applying a multiple to the Reorganized Debtors' projected EBITDA in the final year of the Projection Period.

To estimate the Discount Rate, Gordian used the cost of equity and the after-tax cost of debt for the Reorganized Debtors, assuming a targeted long-term capital structure of approximately 25% debt to total capital. Gordian calculated the cost of equity based upon the Capital Asset Pricing Model, which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market. To estimate the cost of debt, Gordian considered the debt financing costs for comparable companies with leverage similar to the Reorganized Debtors' target capital structure, as the well as terms set forth in the Revolving Exit Facility Commitment Letter and Term Exit Facility Commitment Letter.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect its cost of capital and terminal multiples. Gordian calculated its DCF valuation on a range of Discount Rates between 10.0% and 15.0% and an EBITDA multiple range used to derive a terminal value of 5.0x to 7.0x.

In applying the above methodology, Gordian utilized management's detailed Financial Projections for the years ended September 30, 2006 through September 30, 2010 to derive unlevered after-tax free cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as changes in working capital and capital expenditures. For purposes of the DCF, the Reorganized Debtors are assumed to be full taxpayers. These cash flows, along with the terminal value, are discounted back to the assumed Effective Date using the range of Discount Rates described above to arrive at a range of Enterprise Values.

### c.  NET OPERATING LOSSES

The Reorganized Debtors expect to have NOLs immediately following their emergence from bankruptcy. Such NOLs relate to losses the Reorganized Debtors generated in historical periods before filing for bankruptcy. Gordian has assigned no value to the NOLs ("NOL Value"). To the extent the Reorganized Debtors are able to utilize NOLs following their emergence from bankruptcy, any such NOL Value would be incremental to Gordian's Enterprise Value set forth above.

The summary set forth above does not purport to be a complete description of the analyses performed by Gordian. The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily suitable to summary description. In performing these analyses, Gordian and the Debtors made numerous assumptions with respect to industry performance, business and economic conditions and other matters. The analyses performed by Gordian are not necessarily indicative of actual values or future results, which may be significantly more or less favorable than suggested by such analyses.

3.     POSITION OF AD HOC COMMITTEE AND COMMITTEE

The Ad Hoc Committee and the Committee, and their financial advisors have reviewed the valuation of the Debtors set forth herein and in the attached exhibits and agree with the valuation in the context of the compromise embodied in the Plan.

4.     POSITION OF EQUITY COMMITTEE

The Equity Committee and its financial advisors have not yet formed a final view as to the valuation of the new equity interests in the Reorganized Debtors set forth herein and in the attached exhibits. The Equity Committee continues its work on analyzing the accuracy and correctness of the valuation analysis and the underlying information and assumptions. The Equity Committee will advise equity holders in Class 8 of its opinion with respect to the valuation of the Debtors on or before March 31, 2006, and requests that holders of Class 8 equity interests consider the Equity Committee's recommendation before casting their ballots.

IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims and Equity Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If, however, the Requisite Acceptances to confirm the Plan are not received, or the Plan is not subsequently confirmed and consummated, the theoretical alternatives include: (i) formulation of an alternative plan or plans of reorganization or (ii) liquidation of the Debtors under Chapter 7 or 11 of the Bankruptcy Code.

A.     ALTERNATIVE PLAN(S)

If the Requisite Acceptances to confirm the Plan are not received or if the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive periods in which to file and solicit acceptances of a reorganization plan have expired, any other party in interest) could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

With respect to an alternative plan, the Debtors have explored various other alternatives in connection with the extensive negotiation process involved in the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, which is the result of extensive negotiations between the Debtors and various constituencies, enables Holders of Claims and Equity Interests to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of reorganization, the Plan has the greatest chance to be confirmed and consummated.

B.     LIQUIDATION UNDER CHAPTER 7

Proceeding under chapter 7 would impose significant additional monetary and time costs on the Debtors' Estates. Under chapter 7, one or more trustees would be elected or appointed to administer the Estates, to resolve pending controversies, including Disputed Claims against the Debtors and Claims of the various estates against other parties, and to make distributions to

Holders of Claims. A chapter 7 trustee would be entitled to compensation in accordance with the scale set forth in Bankruptcy Code § 326, and the trustee would also incur significant administrative expenses.

There is a strong probability that a chapter 7 trustee in these Cases would not possess any particular knowledge about the Debtors. The Debtors assert that the value of the Debtors' assets would be greatly diminished thereby. Additionally, a trustee would probably seek the assistance of professionals who would not have any significant background or familiarity with these Cases. The trustee and any professionals retained by the trustee likely would expend significant time familiarizing themselves with these Cases. This would result in duplication of effort, increased expenses, and delay in payments to creditors.

In an analysis of a liquidation under chapter 7, it must be recognized that additional costs in both time and money are inevitable. In addition to these time and monetary costs, there are other problems in a chapter 7 liquidation that would result in a substantially smaller recovery for Holders of Claims and Equity Interests than under the Plan.

Further, distributions under the Plan probably would be made earlier than would distributions in a chapter 7 case. In contrast to the Plan, which contemplates distributions to holders of Allowed Claims in the ordinary course, if approved by the Bankruptcy Court, but, in any event, as soon as practicable after the Effective Date, distributions of the proceeds of a chapter 7 liquidation might not occur until one or more years after the completion of the liquidation in order to afford the trustee the opportunity to resolve claims and prepare for distributions.

THE DEBTORS BELIEVE THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER RECOVERY TO HOLDERS OF CLAIMS AND EQUITY INTERESTS THAN SUCH HOLDERS WOULD RECEIVE IF THE DEBTORS WERE LIQUIDATED UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

The Liquidation Analysis, prepared by the Debtors with their financial advisors, is premised upon a liquidation under Chapter 7 cases and is attached hereto as **Exhibit F**. In the analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of such assets, and the extent to which the assets are subject to liens and security interests.

The Debtors have no knowledge of a buyer whom the Debtors' believe is ready, willing, and financially able to purchase the Debtors as a whole or even to purchase significant portions of the Debtors as ongoing businesses on terms and conditions that are more favorable than the Plan to Holders of Claims and Equity Interests. Therefore, the likely form of any liquidation would be the sale of individual assets. Based upon this analysis, it is likely that a liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable in each instance under the Plan. In the opinion of the Debtors, the recoveries projected to be available in liquidation are not likely to afford Holders of Claims and Equity Interests as great a realization potential as does the Plan.

# X. CERTAIN FACTORS TO BE CONSIDERED

Holders of Eligible Claims and Eligible Equity Interests should consider the risks and uncertainties below in making their decision regarding whether to vote to accept the Plan. The risks and uncertainties described below are not the only ones the Debtors or Reorganized Debtors may face. Additional risks and uncertainties not presently known to the Debtors or that they currently deem immaterial may also harm their businesses.

A.    GENERAL

While the Debtors would hope that a Chapter 11 filing solely for the purpose of implementing an agreed-upon restructuring would be of short duration and would not be seriously disruptive to their business, the Debtors cannot be certain that this would be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in Chapter 11 or to assure that the Plan will be confirmed.

Even if confirmed on a timely basis, a Chapter 11 proceeding to confirm the Plan could have an adverse effect on the Debtors' businesses. Among other things, it is possible that a bankruptcy proceeding could adversely affect (i) the Debtors' relationships with their key vendors, (ii) the Debtors' relationships with their customers, (iii) the Debtors' relationships with their employees, (iv) the legal rights and obligations of the Debtors under agreements that may be in default as a result of the Chapter 11 Cases, and (v) Reorganized IES's ability to list or quote the New IES Common Stock on a national securities exchange or United States automated interdealer quotation system.

A Chapter 11 proceeding also will involve additional expenses and will divert the attention of the Debtors' management from operation of their business and implementation of a strategic business plan.

The extent to which a Chapter 11 proceeding disrupts the Debtors' businesses will likely be directly related to the length of time it takes to complete the proceeding. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis because of a challenge to the Plan or a failure to satisfy the conditions to the Plan, they may be forced to operate in Chapter 11 for an extended period while they try to develop a different reorganization plan that can be confirmed. That would increase both the probability and the magnitude of the adverse effects described above.

B.    BUSINESS AND INDUSTRY RISKS

1.    DEBT AND CASH FLOW.

Upon Confirmation and effectiveness of the Plan, the Debtors will continue to have substantial outstanding indebtedness. On the Effective Date, the Debtors' total outstanding long-term debt obligations will be approximately $58 million, comprised of approximately $53 million borrowed and outstanding under the Term Exit Facility and approximately $4.9 million borrowed and outstanding under the Revolving Exit Facility. Assuming consummation of the Plan, the Debtors' ability to meet their debt service obligations and to reduce their total

indebtedness will depend on the Debtors' future operating performance. The Debtors' future operating performance may depend on their ability to maintain their existing customer base, expand service offerings, and attract new customers, which may require additional financing. In addition, the Debtors' future operating performance will depend on economic, competitive, regulatory, legislative and other factors affecting their business that are beyond their control.

The Debtors, on a consolidated basis, have incurred net losses of approximately $129.6 million and $124.9 million for the years ended September 30, 2005 and 2004, respectively, and may incur significant losses in the foreseeable future. These negative operating results have continually deteriorated the Debtors' overall financial position and leverage situation. There can be no assurance that the Debtors will be able to achieve positive operating results or cash flows following the restructuring.

> 2. DOWNTURNS IN CONSTRUCTION COULD ADVERSELY AFFECT THE DEBTORS' BUSINESS BECAUSE MORE THAN HALF OF THE DEBTORS' BUSINESS IS DEPENDENT ON LEVELS OF NEW CONSTRUCTION ACTIVITY.

More than half of the Debtors' business involves the installation of electrical systems in newly constructed and renovated buildings, plants, and residences. The construction industry is cyclical and downturns in levels of construction or housing starts could have a material adverse effect on the Debtors' business, financial condition, and results of operations. The Debtors' ability to maintain or increase revenues from new installation services will depend on the number of new construction starts and renovations, which will likely correlate with the cyclical nature of the construction industry. The number of new building starts will be affected by local economic conditions, and other factors, including the following:

- employment and income levels;
- interest rates and other factors affecting the availability and cost of financing;
- tax implications for homebuyers and commercial construction;
- consumer confidence; and
- housing demand.

Additionally, a majority of the Debtors' business is focused in the southeastern and southwestern portions of the United States, concentrating their exposure to local economic conditions in those regions. Downturns in levels of construction or housing starts in these geographic areas could result in a material reduction in the Debtors' activity levels.

> 3. THE HIGHLY COMPETITIVE NATURE OF THE DEBTORS' INDUSTRY COULD AFFECT THE DEBTORS' PROFITABILITY BY REDUCING THEIR PROFIT MARGINS.

The electrical contracting industry is served by many small, owner-operated private companies, public companies, and several large regional companies. The Debtors could also face competition in the future from new competitors entering these markets. Electrical contracting has a relatively low capital requirement for entry. Some of the Debtors' competitors offer a greater range of services, including mechanical construction, facilities management, plumbing, and heating, ventilation and air conditioning services. Competition in the Debtors'

markets depends on a number of factors, including price. Some of the Debtors' competitors may have lower overhead cost structures and may, therefore, be able to provide services comparable to the Debtors at lower rates than the Debtors do. If the Debtors are unable to offer their services at competitive prices or if they have to reduce their prices to remain competitive, their profitability would be impaired.

4.      THERE IS A SHORTAGE OF QUALIFIED ELECTRICIANS. SINCE THE MAJORITY OF THE DEBTORS' WORK IS PERFORMED BY ELECTRICIANS, THIS SHORTAGE MAY NEGATIVELY IMPACT THE DEBTORS' BUSINESS, INCLUDING THEIR ABILITY TO GROW.

There is a shortage of qualified electricians in the United States. In order to conduct the Debtors' business, it is necessary to employ electricians and have those electricians qualified in the states where they do business. While overall economic growth has diminished, the Debtors' ability to increase productivity and profitability may be limited by their ability to employ, train, and retain skilled electricians required to meet the Debtors' needs. Accordingly there can be no assurance, among other things, that:

-      the Debtors will be able to maintain the skilled labor force necessary to operate efficiently;
-      the Debtors' labor expenses will not increase as a result of a shortage in the skilled labor supply; and
-      the Debtors will be able to maintain the skilled labor force necessary to implement the Debtors' planned internal growth and respond to improving construction market and work from the hurricane damaged Gulf Coast region.

5.      DUE TO SEASONALITY AND DIFFERING REGIONAL ECONOMIC CONDITIONS, THE DEBTORS' RESULTS MAY FLUCTUATE FROM PERIOD TO PERIOD.

The Debtors' business is subject to seasonal variations in operations and demand that affect the construction business, particularly in residential construction. Untimely weather delay from rain, ice, cold or snow can not only delay the Debtors' work but can negatively impact their schedules and profitability by delaying the work of other trades on a construction site. The Debtors' results may also be affected by regional economic conditions that affect the construction market.

6.      THE ESTIMATES THE DEBTORS USE IN PLACING BIDS COULD BE MATERIALLY INCORRECT. THE USE OF INCORRECT ESTIMATES COULD RESULT IN LOSSES ON A FIXED PRICE CONTRACT. THESE LOSSES COULD BE MATERIAL TO THE DEBTORS' BUSINESS.

The Debtors currently generate, and expect to continue to generate, more than half of their revenues under fixed price contracts. The cost of gasoline, labor and materials, however, may vary significantly from the costs the Debtors originally estimate. Variations from estimated contract costs along with other risks inherent in performing fixed price contracts may result in actual revenue and gross profits for a project differing from those the Debtors originally

estimated and could result in losses on projects. Depending upon the size of a particular project, variations from estimated contract costs can have a significant impact on the Debtors' operating results.

7. A SIGNIFICANT PORTION OF THE DEBTORS' BUSINESS DEPENDS ON THEIR ABILITY TO PROVIDE SURETY BONDS. THE DEBTORS' INABILITY TO OBTAIN SURETY BONDS COULD ADVERSELY AFFECT THEIR OPERATING RESULTS AND REDUCE FUTURE REVENUES.

Surety market conditions are difficult as a result of significant losses incurred by many sureties in recent periods, both in the construction industry as well as in connection with certain large corporate bankruptcies, particularly for large surety bond needs of a company the size of the Debtors. As a result terms have become more restrictive. Further, under standard terms in the surety market, sureties issue bonds on a project by project basis, and can decline to issue bonds at any time. Historically, approximately 35% of the Debtors' fixed price contract business has required bonds and presently only about 10% of the Debtors' work is bonded. While the Debtors have enjoyed a longstanding relationship with their surety, current market conditions, as well as changes in the Debtors' surety's assessment of the Debtors' operating and financial risk, could cause the Debtors' surety to decline to issue bonds for the Debtors' work on terms acceptable to the Debtors or even at all. If that were to occur, the Debtors' alternatives include doing more business that does not require bonds, posting other forms of collateral for project performance such as letters of credit or cash, providing other forms of assurance such as insurance products or parental guarantees, and seeking bonding capacity from other sureties. There can be no assurance that the Debtors could achieve these alternatives. Accordingly, if the Debtors continue to experience less availability of bonding capacity, the Debtors' operating results could be adversely impacted by a reduction of revenue.

At this time, the Debtors do not have a commitment from their surety company that it will continue to write bonds for the Debtors' projects. There are certain situations where, if the Debtors are unable to obtain a surety bond, the Debtors could be subject to claims or damages. Those situations include projects (i) where bonds are required on the job and the Debtors have already begun work and (ii) jobs where the terms of the contract allow the customer to later require a bond even if the bond was not required when work began. If the Debtors are unable to obtain a bond in connection with such a project, the Debtors could be subject to a damage claim by the customer for the costs of replacing the Debtors with another contractor. Customers, however, are often reluctant to replace an existing contractor and may be willing to waive the bonding requirement or, through negotiation, agree to different payment terms.

In certain cases surety bond companies are willing to provide surety bonds only if cash or letters of credit are provided as collateral. This additional cost, when combined with the costs to perform the work and the practice in the industry of the customer retaining a percentage of the contract amount until the job is completed, can make projects that are subject to this type of collateral requirement not economically viable.

8. THE DEBTORS' OPERATIONS ARE SUBJECT TO NUMEROUS PHYSICAL HAZARDS ASSOCIATED WITH THE CONSTRUCTION OF ELECTRICAL

SYSTEMS.  IF AN ACCIDENT OCCURS, IT COULD RESULT IN AN ADVERSE EFFECT ON THE DEBTORS' BUSINESS.

Hazards related to the Debtors' industry include, but are not limited to, electrocutions, fires, machinery caused injuries, mechanical failures or transportation accidents.  These hazards can cause personal injury and loss of life, severe damage to or destruction of property and equipment and may result in suspension of operations.  The Debtors' insurance does not cover all types or amounts of liabilities.  The Debtors' third-party insurance is subject to deductibles for which the Debtors establish reserves and, accordingly, the Debtors effectively self-insure for much of their exposures.  No assurance can be given either that the Debtors' insurance or the Debtors' provisions for incurred claims and incurred but not reported claims will be adequate to cover all losses or liabilities the Debtors may incur in their operations or that the Debtors will be able to maintain adequate insurance at reasonable rates.

9.      LITIGATION AND CLAIMS CAN CAUSE UNEXPECTED LOSSES.

In the construction business there are always claims and litigation.  Latent defect litigation is a normal course for residential home builders in some parts of the country.  There is also the inherent claims and litigation risk of the number of people that work on construction sites and the fleet of vehicles on the road everyday.  The Debtors manage those claims and litigation risks through safety programs, insurance programs, litigation management at the corporate office and the local level and a network of attorneys and law firms throughout the country.  Nevertheless, claims are sometimes made and lawsuits filed and some for amounts in excess of their value or amounts for which they are eventually resolved.  Claims and litigation normally follow a predictable course of time to resolution.  Because of the large number of claims of a company with so many contracts and employees such as the Debtors, there can be periods of time where a disproportionate amount of the claims and litigation may come to the point of resolution through the court system, arbitration, mediation, or settlement all in the same quarter or year.  If these matters resolve near the same time then the cumulative effect can be higher than the ordinary level in any one reporting period.

10.     THE SALE OF SUBSIDIARIES MAY EXPOSE THE DEBTORS TO LOSSES.

The Debtors previously determined to sell all or substantially all of the assets of certain wholly owned subsidiaries.  Those sales were made to facilitate the business needs and purposes of the organization as a whole.  Since the Debtors were a consolidator of electrical contracting businesses, often the best candidate to purchase those assets was a previous owner of those assets.  That previous owner may sometimes still be associated with the subsidiary as an officer of that subsidiary.  To facilitate the desired timing, the sales were being made with more than ordinary reliance on the representations of the purchaser, who is often the person most familiar with the business unit being sold.  There is the potential in retaining the company structure that if the purchaser is unwilling or unable to perform the transferred liabilities, the Debtors may be forced to fulfill obligations that were assumed by others.  The Debtors previously would then seek reimbursement from the parties that assumed those liabilities.

11.     THE DEBTORS MAY EXPERIENCE DIFFICULTIES IN MANAGING INTERNAL GROWTH OR CONSOLIDATIONS.

In order to grow internally, the Debtors must expect to expend significant time and effort managing and expanding existing operations. The Debtors cannot guarantee that their systems, procedures and controls will be adequate to support expanding operations, including the timely receipt of financial information. Growth imposes significant added responsibilities on the Debtors' senior management, such as the need to identify, recruit and integrate new senior managers and executives. If the Debtors are unable to manage their growth, or if they are unable to attract and retain additional qualified management, their operations could be materially adversely affected. As the Debtors have sold companies and consolidated some support functions of human resources, payroll, estimating, safety, accounting, and other administrative support functions it has offered some cost savings. Those savings only arise after the consolidations and after additional time and effort managing that consolidation. The divestitures also result in some increase in non-productive costs such as unused lease facilities and equipment that must be re-deployed or sold.

12.     THE LOSS OF A GROUP OF KEY PERSONNEL, EITHER AT THE CORPORATE OR OPERATING LEVEL, COULD ADVERSELY AFFECT THE DEBTORS' BUSINESS.

The loss of key personnel or the inability to hire and retain qualified employees could have an adverse effect on the Debtors' business, financial condition and results of operations. The Debtors' operations depend on the continued efforts of their current and future executive officers, senior management and management personnel at the companies they have acquired. The Debtors cannot guarantee that any member of management at the corporate or subsidiary level will continue in their capacity for any particular period of time. During these volatile times the Debtors have an increased risk of employees departing. If the Debtors lose a group of key personnel, the Debtors' operations could be adversely affected. The Debtors do not maintain key man life insurance.

13.     THE LOSS OF PRODUCTIVITY, EITHER AT THE CORPORATE OFFICE OR OPERATING LEVEL, COULD ADVERSELY AFFECT THE DEBTORS' BUSINESS.

The Debtors' business is primarily driven by labor. The ability to perform contracts at acceptable margins depends on the Debtors' ability to deliver substantial labor productivity. The Debtors cannot guarantee that productivity will continue at acceptable levels at their corporate office and their operating subsidiaries for a particular period of time. With the Restructuring and the uncertainty in the market there is an increased difficulty in maintaining morale and focus of employees. The loss of productivity could adversely affect the margins on existing contracts or the ability to obtain new contracts.

14. RECENT ADVERSE PUBLICITY ABOUT THE DEBTORS, INCLUDING THEIR CHAPTER 11 FILINGS, MAY HARM THE DEBTORS' ABILITY TO COMPETE IN THIS HIGHLY COMPETITIVE BUSINESS.

The electrical contracting industry is highly competitive, and some of the Debtors' competitors have significantly greater financial resources than the Debtors. Recent adverse publicity concerning the Debtors' financial condition may harm their ability to attract new customers and to maintain favorable relationships with their existing customers and suppliers. For example, it may be more challenging for the Debtors to contract for new work, and some of the Debtors' suppliers may require cash payments rather than extending credit, which adversely affects the Debtors' liquidity. The Debtors may also experience difficulty attracting and retaining key employees.

15. THERE IS NO ESTABLISHED TRADING MARKET FOR THE NEW IES COMMON STOCK.

There is no established trading market for the New IES Common Stock, and there is no assurance that any active trading market will develop for the New IES Common Stock. The IES Common Stock has been suspended from trading on the NYSE, and the NYSE has notified IES of its intent to delist the IES Common Stock pending completion of applicable procedures, including IES's pending appeal of the NYSE's decision to delist the IES Common Stock. The NYSE has the ultimate discretion to approve the New IES Common Stock for listing on the NYSE. If IES or Reorganized IES is unsuccessful in its NYSE appeal or the NYSE determines that the Debtors do not satisfy the criteria for listing the New IES Common Stock on the NYSE, the New IES Common Stock will not be approved for listing on the NYSE. In addition, IES or Reorganized IES may apply (and if delisted from the NYSE, will apply) for listing of the New IES Common Stock on another national stock exchange or on a national quotation system, such as the Nasdaq National Market or the Nasdaq Smallcap Market, assuming the Debtors or Reorganized Debtors satisfy the applicable listing criteria. There is no assurance that IES or Reorganized IES will be successful in its NYSE appeal or that the NYSE will approve the New IES Common Stock for listing on the NYSE. Furthermore, there is no assurance that the Debtors or Reorganized Debtors will satisfy the criteria for listing, or be approved for listing, the New IES Common Stock on another national stock exchange or on a national quotation system. Failure to list the New IES Common Stock may affect the Debtors' ability to Reinstate the Senior Convertible Notes under the Plan and will negatively affect the ability of holders of New IES Common Stock to sell their shares.

16. DIVIDEND POLICY.

Reorganized IES does not anticipate paying any dividends on the New IES Common Stock in the foreseeable future. In addition, the covenants in certain debt instruments to which Reorganized IES will be a party, including the Exit Facility, will likely place restrictions or conditions on IES's ability to pay dividends. Certain institutional investors may only invest in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in New IES Common Stock.

### C. FAILURE TO RECEIVE REQUISITE ACCEPTANCES

There can be no assurance that the Requisite Acceptances to confirm the Plan will be received. Even if the Requisite Acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. The Bankruptcy Court may confirm a modified plan pursuant to the "cramdown" provisions of the Bankruptcy Code which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired class of claims or equity interests if it determines that the rejecting class is being treated appropriately given the relative priority of the claims or equity interests in such class. In order to confirm a plan against a dissenting class, the Bankruptcy Court must also find that at least one impaired class has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such class. If the Requisite Acceptances are received from the Holders of Claims in Class 6 but not from the Holders of Claims in Class 5 or the Holders of Equity Interests in Class 8, the Debtors intend to "cram down" on Holders of Claims in Class 5 and Holders of Equity Interests in Class 8 pursuant to § 1129(b) of the Bankruptcy Code to the extent they are deemed impaired under the Plan.

Alternatively, the Debtors may seek to accomplish an alternative restructuring of their capitalization and their obligations to security holders and other creditors. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Holders of Claims and Equity Interests as those proposed in the Plan.

### D. FAILURE TO CONFIRM THE PLAN

Even if the Requisite Acceptances are received and, with respect to those Classes deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which as a court of equity may exercise substantial discretion, may choose not to confirm the Plan or may require additional solicitations or consents prior to confirming the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that Confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors (see Section VIII.A -- "FEASIBILITY OF THE PLAN AND THE BEST INTERESTS OF CREDITORS TEST -- FEASIBILITY OF THE PLAN") and that the value of distributions to dissenting Holders of Claims and Equity Interests may not be less than the value such Holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. See Section VIII.B -- "FEASIBILITY OF THE PLAN AND THE BEST INTERESTS OF CREDITORS TEST -- BEST INTERESTS TEST." Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Debtors' ability to propose and confirm an alternative reorganization plan is uncertain. Confirmation of any alternative reorganization plan under Chapter 11 of the Bankruptcy Code would likely take significantly more time and result in delays in the ultimate distributions to the Holders of Eligible Claims and Eligible Equity Interests. If confirmation of an alternative plan of reorganization is not possible, the Debtors would likely be liquidated. Based upon the Debtors' analysis, liquidation under Chapter 7 would result in distributions of reduced value, if any, to Holders of Eligible Claims and Eligible Equity Interests. See

Section VIII -- "FEASIBILITY OF THE PLAN AND THE BEST INTERESTS OF CREDITORS TEST." In a liquidation under Chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7. However, it is unlikely that any liquidation would realize the full going concern value of their businesses. Instead, the Debtors' assets would be sold separately. Consequently, the Debtors believe that a liquidation under Chapter 11 would also result in smaller distributions, if any, to the Holders of Eligible Claims and Eligible Equity Interests than those provided for in the Plan.

E.      FAILURE TO CONSUMMATE THE PLAN

Consummation of the Plan is conditioned upon, among other things, entry of the Confirmation Order and an order (which may be the Confirmation Order) approving the assumption and assignment of all executory contracts and unexpired leases (other than those specifically rejected by the Debtors) to the Reorganized Debtors or their assignees. As of the date of this Disclosure Statement, there can be no assurance that any or all of the foregoing conditions will be met (or waived) or that the other conditions to consummation, if any, will be satisfied. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the Restructuring completed. For risks associated with failure to consummate the Plan, see ARTICLE IX – ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.

F.      CLAIMS ESTIMATIONS

There can be no assurance that the estimated amount of Claims and Equity Interests set forth herein are correct, and the actual Allowed amounts of Claims and Equity Interests may differ from estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize or should underlying assumptions-prove incorrect, the actual Allowed amounts of Claims and Equity Interests may vary from those estimated therein.

G.      CERTAIN TAX CONSIDERATIONS

THERE ARE A NUMBER OF MATERIAL INCOME TAX CONSIDERATIONS, RISKS AND UNCERTAINTIES ASSOCIATED WITH CONSUMMATION OF THE PLAN. INTERESTED PARTIES SHOULD READ CAREFULLY THE DISCUSSION SET FORTH IN SECTION VII" -- "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN" FOR A DISCUSSION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN BOTH TO THE DEBTORS AND TO HOLDERS OF CLAIMS THAT ARE IMPAIRED UNDER THE PLAN.

H.      INHERENT UNCERTAINTY OF FINANCIAL PROJECTIONS

The Financial Projections cover the Debtors' operations through the period ending September 30, 2010. These Financial Projections are based upon numerous assumptions that are an integral part of the Financial Projections, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of Reorganized Debtors, industry performance, general business and economic conditions, competition, adequate financing, absence of material contingent or unliquidated litigation or indemnity claims, and

other matters, many of which are beyond the control of Reorganized Debtors and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of Reorganized Debtors' operations. These variations may be material and may adversely affect the ability of the Reorganized Debtors to pay the obligations owing to certain Holders of Claims entitled to distributions under the Plan and other post-Effective Date indebtedness. Because the actual results achieved throughout the periods covered by the Financial Projections may vary from the projected results, the Financial Projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur.

## XI. THE SOLICITATION; VOTING PROCEDURES

### A. VOTING DEADLINE

The period during which Ballots with respect to the Plan will be accepted by the Debtors will terminate on the Voting Deadline. Except to the extent permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).

### B. VOTING PROCEDURES

Under the Bankruptcy Code, for purposes of determining whether the Requisite Acceptances have been received, only Holders of Eligible Claims or Eligible Equity Interests who actually vote will be counted. The failure of a Holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such Holder with respect to voting on the Plan and such abstentions, will not be counted as votes for or against the Plan.

The Debtors are providing the Solicitation Package to Holders of Eligible Claims[7] and Eligible Equity Interests whose names (or the names of whose Nominees) appear as of the Voting Record Date in the records maintained by the Debtors and the security holders lists maintained by the Indenture Trustees. Nominees should provide copies of the Solicitation Package to the beneficial owners of the Eligible Claims and Eligible Equity Interests. Any beneficial owner of Eligible Claims or Eligible Equity Interests who has not received a Ballot should contact his/her or its Nominee or the Solicitation Agent.

Holders of Eligible Claims and Eligible Equity Interests should provide all of the information requested by the Ballots and return all Ballots in the return envelope provided with each such Ballot.

---

[7]The Debtors are providing a solicitation package to and are soliciting the votes of Holders of Senior Convertible Note Claims in Class 5 as Holders of Eligible Claims because of the possibility that such Claims may be Impaired under the Plan in the event the Debtors elect to give such Holders the New Notes in exchange for such Claims. In the event the Requisite Acceptances are not received from Holders of Claims in Class 5 and the treatment elected by the Debtors to be provided to such Holders renders them Unimpaired under the Plan, the votes of such Holders will be disregarded, and Class 5 will be deemed to be an accepting class, pursuant to section 1126(f) of the Bankruptcy Code, for purposes of Confirmation. If the Requisite Acceptances are not received from Holders of Claims in Class 5 and the treatment elected by the Debtors to be provided to such Holders renders them impaired, the Debtors intend to seek Confirmation pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

C.     NOTE FOR HOLDERS OF VOTING NOTES AND IES COMMON STOCK

Only Holders of Senior Subordinated Notes and Senior Convertible Notes (collectively, the "Voting Notes") and IES Common Stock as of the Voting Record Date are entitled to vote on the Plan.  Neither the Senior Subordinated Notes Indenture Trustee nor the Senior Convertible Notes Indenture Trustee will vote on behalf of the Holders of such notes or make any recommendation for or against the Plan.  Holders must submit their own Ballots.

1.     BENEFICIAL OWNERS

A beneficial owner holding Voting Notes or IES Common Stock as a record Holder in its own name should vote on the Plan by completing and signing the applicable enclosed Ballot and returning it directly to the Solicitation Agent on or before the Voting Deadline using the enclosed self-addressed, postage-paid envelope.

Any beneficial owner holding Voting Notes or IES Common Stock in a "street name" through a Nominee may vote on the Plan by one of the following two methods (as selected by such beneficial owner's Nominee).

-     Complete and sign the applicable enclosed beneficial owner Ballot. Return the Ballot to Nominee as promptly as possible and in sufficient time to allow such Nominee to process the Ballot and return it to the Solicitation Agent by the Voting Deadline.  If no self-addressed, postage-paid envelope was enclosed for this purpose, the Solicitation Agent must be contacted for instructions.

-     Complete and sign the applicable pre-validated Ballot (as described below) provided to Holder by Nominee.  The Holder will then return the pre-validated Ballot to the Solicitation Agent by the Voting Deadline using the enclosed self-addressed, postage-paid envelope.

Any Ballot returned to a Nominee by a beneficial owner will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to the Solicitation Agent that Ballot or a Master Ballot that reflects the vote of such beneficial owner.

2.     NOMINEES

A Nominee that on the Voting Record Date is the registered Holder of Voting Notes or IES Common Stock for a beneficial owner should obtain the vote of such beneficial owner of such Voting Notes or IES Common Stock, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

a.     Pre-Validated Ballots

A Nominee may pre-validate a Ballot by: (i) signing the applicable Ballot; (ii) indicating on the Ballot the name of the registered Holder and the amount of Voting Notes or IES Common Stock held by the Nominee; and (iii) forwarding such Ballot together with the Solicitation Package and other materials requested to be forwarded to the beneficial owner for voting.  The

81

beneficial owner must then complete the information requested in the Ballot, review the certifications contained in the Ballot, and return the Ballot directly to the Solicitation Agent in the pre-addressed, postage paid envelope so that it is received by the Solicitation Agent before the Voting Deadline. A list of the beneficial owners to whom "pre-validated" Ballots were delivered should be maintained by the Nominee for inspection for at least one year from the Voting Deadline.

> b.      Master Ballots

A Nominee may obtain the votes of beneficial owners by forwarding to the beneficial owners the applicable unsigned Ballots, together with the Disclosure Statement, a return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded. Each such beneficial owner must then indicate his/her or its vote on the Ballot, complete the information requested in the Ballot, review the certifications contained in the Ballot, execute the Ballot, and return the Ballot to the Nominee. After collecting the Ballots, the Nominee should, in turn, complete the applicable Master Ballot compiling the votes and other information from the Ballot, execute the Master Ballot, and deliver the Master Ballot to the Solicitation Agent so that it is received by the Solicitation Agent before the Voting Deadline. All Ballots returned by beneficial owners should either be forwarded to the Solicitation Agent (along with the Master Ballot) or retained by Nominees for inspection for at least one year from the Voting Deadline.

EACH NOMINEE SHOULD ADVISE ITS BENEFICIAL OWNERS TO RETURN THEIR BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE SOLICITATION AGENT SO THAT IT IS RECEIVED BY THE SOLICITATION AGENT BEFORE THE VOTING DEADLINE.

> 3.      SECURITIES CLEARING AGENCIES

The Debtors expect that the Depository Trust Company, as a Nominee Holder of Voting Notes, will arrange for its participants to vote by executing an omnibus proxy in favor of such participants. As a result of the omnibus proxy, such participant will be authorized to vote its Voting Record Date positions held in the name of such securities clearing agencies.

> 4.      EQUITY COMMITTEE'S EVALUATION; RECOMMENDATION

The Equity Committee is currently reviewing and analyzing the valuation analysis submitted by the Debtors and their financial advisor. After completing such review, the Equity Committee will issue a final recommendation of whether to vote to accept or reject the Plan to all holders of equity interests in Class 8. The final recommendation will be issued in the form of a letter that will be mailed to all holders of equity interests in Class 8 on or before March 31, 2006. A copy of the letter shall also be posted on the following web address on or before March 31, 2006: http://www.velaw.com/mcso/clients/ies.asp. The Equity Committee requests that all holders of equity interests in Class 8 consider the Equity Committee's recommendation prior to casting their ballots.

5.    MISCELLANEOUS

For purposes of determining whether sufficient votes have been received to accept or reject the Plan, the beneficial owners of Voting Notes or IES Common Stock will be deemed to be the "holders" of the Claims represented by such Voting Notes or IES Common Stock, as applicable.  Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Debtors, in their sole discretion, may request that the Solicitation Agent attempt to contact such voters to cure any such defects in the Ballots.

Except as provided below, unless the applicable Ballot is timely submitted to the Solicitation Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking Confirmation of the Plan.

In the event of a dispute with respect to any Senior Subordinated Note Claim, Senior Convertible Note Claim or IES Common Stock Interest, any vote to accept or reject the Plan cast with respect to such Claim or Equity Interest will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise.

D.    FIDUCIARIES AND OTHER REPRESENTATIVES

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such Person should indicate such capacity when signing and, unless otherwise determined by the Debtors, must submit proper evidence satisfactory to the Debtors of authority to so act.  Authorized signatories should submit the separate Ballot of each beneficial owner for whom they are voting.

UNLESS THE APPLICABLE BALLOT BEING FURNISHED IS TIMELY SUBMITTED TO THE SOLICITATION AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN.  IN NO CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE NOMINEE OR THE SOLICITATION AGENT.

E.    PARTIES ENTITLED TO VOTE

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "Impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or equity interest entitles the Holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or equity interest as it existed before the default.

In general, a Holder of a claim or equity interest may vote to accept or to reject a plan if the claim or equity interest is "allowed," which means generally that no party-in-interest has objected to such claim or equity interest, and the claim or equity interest is Impaired by the plan.

If, however, the Holder of an Impaired claim or equity interest will not receive or retain any distribution under the plan on account of such claim or equity interest, the Bankruptcy Code deems such Holder to have rejected the plan, and, accordingly, Holders of such claims and equity interests do not actually vote on the plan. If a claim or equity interest is not Impaired by the plan, the Bankruptcy Code deems the Holder of such claim or equity interest to have accepted the plan and, accordingly, Holders of such claims and equity interests are not entitled to vote on the plan.

Classes 1, 2, 3, 4, 7 and 10 of the Plan are Unimpaired. Accordingly, under section 1126(f) of the Bankruptcy Code, all such Classes of Claims are deemed to have accepted the Plan and are not entitled to vote in respect of the Plan.

Class 5 may be Impaired by the Plan in the event that the Debtors elect to give the Holders of Claims in Class 5 the New Notes in exchange for such Claims. Therefore, the Holders of Claims in Class 5 are being solicited for votes in favor of the Plan. To the extent the treatment of Class 5 Claims elected by the Debtors is determined by the Bankruptcy Court to render the Holders of such Claims Unimpaired, the Holders of Claims in Class 5 will be conclusively presumed to have accepted the Plan notwithstanding that any Holder of a Claim in Class 5 may have voted to reject the Plan.

Classes 6 and 8 are Impaired. Accordingly, the Debtors are soliciting acceptances from the Holders of Claims in Class 6 and Equity Interests in Class 8.

Class 9 will not receive or retain any distribution or property under the Plan on account of their Equity Interests. Accordingly, under section 1126(g) of the Bankruptcy Code, such Class of Equity Interests is deemed to have rejected the Plan and is not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

F.      AGREEMENTS UPON FURNISHING BALLOTS

The delivery of an accepting Ballot to the Solicitation Agent by a Holder of Eligible Claims or Eligible Equity Interests pursuant to one of the procedures set forth above will constitute the agreement of such Holder to accept (i) all of the terms of, and conditions to, the Solicitation and (ii) the terms of the Plan; provided, however, all parties in interest retain their right to object to Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

G.      WAIVERS OF DEFECTS, IRREGULARITIES, ETC.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Solicitation Agent and the Debtors in their sole discretion, which determination will be final and binding. As indicated in Section XI.H, effective withdrawals of Ballots must be delivered to the Solicitation Agent prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal. The Debtors also

reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including of the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

H. WITHDRAWAL OF BALLOTS; REVOCATION

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Solicitation Agent at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be received by the Solicitation Agent in a timely manner at the address set forth in Section XI.J. Prior to the filing of the Plan with the Bankruptcy Court, the Debtors intend to consult with the Solicitation Agent to determine whether any withdrawals of Ballots were received and whether the Requisite Acceptances of the Plan have been received. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots.

A purported notice of withdrawal of Ballots which is not received in a timely manner by the Solicitation Agent will not be effective to withdraw a previously cast Ballot.

Any party who has previously submitted to the Solicitation Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change his or its vote by submitting to the Solicitation Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received, only the Ballot which bears the latest date will be counted for purposes of determining whether the Requisite Acceptances have been received.

The Debtors will pay all costs, fees and expenses relating to the Solicitation, including customary mailing and handling costs of Nominees.

I. DELIVERY OF EXISTING SECURITIES

The Debtors are not at this time requesting the delivery of, and neither the Debtors nor the Solicitation Agent will accept, certificates representing any Existing Securities. In

connection with the Effective Date, the Debtors will furnish all record Holders of Existing Securities with appropriate letters of transmittal to be used to remit their Existing Securities in exchange for the distribution under the Plan. Information regarding such remittance procedure (together with all appropriate materials) will be distributed by the Reorganized Debtors after the Confirmation Date.

J.      FURTHER INFORMATION; ADDITIONAL COPIES

If you have any questions or require further information about the voting procedure for voting your Claim or about the Solicitation Package, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, the Plan Supplement or any exhibits to such documents (at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d)), please contact the Solicitation Agent:

> IES Ballot Processing
> c/o Financial Balloting Group LLC
> 757 Third Avenue, 3rd Floor
> New York, New York 10017
> (646) 282-1800

RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that Confirmation and consummation of the Plan is preferable to all other alternatives discussed herein. Consequently, the Debtors, with the support of the Ad Hoc Committee of Holders of Senior Subordinated Notes and of the Official Committee of Unsecured Creditors, urge all Holders of Eligible Claims and Eligible Equity Interests to vote to accept the Plan, and to complete and return their Ballots so that they will be received by the Solicitation Agent on or before 5:00 p.m., New York City time, on April 19, 2006.

Dated: March 17, 2006

INTEGRATED ELECTRICAL SERVICES, NC.


By:   */s/ Curt L. Warnock*
      Curt L. Warnock
      Senior Vice President

ALADDIN-WARD ELECTRIC & AIR, INC.
AMBER ELECTRIC, INC.
ARC ELECTRIC, INCORPORATED
BACHOFNER ELECTRIC, INC.
BEAR ACQUISITION CORPORATION
BRYANT ELECTRIC COMPANY, INC.
BW/BEC, INC.
BW CONSOLIDATED, INC.
CHARLES P. BAGBY CO., INC.
COLLIER ELECTRIC COMPANY, INC.
COMMERCIAL ELECTRICAL CONTRACTORS, INC.
CROSS STATE ELECTRIC, INC.
CYPRESS ELECTRICAL CONTRACTORS, INC.
DANIEL ELECTRICAL CONTRACTORS, INC.
DANIEL ELECTRICAL OF TREASURE COAST, INC.
DANIEL INTEGRATED TECHNOLOGIES, INC.
DAVIS ELECTRICAL CONSTRUCTORS, INC.
ELECTRO-TECH, INC.
EMC ACQUISITION CORPORATION
FEDERAL COMMUNICATIONS GROUP, INC.
GENERAL PARTNER, INC.
HATFIELD REYNOLDS ELECTRIC COMPANY
HOLLAND ELECTRICAL SYSTEMS, INC.
HOUSTON-STAFFORD ELECTRIC HOLDINGS III, INC.
HOUSTON-STAFFORD MANAGEMENT LLC
ICS HOLDINGS LLC
IES ALBUQUERQUE, INC.
IES AUSTIN, INC.
IES AUSTIN MANAGEMENT LLC
IES CHARLESTON, INC.
IES CHARLOTTE, INC.
IES COLLEGE STATION, INC.
IES COLLEGE STATION MANAGEMENT LLC
IES COMMUNICATIONS, INC.
IES CONTRACTORS MANAGEMENT LLC
IES DECATUR, INC.
IES EAST MCKEESPORT, INC.
IES ENC, INC.
IES ENC MANAGEMENT, INC.
IES MERIDIAN, INC.
IES NEW IBERIA, INC.
IES OKLAHOMA CITY, INC.

IES OPERATIONS GROUP, INC.
IES PROPERTIES, INC.
IES PROPERTIES MANAGEMENT, INC.
IES RALEIGH, INC.
IES RAPID CITY, INC.
IES RESIDENTIAL GROUP, INC.
IES SPECIALTY LIGHTING, INC.
IES VALDOSTA, INC.
IES VENTURES INC.
IES WILSON, INC.
INTEGRATED ELECTRICAL FINANCE, INC.
INTELLIGENT BUILDING SOLUTIONS, INC.
J.W. GRAY ELECTRIC CO., INC.
J.W. GRAY MANAGEMENT LLC
KAYTON ELECTRIC, INC.
KEY ELECTRICAL SUPPLY, INC.
LINEMEN, INC.
MARK HENDERSON, INCORPORATED
MENNINGA ELECTRIC, INC.
MID-STATES ELECTRIC COMPANY, INC.
MILLS ELECTRICAL CONTRACTORS, INC.
MILLS MANAGEMENT LLC
MITCHELL ELECTRIC COMPANY, INC.
M-S SYSTEMS, INC.
MURRAY ELECTRICAL CONTRACTORS, INC.
NBH HOLDING CO., INC.
NEAL ELECTRIC MANAGEMENT LLC
NEW TECHNOLOGY ELECTRICAL
   CONTRACTORS, INC.
NEWCOMB ELECTRIC COMPANY, INC.
PAN AMERICAN ELECTRIC COMPANY, INC.
PAN AMERICAN ELECTRIC, INC.
PAULIN ELECTRIC COMPANY, INC.
POLLOCK ELECTRIC, INC.
PRIMENET, INC.
PRIMO ELECTRIC COMPANY
RAINES ELECTRIC CO., INC.
RAINES MANAGEMENT LLC
RIVIERA ELECTRIC, LLC
RKT ELECTRIC, INC.
ROCKWELL ELECTRIC, INC.
RODGERS ELECTRIC COMPANY, INC.
RON'S ELECTRIC, INC.
SEI ELECTRICAL CONTRACTOR, INC.
SPECTROL, INC.
SUMMIT ELECTRIC OF TEXAS, INC.

TESLA POWER GP, INC.
THOMAS POPP & COMPANY
VALENTINE ELECTRICAL, INC.
WRIGHT ELECTRICAL CONTRACTING, INC.


By: _____*/s/ Curt L. Warnock*_____
      Curt L. Warnock
      Vice President

IES CONTRACTORS, INC.

Name: _____*/s/ Curt L. Warnock*_____
      Curt L. Warnock
      Secretary

BEXAR ELECTRIC COMPANY, LTD.
By:   BW/BEC, Inc., its general partner

Name: _____*/s/ Curt L. Warnock*_____
      Curt L. Warnock
      Vice President

HAYMAKER ELECTRIC, LTD
By:   General Partner, Inc., its general partner

Name: _____*/s/ Curt L. Warnock*_____
      Curt L. Warnock
      Vice President

HOUSTON-STAFFORD ELECTRICAL
CONTRACTORS LP
By:  Houston-Stafford  Management  LLC,  its
     general partner

Name: _____*/s/ Curt L. Warnock*_____
      Curt L. Warnock
      Vice President

**IES AUSTIN HOLDING LP**
By: IES Austin Management LLC, its general partner

Name: _/s/ Curt L. Warnock_
     Curt L. Warnock
     Vice President

**IES COLLEGE STATION HOLDINGS LP**
By: IES College Station Management LLC, its general partner

Name: _/s/ Curt L. Warnock_
     Curt L. Warnock
     Vice President

**IES FEDERAL CONTRACT GROUP, LP**
By: IES Contractors Management LLC

Name: _/s/ Curt L. Warnock_
     Curt L. Warnock
     Vice President

**IES MANAGEMENT ROO, LP**
By: Neal Electric Management LLC, its general partner

Name: _/s/ Curt L. Warnock_
     Curt L. Warnock
     Vice President

**IES MANAGEMENT, LP**
By: IES Residential Group, Inc., its general partner

Name: _/s/ Curt L. Warnock_
     Curt L. Warnock
     Vice President

**IES PROPERTIES, LP**
By: IES Properties Management, Inc., its general partner

Name: _/s/ Curt L. Warnock_
     Curt L. Warnock
     Vice President

J.W. GRAY ELECTRICAL CONTRACTORS LP

By: J.W. Gray Management LLC, its general partner

Name:  */s/ Curt L. Warnock*
     Curt L. Warnock
     Vice President

MILLS ELECTRIC LP

By: Mills Management LLC

Name:  */s/ Curt L. Warnock*
     Curt L. Warnock
     Vice President

NEAL ELECTRIC LP

By: BW/BEC, Inc., its general partner

Name:  */s/ Curt L. Warnock*
     Curt L. Warnock
     Vice President

POLLOCK SUMMIT ELECTRIC LP

By: Pollock Electric, Inc. and Summit Electric of Texas, Inc., its general partners

Name:  */s/ Curt L. Warnock*
     Curt L. Warnock
     Vice President

RAINES ELECTRIC LP

By: Raines Management LLC, its general partner

Name:  */s/ Curt L. Warnock*
     Curt L. Warnock
     Vice President

TESLA POWER AND AUTOMATION, L.P.

By: Tesla Power GP, Inc., its general partner

Name:  */s/ Curt L. Warnock*
     Curt L. Warnock
     Vice President

TESLA POWER PROPERTIES, LP
By:   Tesla Power GP, Inc., its general partner

Name:   */s/ Curt L. Warnock*
      Curt L. Warnock
      Vice President

BEXAR ELECTRIC II LLC
BW/BEC II LLC
BW/BEC, L.L.C.
HOUSTON-STAFFORD HOLDINGS II LLC
HOUSTON-STAFFORD HOLDINGS LLC
IES AUSTIN HOLDINGS II LLC
IES AUSTIN HOLDINGS LLC
IES COLLEGE STATION HOLDINGS II LLC
IES COLLEGE STATION HOLDINGS LLC
IES CONTRACTORS HOLDINGS LLC
IES HOLDINGS II LLC
IES HOLDINGS LLC
IES PROPERTIES HOLDINGS II LLC
J.W. GRAY HOLDINGS II LLC
J.W. GRAY HOLDINGS LLC
MILLS ELECTRIC HOLDINGS II LLC
MILLS ELECTRICAL HOLDINGS LLC
POLLOCK SUMMIT HOLDINGS II LLC
RAINES HOLDINGS II LLC
RAINES HOLDINGS LLC
TESLA POWER (NEVADA) II LLC


By:_____*/s/ Victor Duva*_____
     Victor Duva, Manager

IES PROPERTIES HOLDINGS, INC.
POLLOCK SUMMIT HOLDINGS, INC.
TESLA POWER (NEVADA), INC.


By:_____ */s/ Victor Duva*_____
     Victor Duva, President

**Addendum 1**

Integrated Electrical Services, Inc.
Aladdin-Ward Electric & Air, Inc.
Amber Electric, Inc.
ARC Electric, Incorporated
Bachofner Electric, Inc.
Bear Acquisition Corporation
Bexar Electric Company, Ltd.
Bexar Electric II LLC
Bryant Electric Company, Inc.
BW/BEC, Inc.
BW/BEC II LLC
BW/BEC, L.L.C.
BW Consolidated, Inc.
Charles P. Bagby Co., Inc.
Collier Electric Company, Inc.
Commercial Electrical Contractors, Inc.
Cross State Electric, Inc.
Cypress Electrical Contractors, Inc.
Daniel Electrical Contractors, Inc.
Daniel Electrical of Treasure Coast, Inc.
Daniel Integrated Technologies, Inc.
Davis Electrical Constructors, Inc.
Electro-Tech, Inc.
EMC Acquisition Corporation
Federal Communications Group, Inc.
General Partner, Inc.
Hatfield Reynolds Electric Company
Haymaker Electric, Ltd.
Holland Electrical Systems, Inc.
Houston-Stafford Electric Holdings III, Inc.
Houston-Stafford Electrical Contractors LP
Houston-Stafford Holdings II LLC
Houston Stafford Holdings LLC
Houston-Stafford Management LLC
ICS Holdings LLC
IES Albuquerque, Inc.
IES Austin, Inc.
IES Austin Holding LP
IES Austin Holdings II LLC
IES Austin Holdings LLC
IES Austin Management LLC
IES Charleston, Inc.
IES Charlotte, Inc.
IES College Station, Inc.

IES College Station Holdings II LLC
IES College Station Holdings LLC
IES College Station Holdings, LP
IES College Station Management LLC
IES Communications, Inc.
IES Contractors Holdings LLC
IES Contractors, Inc.
IES Contractors Management LLC
IES Decatur, Inc.
IES East McKeesport, Inc.
IES ENC, Inc.
IES ENC Management, Inc.
IES Federal Contract Group, L.P.
IES Holdings II LLC
IES Holdings LLC
IES Management, LP
IES Management ROO, LP
IES Meridian, Inc.
IES New Iberia, Inc.
IES Oklahoma City, Inc.
IES Operations Group, Inc.
IES Properties Holdings II LLC
IES Properties Holdings, Inc.
IES Properties, Inc.
IES Properties, LP
IES Properties Management, Inc.
IES Raleigh, Inc.
IES Rapid City, Inc.
IES Residential Group, Inc.
IES Specialty Lighting, Inc.
IES Valdosta, Inc.
IES Ventures Inc.
IES Wilson, Inc.
Integrated Electrical Finance, Inc.
Intelligent Building Solutions, Inc.
J.W. Gray Electric Co., Inc.
J.W. Gray Electrical Contractors LP
J.W. Gray Holdings II LLC
J.W. Gray Holdings, LLC
J.W. Gray Management LLC
Kayton Electric, Inc.
Key Electrical Supply, Inc.
Linemen, Inc.
Mark Henderson, Incorporated
Menninga Electric, Inc.
Mid-States Electric Company, Inc.

Mills Electrical Contractors, Inc.
Mills Electric Holdings II LLC
Mills Electrical Holdings LLC
Mills Electric, LP
Mills Management LLC
Mitchell Electric Company, Inc.
M-S Systems, Inc.
Murray Electrical Contractors, Inc.
NBH Holding Co., Inc.
Neal Electric LP
Neal Electric Management LLC
New Technology Electrical Contractors, Inc.
Newcomb Electric Company, Inc.
Pan American Electric Company, Inc.
Pan American Electric, Inc.
Paulin Electric Company, Inc.
Pollock Electric, Inc.
Pollock Summit Electric LP
Pollock Summit Holdings II LLC
Pollock Summit Holdings, Inc.
PrimeNet, Inc.
Primo Electric Company
Raines Electric Co., Inc.
Raines Electric LP
Raines Holdings II LLC
Raines Holdings LLC
Raines Management LLC
Riviera Electric, LLC
RKT Electric, Inc.
Rockwell Electric, Inc.
Rodgers Electric Company, Inc.
Ron's Electric, Inc.
SEI Electrical Contractor, Inc.
Spectrol, Inc.
Summit Electric Of Texas, Inc.
Tesla Power And Automation, L.P.
Tesla Power GP, Inc.
Tesla Power Properties, L.P.
Tesla Power (Nevada) II LLC
Tesla Power (Nevada), Inc.
Thomas Popp & Company
Valentine Electrical, Inc.
Wright Electrical Contracting, Inc.